## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

TELESERVICES GROUP, INC.,

    Debtor.

_____/

MARCIA R. MEOLI, Trustee,

    Plaintiff,

vs.

THE HUNTINGTON NATIONAL BANK,

    Defendant.

_____/

Case No.  HG 05-00690

Adv. Pro. No.  07-80037

### <u>OPINION RE: BIFURCATED ISSUES</u>

Appearances:

Douglas A. Donnell, Esq., and John E. Anding, Esq., Attorneys for Plaintiff
Robert S. Hertzberg, Esq., Laurence Z. Shiekman, Esq., and Frank H. Griffin, IV, Esq.,
    Attorneys for Defendant

Trustee Marcia Meoli has sued The Huntington National Bank ("Huntington") to recover

over $73 million[1] in fraudulent transfers Huntington allegedly received either directly from

Teleservices Group, Inc. ("Teleservices") itself or indirectly through a related company, Cyberco

---

[1]*See* Brief in Support of Trustee's Motion for Summary Judgment, Ex. A [DN 355]
(hereinafter "Trustee Brief, May 26, 2010").

Holdings, Inc.[2] This opinion addresses most, but not all, of the remaining factual and legal issues raised in this complicated case.[3]

## JURISDICTION

The court has jurisdiction to hear this adversary proceeding. 28 U.S.C. §§ 1334 and 157(b)(1). *See also* W.D. Mich. LCivR 83.2. The issue raised is also a core matter. 28 U.S.C. § 157(b)(2)(H). Therefore, the findings of fact and conclusions of law set forth in this opinion[4] are appealable pursuant to 28 U.S.C. § 158.

---

[2]Teleservices Group, Inc. and Cyberco Holdings, Inc. were related companies with a common owner. Cyberco Holdings also operated under a number of assumed names, including CyberNET Group and Cybernet Engineering. Cyberco Holdings, Inc. shall be referred to in this opinion as "Cyberco."

[3]Although Trustee seeks only the recovery of fraudulent transfers made by Teleservices, this adversary proceeding became entangled with the Cyberco bankruptcy proceeding through Huntington's motions to substantively consolidate the two Chapter 7 cases. Huntington contended that it was entitled to that relief as a matter of equity, which prompted both Chapter 7 trustees to assert that Huntington had unclean hands. Given that Huntington itself was claiming good faith as its primary defense to the Teleservices adversary proceeding and given that it and the unclean hands defense would likely turn on many of the same facts, the substantive consolidation motions and the Teleservices adversary proceeding were consolidated. The two defenses, as well as a number of other issues, were then separated from the rest of the dispute for early trial. *Cf.* FED. R. BANKR. P. 7042 and FED. R. CIV. P. 42. However, the need for a bifurcated trial became less apparent when the court eliminated the unclean hands defense just before trial.

Nonetheless, the trial proceeded as planned, with proofs being taken only with respect to the issues relegated to the first portion of the bifurcated proceeding. It took place over twelve days. Fifteen witnesses testified and the testimony of ten other witnesses was offered through nine excerpted deposition transcripts and one declaration. Numerous exhibits were also admitted.

The court has already denied Huntington's motions for substantive consolidation. *See In re Cyberco Holdings, Inc.*, 431 B.R. 404 (Bankr. W.D. Mich. 2010). Therefore, this opinion addresses only the issues raised at trial concerning the Teleservices adversary proceeding. This opinion also includes a summary of the court's dispositive pretrial rulings for context. And finally, the opinion identifies what remains to be decided along with some discussion in those instances where the record to date already includes a considerable amount of relevant evidence. However, the court will not dispose of any of these remaining issues until they are properly before it.

[4]*Cf.* FED. R. BANKR. P. 7052 and FED. R. CIV. P. 52.

2

## ASSESSING HUNTINGTON'S GOOD FAITH

Although Huntington has raised a number of issues in this adversary proceeding, the mainstay of its defense has been that it received all of the transfers from Teleservices in good faith. Indeed, this case presents the odd situation of Huntington asserting its good faith under Section 548(c)[5] with respect to some of the transfers and its good faith under Section 550(b)(1) with respect to other transfers. Therefore, it is appropriate to offer even before a discussion of the underlying facts some insight as to the court's conclusions concerning this admittedly illusive concept.

Recent case law strongly favors an objective approach to assessing a transferee's good faith under either section. This court, though, has determined that testing either Section 548(c) or Section 550(b)(1) good faith is in fact subjective, with the focus being upon traditional notions of honesty and integrity. In many ways, this conclusion should seem obvious. If the person accepting the transfer is able to establish his innocence vis-a-vis the debtor's fraudulent motives, a trier of fact would be hard pressed to still decide that he had taken in bad faith. If, though, that same person had actually participated in the deception, then it would be just as easy to conclude that his involvement in the transaction had been dishonest - i.e., not in good faith.

However, a transferee's honesty with respect to the fraud being perpetrated encompasses more than just complicity, for the transferee's mere awareness of the debtor's fraudulent intent would also cause his taking to be in bad faith. But a transferee is no more likely to admit that he knew of the debtor's fraudulent purpose at the time of receipt than would the debtor himself admit that he had

---

[5]11 U.S.C. § 548(c). Teleservices' petition pre-dates the October 17, 2005 effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L.No. 109-8, § 1501(b)(1), 119 Stat. 23. Unless otherwise indicated, all citations in this opinion to the Bankruptcy Code will be to the Bankruptcy Code as written prior to the BAPCPA amendments.

3

harbored such designs. Courts have for centuries used the so-called badges of fraud to assess a debtor's fraudulent intent. Should not, then, the same badges be relevant when the issue turns to determining whether the transferee himself was aware of any fraud?

Unfortunately, while the debtor's own fraud can be established simply through the existence of enough badges, a transferee's related good faith is also a function of his awareness of those badges. A question, then, inevitably arises as to what, if any, duty does the transferee have to investigate should some but not enough badges come to his attention at a particular point in time? Moreover, there is also the issue of retroactivity. If, for example, the transferee's investigation of a particular badge later leads him to the discovery of enough other badges to make him aware of the debtor's fraudulent intent, should the transfer previously received now be deemed to have been taken in bad faith? This latter question is especially important when the targeted transferee continued to receive transfers after the first suspicion arose, as is the case in this instance.

Questions like these have led this court to the further conclusion that a procedural component must be added to the good faith analysis whenever anything more than the simplest of fraudulent transfers is involved. That is, a court must in many cases assess not only whether the transferee conducted himself honestly and with integrity regarding the receipt of any particular transfer. The court must often assess as well whether the transferee conducted himself honestly and with integrity in addressing the receipt of a series of fraudulent transfers as a succession of badges evidencing that intent came to the transferee's attention.

And finally, this court recognizes that it is not the trustee who must prove the transferee's bad faith in accepting the transfer. Instead, it is the transferee who must establish that he had acted in good faith. Should, then, the transferee's response to suspicions at any time fall short of an honest

4

effort, the transferee would necessarily lose the ability to claim good faith going forward. But it follows as well that such a lapse should not negate what had been up to that point a good faith effort to investigate the recipient's suspicions concerning transfers already received. In other words, the transferee should be able to keep whatever he has received up to the point in time when either (1) he became aware of (or turned a blind eye to) enough badges of fraud to no longer be in good faith, or (2) his attempts to ferret out additional badges no longer represented an honest effort on his part.

In sum, Huntington's success in professing its good faith under the facts presented will depend upon whether Huntington has convinced this court that it honestly remained unaware of Teleservices' fraud for more than a year notwithstanding its growing suspicions. The court will now address those facts.

## FACTS

Huntington is a regional bank with its headquarters in Columbus, Ohio. Cyberco, which also went by CyberNET and CyberNET Group, had a short but tumultuous lending relationship with Huntington. It lasted only from September 2002 to October 2004.

Huntington administered the Cyberco loan through its West Michigan offices. Kelly Hutchings was the account officer and Cal Hekman her immediate boss. Both were members of the region's commercial lending group. John Irwin was the group's leader.

Irwin in turn reported to Jim Dunlap, Huntington's regional president. Other senior members of the West Michigan management team were John Kalb, the region's credit officer, Steve George, the region's special assets officer, and Larry Rodriguez, the region's security officer. And finally, there was Gail White. Although White was not in the commercial lending group, she became

5

intimately involved in the loan because of suspicions she had about both Cyberco and the large transfers it was receiving from another member of the Cyberco family – Teleservices.

Kalb and George each had a counterpart in Columbus. Larry Hoover was the senior credit officer for all of Huntington's loans. Michael Cross oversaw all of the regional special asset groups. Hoover and Cross, as well as others in Columbus, expected Kalb in particular to keep them informed about Cyberco once it was placed on Huntington's criticized asset list.

The loan closed in September 2002. It was a typical commercial loan, with a revolving line of credit based upon Cyberco's receivables, a term note, and some letters of credit. Like many commercial loans, it was collateralized by all of Cyberco's assets, including Cyberco's substantial accounts receivable. Huntington had intended to monitor those receivables through a lockbox. However, what Huntington discovered about a year into the relationship was that Cyberco was instead receiving most of its cash through large and regular transfers from Teleservices. No one at Huntington recognized that name. Cyberco answered Huntington's inquiries by explaining, untruthfully as it turned out, that Teleservices was a related company and that it was merely collecting Cyberco's own receivables on Cyberco's behalf. In truth, the transferred funds were actually the proceeds of a fraud that Cyberco and Teleservices together were perpetrating on unsuspecting equipment finance companies.

The Teleservices funds were being deposited into Cyberco's Huntington accounts. Huntington swept those accounts every day and then replenished them as needed through the line of credit. As a consequence, millions of dollars more than what Huntington was actually owed flowed through its hands. These additional amounts, together with the paydown of Huntington's own loan, represent what the Teleservices trustee now seeks to recover.

6

It was White who inadvertently discovered the Teleservices transfers in the fall of 2003. Although Huntington did not learn of the lie until much later, the relationship was already strained enough at that time to convince Huntington that Cyberco should leave the bank. Here is a brief chronology of subsequent events:

| | | |
|---|---|---|
| January 2004 | - | Cyberco was asked to find a new lender. |
| April 2004 | - | Cyberco was given a second ninety-day extension to accomplish this exit strategy. |
| Summer 2004 | - | Cyberco did not find a new lender but instead began paying down the Huntington loan with even more funds received from Teleservices. |
| Fall 2004 | - | Huntington was repaid the remaining Cyberco balance with checks from Teleservices made payable directly to it. |

This adversary proceeding, then, can be summarized in so many paragraphs. However, the details unfold like a tragic play, with Kalb, White, Rodriguez, and George each having a part.[6] Through all of them is revealed both Huntington's good faith and its turning a blind eye. The story also shows how a seemingly insignificant decision can lead to enormous loss. But most of all, it speaks of Huntington's misplaced trust in an unscrupulous con man - Barton Watson.

The Set-Up

The story is best told by turning first to March 2004. Many months had passed since Gail White had begun investigating Cyberco and the Teleservices transfers.[7] Her previous meetings with

---

[6]Huntington also agrees that Kalb, White and George were important actors. Def. Huntington Nat'l Bank Post-Tr. Memo., 59 (hereinafter "Huntington Post-Tr. Memo"). Huntington and the court differ only as to Rodriguez's importance.

[7]White at 206-07, 220, 227, Nov. 5, 2009 [DN 290].

7

Kalb had not met with much success. All he kept telling her was to keep on digging. This time, though, she was sure she could convince him of Cyberco's fraud.[8]

Cyberco had started rather modestly in the late 1980s.[9] However, by 2002, Cyberco was holding itself out as a fast growing, tech savvy company.

> With its world headquarters based in Grand Rapids, Michigan, CyberNET is the internationally recognized front-runner in the design, deployment and operation of information technology infrastructures necessary to put mission-critical corporate data into the hands of users.

Huntington's 2002 Shareholder Report.[10]

Cyberco's previous lender had been in Chicago. However, according to Cyberco, the relationship soured after a much larger bank had acquired it. Cyberco also wanted a more locally oriented lender.[11] Huntington was ecstatic.

> A global technology leader like the CyberNET Group can do business with any bank it chooses. Why it chose Huntington goes to the heart of the essential partnership concept.

Huntington's 2002 Shareholder Report.[12]

---

[8]White at 217, 235, Nov. 5, 2009 [DN 290]; White at 50-51, Nov. 6, 2009 [DN 291]; Kalb at 196-97, 265-70, 279, 282, Dec. 14, 2009 [DN 274]; Kalb at 11, 13-14, 34, Dec. 15, 2009 [DN 271].

[9]Horton at 26, Jan. 4, 2010 [DN 295].

[10]Trustee Ex. 30.

[11]Hekman at 87, Nov. 5, 2009 [DN 290]; *see also* Horton at 58, Jan. 4, 2010 [DN 295]. James Horton was the second in command at Cyberco. He was also one of Watson's co-conspirators.

[12]Trustee Ex. 30.

Huntington immediately replaced Cyberco's existing line of credit with its own line. It then increased the line within months. Huntington also financed various equipment acquisitions and issued letters of credit. By the time of White's March 2004 meeting with Kalb, Cyberco owed Huntington over $16 million.[13]

White had been only vaguely aware of Cyberco prior to September 2003. However, it happened that she alone had the authority late one Friday afternoon to look at a returned check that Cyberco had deposited a few days before. The payor was a company called Teleservices. White had to decide whether to continue crediting Cyberco's account for the $2.3 million deposit; otherwise, checks that Cyberco itself had written would begin to bounce. White chose not to extend the credit.[14]

This was not the first time that Cyberco had been significantly overdrawn on its accounts. An overdraft had previously occurred in December 2002 and another had occurred in February 2003. Moreover, Cyberco had requested two "hard holds" within the last six months.[15]   Therefore,

---

[13]Trustee Ex. 23 at 8; Trustee Ex. 46 at 3-5.

[14]White at 206-07, Nov. 5, 2009 [DN 290].

[15]Hutchings at 99-102, 110, Dec. 15, 2009 [DN 271]; Trustee Exs. 31, 35, 43. A "hard hold" involved Huntington shutting down the automated clearing house service that it provided in connection with Cyberco's deposit accounts. Cyberco had requested the hold in each instance based upon a pretended fear that its electronic accounting systems had been compromised. Each hold worked to Cyberco's advantage by temporarily delaying the clearing of deposits made into the account. Getschow at 12-15, Dec. 16, 2009 [DN 272] (Getschow supervised the region's treasury department).

Huntington decided that a meeting with Barton Watson, Cyberco's chairman and CEO, was in order.[16]

Watson was extremely intelligent and well heeled. His office was opulent. He drove exotic cars, drank fine wines, and jetted about the world. Watson even had an exclusive "Black Card."[17] But Watson was also a bully. He intimidated others with his intellect and lifestyle. And like all bullies, he had a temper. Those who crossed Watson risked incurring his immediate wrath.[18]

Huntington and Watson met on October 2, 2003. Kelly Hutchings, the Cyberco account officer, and Cal Hekman, who was Hutchings' boss, both attended. White was also asked to come along. What had prompted her invitation was White's discovery that the returned Teleservices check was only the most recent in a series of Teleservices checks, all in large amounts, that Cyberco had begun depositing a few months earlier.[19] Neither Hutchings nor Hekman was aware of any of these

---

[16]Hutchings at 117-18, Dec. 15, 2009 [DN 271]; Getschow at 14-15, Dec. 16, 2009 [DN 272]; Trustee Ex. 208; Hunt. Ex. 109.

[17]Hekman at 84, 89, Nov. 5, 2009 [DN 290]; Dunten at 57-61, Dec. 16, 2009 [DN 272]; Horton at 48-49, 66, Jan. 4, 2010 [DN 295]; Trustee Ex. 44; Hunt. Ex. 180 at FBI 00138. American Express offered its Centurion Card, a/k/a the "Black Card," by invitation only in the early 2000s. Even today, eligibility is very restricted. The elite few who are issued a card must pay $2,500 annually after first paying a $5,000 initiation fee.

[18]Horton at 11, 66, 78, 92, 97, 106, 132, 154, Jan. 4, 2010 [DN 295]; Kotlarz-Watson Dep., Hunt. Ex. 293 at 11, 22, 25, 27; Mast Dep., Hunt. Ex. 294 at 62-64; Roepke Dep., Hunt. Ex. 295A at 107, 108; Trustee Ex. 101.

[19]White also attended the meeting just in case Watson wanted an explanation for why White had not continued to credit Cyberco's account for the returned Teleservices check. White at 212-13, Nov. 5, 2009 [DN 290]; Hutchings at 117-18, Dec. 15, 2009 [DN 271]; Getschow at 14-15, 32, Dec. 16, 2009 [DN 272].

transfers.  Nor did they know anything about the company.  Therefore, Teleservices was added to the agenda and White became involved.[20]

Watson explained at the meeting that Teleservices was a new addition to the Cyberco family that was not yet operational.  Its purpose, he said, would be to oversee internal finances for all of Cyberco's far flung operations, including the collection of Cyberco's receivables.  He indicated that Teleservices would be providing help desk services to third party customers as well.[21]

Watson's explanation satisfied Hekman and Hutchings, at least for the moment.  However, White had her doubts.  Having the same company provide customer services and also manage funds didn't seem like a logical fit.  Moreover, Watson's statement that Teleservices was not yet operational was inconsistent with the fact that Teleservices had already been transferring large amounts to Cyberco during the preceding three months.  Indeed, the checks Teleservices had delivered to Cyberco during this interval had been from a sequence of only ten checks.  Why wasn't Teleservices also writing more checks to other members of the Cyberco family?[22]

She immediately took her concerns to Kalb.  Again, John Kalb was the credit officer for Huntington's West Michigan operations.  Not only did he report directly to Dick Witherow in Columbus; he also reported indirectly to Dunlap, the regional president.  Kalb's responsibilities included both signing off on new loans proposed by the commercial lending group and assisting the group in its management of existing loans as issues arose.  He had both an MBA and a law degree.

---

[20]White at 212-13, Nov. 5, 2009 [DN 290]; Hutchings at 117-18, Dec. 15, 2009 [DN 271].

[21]Hekman at 96, White at 214-15, Nov. 5, 2009 [DN 290]; Hutchings at 118, Dec. 15, 2009 [DN 271]; Getschow at 19, Dec. 16, 2009 [DN 272]; Trustee Exs. 58, 59.

[22]Hekman at 98, 102, 173, White at 215-216, Nov. 5, 2009 [DN 290]; White at 19-21, 48, Nov. 6, 2009 [DN 291]; Hutchings at 119, Dec. 15, 2009 [DN 271].

11

He also had the reputation of being a worrier, which undoubtedly was a good attribute for someone in his position.[23]

Although White did not work for Kalb, he had in the past assigned her special projects from time to time.[24]  Kalb agreed with White that it was worth learning more about Cyberco and Teleservices.  Therefore, he encouraged her to look into it further.[25]

White's immediate concern was that the two companies were kiting checks.  However, that fear was quickly allayed when Teleservices began making the transfers by wire.[26]  Consequently, White focused more and more of her attention upon the lockbox that the parties had established at the outset of the relationship.[27]  Huntington had hoped to use the lockbox to monitor what was

---

[23]Irwin at 245-46, Nov. 4, 2009 [DN 273]; White at 216-17, Nov. 5, 2009 [DN 290]; White at 50-51, Nov. 6, 2009 [DN 291]; Kalb at 179, 183, 199-202, Dec. 14, 2009 [DN 274]; Trustee Ex. 76.

[24]White actually was a senior vice president in another department.  She managed operations and the administrative assistants within that department.  White at 204-06, Nov. 5, 2009 [DN 290]; Kalb at 228-29, Dec. 14, 2009 [DN 274].

[25]White at 217, Nov. 5, 2009 [DN 290]; Kalb at 195-96, Dec. 14, 2009 [DN 274].

[26]Check kiting is illegal.  A kite takes place when a customer uses accounts at different banks to take advantage of the delay between the deposit of a check in one account and its later payment from another.  White suspected check kiting because Cyberco's accounts were in Grand Rapids while Teleservices' account was in California.  However, Teleservices' switch to wire transfers eliminated check kiting as a possibility because there is no delay between a wired deposit and its payment.  White at 219, Nov. 5, 2009 [DN 290]; Hutchings at 198, Dec. 15, 2009 [DN271]; Trustee Ex. 108.

[27]The lockbox arrangement contemplated all of Cyberco's customers directly depositing the receivables due Cyberco into a single account maintained by Huntington.  That account was then to be regularly swept in order to reduce the line of credit.  In turn, Huntington would meet Cyberco's cash needs through new advances on the same line.

without question the largest component of its collateral base. Obviously, that purpose was not served if the receivables were being collected by Teleservices instead.[28]

White nonetheless attempted to track Cyberco's receivables. Unfortunately, White had little to work with apart from the reports that Cyberco itself was providing. In fact, White's investigation was limited for the most part to collecting whatever data she could from the bank accounts Cyberco maintained at Huntington. All that she was able to prepare from this data was a spreadsheet that charted the many wire transfers in and out of Cyberco's accounts. Most of the incoming transfers continued to be from Teleservices. As for the outgoing transfers, most were to financial institutions that had funded Cyberco's ongoing purchases of computer equipment either by lease or by loan.[29] What White was able to discern as time progressed was that the transfers in from Teleservices and the transfers out to the financial institutions were both increasing in amount.[30]

White's March 2004 meeting with Kalb was another one of her biweekly updates. She really had not found much to substantiate her suspicions until then. But this was the first time she had a Cyberco receivables aging report and it spoke volumes. Watson had always claimed that Cyberco's customers simply refused to pay their accounts through the lockbox. However, the aging provided to White revealed a virtual who's who of Fortune 500 companies – Boeing, Cargill, and Electronic

---

[28]Hekman at 118, White at 228, 263-69, Nov. 5, 2009 [DN 290]; Hutchings at 267, Dec. 15, 2009 [DN 271]; Getschow at 22-23, Dec. 16, 2009 [DN 272].

[29]White also discovered some Cyberco wire transfers involving both China and Pakistan. White understood that both countries were frequently used to launder money. However, White never thought that Cyberco's transactions with those countries were ever large enough in amount or frequency to raise concern. White at 208-11, 218, 220-21, 223-24, Nov. 5, 2009 [DN 290]; White at 24-25, 30-31, 53, Nov. 6, 2009 [DN 291]; Trustee Exs. 94, 209.

[30]White at 32-33, Nov. 6, 2009 [DN 291].

Data Systems were only three of the many named. [31] It made no sense that customers like these would be uncomfortable remitting their payments to a lockbox. Nor could White understand why a large technology provider like Electronic Data Systems would be a substantial customer of Cyberco when EDS itself would presumably be providing the very same services to its own customers. Therefore, White was convinced now more than ever that Cyberco was at the very least defrauding Huntington by overstating its accounts receivables through the inclusion of fictitious customers. [32]

Although White may have been frustrated with Kalb's response up to that point, Kalb had had his own doubts about Cyberco all along. He, as the regional credit officer, had been involved in the decision-making from the very outset. He knew even then that the computer services business was risky and that there was a tendency in the industry to overstate receivables by prematurely reporting uncompleted projects as fully earned. He was also uneasy because Cyberco had not covered the two overdrafts that had occurred earlier as Huntington's zero tolerance policy required. [33] To the contrary, it was Huntington that had covered the shortfalls through a further increase in Cyberco's line of credit. [34]

---

[31]Trustee Ex. 92. The aging report also showed large account balances due. For example, it indicated that Boeing and EDS each owed Cyberco over one million dollars.

[32]White at 217, 224-26, 229-35, Nov. 5, 2009 [DN 290]; White at 28, 51, 55, 75-76, Nov. 6, 2009 [DN 291]; Kalb at 265-70, Dec. 14, 2009 [DN 274]; Kalb at 14, Dec. 15, 2009.

[33]Shady customers will use overdrafts as an unconventional means of "borrowing" from a bank. Therefore, Huntington expected its customers to maintain sufficient funds on hand at all times. White at 67, Nov. 6, 2009 [DN 291]; Kalb at 184-85, 189-90, 196, 215-16, 232, 243-44 Dec. 14, 2009 [DN 274]; Kalb at 21, Dec. 15, 2009; Trustee Exs. 32, 36, 61.

[34]Irwin at 198, Nov. 4, 2009 [DN 273]; Kalb at 234, 247, Dec. 14, 2009 [DN 274]; Kalb at 21, Dec. 15, 2009 [DN 271]; Hutchings at 100, 273-74, Dec. 15, 2009 [DN 271; Trustee Exs. 31, 86.

14

There was also the matter of Cyberco's audited financial statements. The loan documents required Cyberco to provide audited statements to Huntington within ninety days of Cyberco's calendar year end. However, it was now March of 2004 and Huntington had yet to receive even Cyberco's 2002 statements. All that it had was Cyberco's repeated promises that they would be forthcoming as soon as its auditors could get a sign off with respect to a sale or merger of one of Cyberco's subsidiaries.[35]

Again, Huntington had already told Cyberco earlier that year that it should find a new bank and Kalb had also been instrumental in that decision. The others involved – i.e., the three commercial loan officers – all attributed the move to Huntington's inability to fully understand Cyberco's business and Huntington's own limitations as a global financier. [36] Kalb, though, had much deeper concerns. Here is how Kalb himself explained the decision to Jim Dunlap, the regional president, after Dunlap's return from vacation:

> John Irwin, Cal Hekman, Kelly Hutchings and I had a meeting relating to Cyberco and despite the "good numbers" the "red flags" continue. It is our joint conclusion that we should exit the account and I give the team [i.e., the commercial lending group] credit for taking this step despite outward financial performance. If there is one thing that has been clear about recent times it is the heightened risk of financial misinformation (as well as fraud) and we need to be cognizant of that fact as we see these red flags. We will keep you informed as to how we will communicate this exit to the client or

---

[35]Hekman at 103, Nov. 5, 2009 [DN 290]; Kalb at 194-95, 204, Dec. 14, 2009 [DN 274]; Hutchings at 122, Dec. 15, 2009 [DN 271]; Trustee Ex. 23 at 17.

[36]Irwin at 159-61, 231-33, Nov. 4, 2009 [DN 273]; Hekman at 146-47, Nov. 5, 2009 [DN 290]; Kalb at 198, Dec. 14, 2009 [DN 274]; Hutchings at 126, Dec. 15, 2009 [DN 271].

15

> if there is another chapter to the saga. Here is hoping we don't lose money in the process.

Jan. 9, 2004 Email.[37]

Kalb referred to these same red flags days later in an email to Witherow, his own boss in Columbus. Particularly telling was Kalb's final comment - "So we have no 'demonstrable' financial reason to be worried but we are anyway."[38]

Kalb, then, was clearly not indifferent to what White had been reporting to him prior to the latest meeting she had scheduled. He too was suspicious of both Cyberco and Watson; perhaps even more so. The problem, though, was that he had nothing more than his suspicions to act upon. White had certainly not found anything concrete up to that point. Nor had his other efforts to investigate uncovered anything. Kalb himself had called Cyberco's attorney after the two overdrafts in early 2003. The attorney's response was "glowing." [39] And, after learning of the transfers from Teleservices, Kalb ordered a personal background check on Watson. That effort likewise came up clean. As Kalb also reported to Witherow in his January email – "Every time we did additional 'deep dives,' the people and the company always checked out."[40]

Kalb agreed by the end of their March 2004 meeting that White may have finally found something. The aging report did suggest that Cyberco was committing receivables fraud. Therefore,

---

[37]Trustee Ex. 76. Kalb at 200-01, Dec. 14, 2009 [DN 274]; Kalb at 17-20, Dec. 15, 2009 [DN 271]; Trustee Ex. 78.

[38]Kalb at 179, Dec. 14, 2009 [DN 274]; Trustee Ex. 78.

[39]White at 224, Nov. 5, 2009 [DN 290]; Kalb at 192, Dec. 14, 2009 [DN 274].

[40]Kalb at 197, Dec. 14, 2009 [DN 274]; Hutchings at 123-24, Dec. 15, 2009 [DN 271]; Trustee Ex. 78.

16

Kalb had White contact Huntington's security department, which ultimately led her to Larry Rodriguez, the region's head of security. Rodriguez was an experienced investigator, having served in that capacity with the Michigan State Police before retiring and joining Huntington. Although he, like Kalb, reported directly to Huntington's corporate headquarters, he by necessity interacted with the rest of West Michigan's senior management, including Dunlap and Kalb.[41]

Rodriguez immediately reviewed White's file, including her spreadsheets. He then interviewed her a few weeks later. He also did some investigating on his own. It included going through local court records and speaking with an acquaintance at the FBI. The contact told Rodriguez that Cyberco and its principals were under investigation. However, Rodriguez was not provided with any details.[42]

It took Rodriguez about a month to get to this point. He agreed with White that it was unlikely that Cyberco and Teleservices were kiting checks because the transfers were by wire and all in one direction. He had also decided by this time that it really didn't matter to Huntington whether Cyberco was overstating its receivables or not so long as Cyberco continued with the exit plan of finding a new lender. And finally, Rodriguez figured that the FBI's own investigation would uncover anything else that might be untoward at Cyberco.[43]

---

[41]White at 234-37, Nov. 5, 2009 [DN 290]; White at 75-76, 80-81, Nov. 6, 2009 [DN 291]; Kalb at 205-06, Dec. 14, 2009 [DN 274]; Rodriguez at 7-9, 19-20, 29, 36, 48, 102, 148, Dec. 14, 2009 [DN 274]; Trustee Exs.108, 134.

[42]White at 67, Nov. 6, 2009 [DN 291]; Rodriguez at 14-18, 23-26, 28, 29-31, 65, 74-77, 105, 128-29, 130-31, 133, 140, Dec. 14, 2009 [DN 274]; Trustee Ex. 220.

[43]Rodriguez at 28-29, 41-42, 111, 135, 136, Dec. 14, 2009 [DN 274]; Trustee Ex. 108.

Therefore, Rodriguez closed his file, at least until something further turned up. He did report back to Richard Harp, Huntington's director of security. Beyond that, though, he did little else. In particular, he never spoke with either Kalb or White about what he had discovered in the court records.[44]

It was not as though Kalb and White had lost interest. White continued to add to her spreadsheets whatever information she could concerning the Teleservices deposits and Cyberco's own cash disbursements. She also, with Huntington's approval, cooperated with the FBI as it later extended its investigation to reviewing Huntington's files and interviewing bank personnel.[45]

As for Kalb, he remained interested in the progress of Cyberco's anticipated exit. The failure to provide audited financials for 2002 and now 2003 continued to be a concern even though Kalb, like everyone else, hoped that Cyberco would soon be gone. Questions about Teleservices also remained. James Horton, who was Cyberco's second in command, had finally answered an inquiry that Hutchings had made months earlier. Horton's memo did include some additional information about Teleservices. However, this time Cyberco's explanation was that Teleservices was an existing company that Krista Kotlarz, Watson's wife, had owned some time ago and that Cyberco was now in the process of re-acquiring to provide outsourcing services in the Philippines.[46]

---

[44]Rodriguez at 9, 14, 17-21, 28-31, 34, 36-37, 77-80, 83, 88, 90, 121, 135, 139-40, 145-46, 155-56, 158-59, Dec. 14, 2009 [DN 274]; Trustee Exs. 104, 105, 108, 109, 134, 143.

[45]White at 245-47, 252-56, Nov. 5, 2009 [DN 290]; White at 21, 60-62, 119-20, 133, Nov. 6, 2009 [DN 291]; Trustee Ex. 222.

[46]Kalb at 214-15, Dec. 14, 2009 [DN 274]; Kalb at 58-63, 71, Dec. 15, 2009 [DN 271]; Hutchings at 231-32, Dec. 15, 2009 [DN 271]; Trustee Exs. 98, 107, 108, 109, 113, 143.

But that was it. Still lacking were answers to what had piqued Huntington's curiosity in the first place - the millions of dollars that Teleservices was continuing to transfer to Cyberco and the related under-utilization of the lockbox. Also lacking was any further information about Teleservices becoming Cyberco's finance arm. To the contrary, Horton mentioned in the same memo that a new holding company was being formed to provide treasury services to Cyberco and its affiliates.[47]

Nor was Kalb content to leave the accounts receivable investigation to corporate security. Hutchings and he had both agreed with White's suggestion that Huntington itself send account verifications to customers selected from the February aging. Therefore, a receivables audit was added as a condition for any further extension of the line of credit, which was now scheduled to expire on April 30, 2004. Watson, however, hit the roof when he learned of this requirement. He made it absolutely clear that no one from Huntington was to speak with any of Cyberco's customers.[48] In Watson's words, he was "appalled that anyone would even suggest such an action since customers would of course smell a rat of some kind."[49]

Watson did suggest a compromise. What he proposed, and what Huntington ultimately agreed to, was for Grant Thornton, an internationally recognized accounting firm, to conduct an independent audit through its Hong Kong office. Grant Thornton issued its report in early May, which coincided with Rodriguez's decision to close his investigation. The report indicated that

---

[47]Hutchings at 233, Dec. 15, 2009 [DN 271]; Trustee Exs. 98, 107.

[48]Kalb at 206-07, Dec. 14, 2009 [DN 274]; Kalb at 40-44, Hutchings at 136-38, Dec. 15, 2009 [DN 271]; Trustee Exs. 96, 101, 103.

[49]Trustee Ex. 101.

19

Grant Thornton had received a 100% response to the sampling of customers it had selected from Cyberco's posted receivables. The report further indicated that all but one response confirmed the balances stated and that the one deviation was insignificant.[50]

Kalb also learned at about the same time that the FBI had served the bank with subpoenas as part of its own investigation of Cyberco. Kalb assumed that the investigation involved tax problems, which was not something to get too alarmed about. Nonetheless, he did attempt to follow up with Rodriguez. But Rodriguez was tightlipped. Moreover, when Kalb suggested that Watson himself be confronted, he was persuaded not to on the basis that it would impede the FBI's investigation. Kalb was instead encouraged to continue as if all was normal with Cyberco.[51]

Normal meant that Kalb signed off on another ninety-day extension of Cyberco's line of credit, this time to August 1. Although finding a new lender continued as the preferred option, Kalb began to prepare for a more aggressive approach. For example, he had already begun speaking with Steve George, the head of the region's special asset group. As its leader, George would frequently offer advice concerning problem loans and, in appropriate circumstances, his group would actually assume responsibility for a particularly troublesome account. George himself had had considerable experience in both commercial lending and commercial credit before becoming a special assets officer in the late 1980s.[52]

Kalb shared with George the same misgivings that he had shared with Dunlap and Witherow months before - that something did not seem quite right about Cyberco. In particular, he was

---

[50]Kalb at 43-44, Hutchings at 138, 152, Dec. 15, 2009 [DN 271]; Trustee Ex. 121.

[51]Kalb at 211, Dec. 14, 2009 [DN 274]; Kalb at 51-52, 55-56, Dec. 15, 2009 [DN 271].

[52]George at 69-75, 79-81, Dec. 16, 2009 [DN 272]; Trustee Ex. 117.

bothered by Cyberco's continued inability to provide audited financial statements and the general unfavorable direction in which the account was heading. Kalb, though, conceded once again that he himself had not come across anything to give substance to his suspicions.[53]

After looking at the file, George met with both Hutchings and Hekman, the two loan officers most familiar with the account. He spoke with White as well. His reaction to what he found was the same as Rodriguez's. That is, it was unlikely that there was check kiting because the deposits were by wire and receivables fraud was not a concern so long as Cyberco would be soon ending the relationship. Therefore, George saw no reason not to extend the line of credit another ninety days.[54] George did, though, agree with Kalb that there was enough to Kalb's concerns to warrant downgrading the credit to "9" so that George and his group could begin monitoring the Cyberco account as well.[55]

Although the extension's purpose was to provide more time to find a new lender, it became clearer and clearer as the new deadline approached that Cyberco was not going to secure replacement financing. In fact, by mid-July Cyberco had already on its own reduced the line of credit from $13 million to $7.5 million. Hutchings also reported on July 28 Horton's delivery of a $1.5 million

---

[53]George at 79-81, 191-92, Dec. 16, 2009 [DN 272].

[54]George at 79-86, 90-94, 164-67, Dec. 16, 2009 [DN 272]; Rodriguez at 28-29, 136, Dec. 14, 2009 [DN 274]; Trustee Ex. 230.

[55]Huntington rated the quality of its loans on a scale of one to twelve with "1" being the best. It had already downgraded the Cyberco loan from "5" to "8" in January, just after Cyberco was asked to leave. Trustee Exs. 67, 81, 111. The loan was downgraded again in April because Huntington's policy only permitted the special assets group to get involved with loans rated at "9" or worse. George at 79-81, 94, Dec. 16, 2009 [DN 272].

21

Teleservices check made payable directly to Huntington and Horton's promised delivery of two more checks in short order to cover the rest of what was owed.[56]

Huntington welcomed the news. However, George and Kalb had their doubts. George felt that the "sticky" part of the payoff was still to come. As for Kalb, he cautioned Cross and Hoover[57] to "keep your fingers crossed."[58]

George's and Kalb's comments proved prophetic, for Cyberco did not pay down the remaining loan balance by early August as Horton had promised. Instead, the three checks that Huntington did receive from Teleservices in August totalled only $950,000. Of course, by this time the line of credit was well past due and Huntington no longer had any intention of giving Cyberco a further extension. Therefore, on September 2, 2004, Huntington formally demanded that Cyberco repay all amounts then outstanding, which at that point was just over $6 million.[59]

Huntington thereafter received five more checks from Teleservices over the next two months, with the largest also being the last. That check cleared on October 29, 2004. George, who by then had assumed full responsibility for collection of the Cyberco debt, reported the last check had paid

---

[56]George at 193-94, Dec. 16, 2009 [DN 272]; Trustee Exs. 134, 136.

[57]Again, Michael Cross and Larry Hoover were members of Huntington's senior management in Columbus. Kalb was reporting to them in particular because Cyberco had been put on Huntington's criticized asset list earlier that year. Hoover Depo., Trustee Ex. 262D at 10-11, 14-15; Cross Depo., Trustee Ex. 263D at 9, 62-64, 68; Trustee Ex. 137.

[58]Trustee Ex. 136.

[59]Trustee Exs. 137, 140, 211.

in full all of Cyberco's direct obligations with Huntington and that only a $600,000 letter of credit remained. Kalb's response was "All I can say is 'whew'!!"[60]

The Fraud

The FBI raided Cyberco's offices later that year. What the FBI had uncovered was a massive fraud that far exceeded anything that White had imagined.

Cyberco had actually started as a legitimate business and Cyberco still had some real customers in 2002 when it lured Huntington into its web. However, by that time, Watson was resorting more and more to fraud to generate Cyberco's revenues. Indeed, virtually all of its revenue was attributable to fraud when Cyberco finally collapsed in late 2004.[61]

Watson's scheme was as simple as it was brazen.[62] He sought out banks, leasing companies, and other similar institutions on the pretext that Cyberco needed more computer equipment for its rapidly growing global business. However, Cyberco never acquired any of the equipment for which it had received funding. Rather, Watson would represent that Teleservices was Cyberco's source for the desired equipment and, as a consequence, the finance companies would forward the necessary funds to Teleservices on the mistaken belief that Teleservices had something to sell. Watson would then have Teleservices issue false invoices and other documents to evidence the supposed transaction. As for Cyberco, Watson packed its computer room with both real and fake servers. He

---

[60]Trustee Exs. 152, 153, 211.

[61]Horton at 28-29, 46-47, 66, Jan. 4, 2010 [DN 295]; Trustee Ex. 266D.

[62]Watson did not testify because he took his life shortly after the fraud was revealed. Witnesses who were familiar with Watson nonetheless identified him as the scheme's mastermind. For convenience, the court will only refer to Watson as the perpetrator of the fraud even though others, including Horton, actively assisted him in the endeavor.

23

then swapped serial numbers among those servers in order to deceive his victims whenever a collateral audit was attempted.[63]

Teleservices, of course, did not keep its ill-gotten gains. Rather, it funneled them back to Cyberco and Cyberco in turn used what it received: (1) to perpetuate the fraud by making payments on the many promissory notes and leases Cyberco had signed in connection with prior nonexistent purchases; and (2) to pay Cyberco's other operating expenses, including the handsome salaries and expense accounts of Watson and his fellow cheats. Of course, Watson accomplished this by depositing the transfers from Teleservices into Cyberco's Huntington accounts and Huntington in turn was regularly sweeping those accounts and the re-advancing as part of the cash management service it provided to Cyberco. Consequently, millions and millions of dollars passed through Huntington even though Cyberco's actual indebtedness to Huntington was considerably less.[64]

Huntington was no less a victim of Watson's schemes.[65] For example, Watson neglected to mention during the courtship that Cyberco's prior bank had in fact asked it to leave. Moreover, all of the financial information Cyberco had been providing to it, including the accounts receivable

---

[63]Horton at 31, 37-38, 42-44, 47, Jan. 4, 2010 [DN 295]. In hindsight, Watson's success at fooling so many sophisticated lenders seems unbelievable. For example, only a third to one-half of the servers on site were real. The rest were empty boxes with flashing lights. Indeed, reports are that the room in which everything was crammed was not sufficiently air conditioned to draw off the heat that would have been generated had all of the servers been in fact operational. As for the serial numbers, Watson simply used off-the-shelf label making software to print out bogus serial number tags that could be pulled off and reattached as the need arose.

[64]Horton at 31, 51, 76, 107-08, 120, Jan. 4, 2010 [DN 295]; Roepke Depo., Hunt. Ex. 295A at 75-81.

[65]Some of the leasing companies accused Huntington of aiding and abetting Cyberco's fraud. However, the district court summarily dismissed that count in separate litigation that has paralleled this proceeding. *See El Camino Resources, Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875 (W.D. Mich. 2010).

reports, was false. Indeed, Watson duped both Grant Thornton and Huntington in connection with the April 2004 receivables audit by providing Grant Thornton with fake responses prepared by his cohorts.[66]

It also turned out that Watson had a past. As already indicated, one of Kalb's "deep dives" had been to verify Watson's background. The report had come back clean but only because Watson had provided a false social security number. What Huntington discovered a few months later was that Watson was, among other things, (1) a former stockbroker who had been permanently blacklisted by the National Association of Securities Dealers; (2) someone who had previously confessed to a civil judgment for bank fraud in Michigan and an earlier fraud in California; and (3) a convicted felon who had actually served three years during the 1980s for a fraud-related crime. Moreover, it was Rodriguez, the region's chief of security, who first discovered that Watson "was not a very trustworthy person."[67] Remember, as part of his assignment to investigate Cyberco's possible fraud, Rodriguez had visited the county court in April to examine its files. What he found was pending litigation against Cyberco that both revealed and documented Watson's fraudulent past.[68]

Rodriguez clearly understood the significance of his discovery, for he immediately informed the FBI about what he had learned. [69] Yet Rodriguez never provided this information to Kalb.

---

[66]Horton at 76-78, 87-88, Jan. 4, 2010 [DN 295].

[67]Rodriguez at 30, 140-145, Kalb at 197, Dec. 14, 2009 [DN 274]; Trustee Ex. 220.

[68]Rodriguez at 30, 140-145, Dec. 14, 2009 [DN 274]; Trustee Ex. 220.

[69]Rodriguez at 30-31, 140-145, Dec. 14, 2009 [DN 274]; Trustee Exs. 220, 228B. Rodriguez also believes he shared his discovery with Richard Harp, Huntington's director of corporate security. In addition, George recalls Rodriguez telling him sometime later about Watson's conviction.

Indeed, Kalb recalls Rodriguez as being reluctant to share any information with him when Kalb did make the effort to ask.[70]

One, then, can only wonder how Kalb or, for that matter, anyone who was privy to Watson's recent "clean" background check would have responded in April or any time afterwards had Rodriguez disclosed Watson's true past. That Watson was an accomplished con man would presumably have been damning in and of itself. However, Rodriguez's discovery, if it had been shared with Kalb, would have also established without any question that Watson had intentionally deceived Huntington only months before by providing a false social security number in connection with the background check. And with this revelation would presumably have also come the realization that Kalb's instincts had been correct all along – that there was reason to doubt anything that Watson had been telling Huntington about Cyberco and, just as important, about Teleservices. Put simply, had Rodriguez not withheld from Kalb Watson's fraudulent past, Kalb and others at Huntington would have undoubtedly concluded that absolutely nothing at Cyberco could be accepted at face value, including the increasingly suspicious story of who Teleservices was and why it was transferring huge amounts of money to Cyberco.

The Bankruptcy Proceedings

Creditors of Cyberco commenced an involuntary Chapter 7 proceeding against it shortly after the FBI's raid and only days after a state court had ordered a receiver to take control of both entities. The receiver did not oppose the Cyberco petition. Moreover, the receiver himself filed a voluntary Chapter 7 petition on behalf of Teleservices a month later.

---

Rodriguez at 158-59, Dec. 14, 2009 [DN 274]; George at 187, Dec. 16, 2009 [DN 272].

[70]Kalb at 212-13, Dec. 14, 2009 [DN 274].

26

Trustee Meoli[71] has commenced this adversary proceeding on the theory that Huntington received millions of dollars in fraudulent transfers from Teleservices. Included are the nine Teleservices checks delivered directly to Huntington during the last half of 2004. Trustee asserts that these transfers, which total $7,395,283.04, were both actually and constructively fraudulent under Section 548. Trustee further contends that the much larger amounts that Teleservices was depositing into Cyberco's Huntington accounts throughout the entire scam are both avoidable as fraudulent transfers to Cyberco and then recoverable from Huntington as a subsequent transferee under Section 550(a)(2). By Trustee's current reckoning, these indirect transfers to Huntington total another $65,640,146.53.[72]

### DISCUSSION

<u>Direct Transfers - Trustee's Prima Facie Case</u>

Section 548 of the Bankruptcy Code empowers the trustee to avoid transfers that have been fraudulently made and Section 550 in turn permits the trustee to recover the avoided transfer from the transferee when appropriate. Like its counterpart under similar state schemes, Section 548(a) provides that a transfer of the debtor's property may be avoided if the debtor made it with the actual intent to hinder, delay, or defraud his creditors. 11 U.S.C. § 548(a)(1)(A). That subsection further provides that a transfer of the debtor's property may also be avoided if (1) it was made while the debtor was insolvent; and (2) the debtor received less than a reasonably equivalent value in

---

[71]Thomas Richardson had originally been appointed as the trustee for both the Cyberco and the Teleservices bankruptcy estates. However, Meoli replaced Richardson as the Teleservices' trustee on August 3, 2007.

[72]Trustee Brief, May 26, 2010, Ex. A.

exchange. 11 U.S.C. § 548(a)(1)(B). Debtors who make fraudulent transfers of the latter type are said to have had a constructive intent to defraud their creditors.

This court reaffirms[73] that the nine checks that Teleservices delivered directly to Huntington between July and October, 2004, are all actually fraudulent transfers under Section 548(a)(1)(A). Granted, Teleservices had not legitimately come by any of what it then transferred. Teleservices, in reality, was nothing more than a corporate shell through which the monies fraudulently procured would be then funneled almost immediately to Cyberco or, in these nine instances, to Huntington, Cyberco's creditor.[74] Teleservices had no officers or employees and its only assets were a few bank accounts.

Nonetheless, Teleservices was at all times a corporation recognized under Delaware law.[75] As such, Teleservices was capable of owning property, including money held on deposit with a bank. Nor does it make a difference that defrauded finance companies were the source of these deposits.

---

[73]The court has already determined in conjunction with Trustee's July 10, 2009 motion for summary judgment that all nine of the direct transfers from Teleservices to Huntington were avoidable under Section 548(a). *Cf.* Sept. 25, 2009 Bench Opinion [DN 175]. The findings herein simply supplement that prior determination.

[74]In fact, Watson financed the final paydown of Huntington's debt through additional fraudulent computer equipment purchases. Specifically, Teleservices' bank records indicate that twelve different equipment finance companies transferred over $35 million into Teleservices' Silicon Valley bank account during the same interval that Teleservices was writing the over $7 million in checks to Huntington.

[75]It came to this court's attention in conjunction with a pretrial motion that the State of Delaware, which is where Teleservices was incorporated, issued a certificate in March 2004 that Teleservices was no longer in existence. The reason given in the certificate was that Teleservices had failed to pay taxes associated with its incorporation. However, the court concluded that Teleservices' existence had not terminated notwithstanding the certificate's declaration to the contrary. *Cf.* Sept. 25, 2009 Bench Opinion [DN 175]. Moreover, the court now reaffirms that Teleservices existed as a legally recognized entity up to at least January 21, 2005, which is the date Teleservices' bankruptcy was commenced.

Ownership might have been a question had Teleservices taken the money at gunpoint instead. However, in this instance all of the victims' money had been willingly transferred to Teleservices, albeit under false pretenses. Consequently, Teleservices would have obtained under the law a sufficient interest in what it had stolen in order to have made a cognizable Section 548(a) transfer of its property when it then used the purloined funds to pay off the remainder of Cyberco's debt to Huntington. *Cf. Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922, 929 (6th Cir. 2000) ("[A]n individual commits the crime of false pretenses when he fraudulently convinces another to part with *both* possession of and title to property. In such a situation, the offender obtains voidable title to the property.") (emphasis in original).

The court also finds that Teleservices intended at the very least to hinder or delay its own creditors when it made these direct transfers to Huntington. Teleservices was, of course, unusual because it had no creditors in the traditional sense. Nonetheless, each of its victims had a right to repayment that arose immediately upon being bilked. Moreover, Teleservices had no other source of revenue. Therefore, Teleservices' decision to use the funds it had stolen to repay Cyberco's indebtedness to Huntington would have without question hindered those claimants' rights.[76]

Direct Transfers - Huntington's Section 548(c) Value Defense

Huntington has not seriously contested the fraudulent nature of Teleservices' direct transfers to it. Huntington instead has focused on the affirmative defense that Section 548(c) provides.

---

[76]Trustee has pled in the alternative that all of the transfers are also avoidable under Section 544(b) and the applicable Michigan fraudulent transfer laws, they being MICH. COMP. LAWS §§ 566.31 *et seq.* This alternative theory is largely irrelevant since most of the targeted transfers are clearly covered under Section 548(a). However, a few are not because they occurred outside the one year limit then imposed by that section. *See infra* n.92. These remaining transfers are addressed later in this opinion. *See infra* Indirect Transfers - Section 544(b) Avoidance of Underlying Transfers.

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).

This court has already addressed whether Huntington had given Teleservices "value" within the meaning of this subsection in conjunction with Trustee's prior motion for summary judgment.[77]

Trustee had asserted in her motion that Huntington could not have given value to Teleservices in exchange for the direct transfers it had received from Teleservices because Teleservices had no lending relationship with Huntington. If anyone had received value, she argued, it was Cyberco.

"Value," for purposes of Section 548, means:

> [P]roperty, or satisfaction or securing of **a present or antecedent debt of the debtor**, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor . . . .

11 U.S.C. § 548(d)(2)(A) (emphasis added).

On its face, Teleservices' payment of a debt other than its own to Huntington does not seem like a way for Huntington to have given value to Teleservices in exchange. However, this court concluded that Teleservices would have also received value if, as Huntington was asserting, Teleservices was Cyberco's alter ego.[78] In other words, if Huntington could establish that Teleservices, as Cyberco's alter ego, should also be held accountable for Cyberco's obligations, then the paydowns by

---

[77]Sept. 25, 2009 Bench Opinion [DN 175].

[78]*Id.* at 46.

Teleservices to Huntington would have provided value to Teleservices as well through the reduction of this corresponding claim against it.[79]

Most, but not all, factors support the conclusion that Teleservices was the alter ego or an instrumentality of Cyberco. Again, Teleservices had no officers, directors, or employees and its only apparent assets were some bank accounts. Indeed, Teleservices was able to fulfill its part in Watson's scheme only through Cyberco's executives assuming fictitious names and then pretending to speak on Teleservices' behalf. On the other hand, not all facts favor Huntington. For example, Teleservices' affairs, as limited and as devious as they may have been, were for the most part distinct from those of Cyberco. This is not a situation where the affairs of Cyberco and Teleservices became so intertwined that it was impossible to distinguish one from the other. Indeed, the scam depended upon Teleservices being perceived as an unrelated vendor of computer equipment. Moreover, whatever Teleservices stole from its victims flowed, for the most part, in a one-way direction from its account to Cyberco's account, never to return. It was not until the waning months of both Cyberco's and Teleservices' existence that Cyberco began to transfer some monies back to Teleservices' account.

However, even if the court were to conclude that Teleservices was in fact Cyberco's alter ego, Michigan law is clear that the doctrine is to be applied only to avoid an injustice.[80]

---

[79]Although "value" under Section 548(d)(2)(A) is described in terms of satisfying debt as opposed to a claim, "debt" is defined elsewhere in the Code as meaning "liability on a claim," and "claim," in turn, includes a "right to payment." 11 U.S.C. §§ 101(5)(A), (12).

[80]Paul v. Univ. Motor Sales Co., 283 Mich. 587, 602-03, 278 N.W. 714, 720-21 (1938); Bitar v. Wakim, 456 Mich. 428, 431, 572 N.W.2d 191, 192 (1998). See also Spartan Tube and Steel, Inc. v. Himmelspach (In re RCS Engineered Prods. Co., Inc.), 102 F.3d 223, 226 (6th Cir. 1996).
The court recognizes that Delaware law might ultimately dictate Teleservices' status as Cyberco's alter ego because Teleservices was incorporated in Delaware. However, Delaware courts,

31

Unfortunately for Huntington, the doctrine's application in this instance would in fact result in an injustice. Huntington's problem is that Teleservices' only source of revenue was the money it was grifting from the various finance companies through sales of non-existent computer equipment. For Huntington, then, to use this theory to keep what had been stolen from another would not be just. It would be unjust. Therefore, Huntington's application of the alter ego doctrine to establish value between Teleservices and it under Section 548(c) was suspect.[81]

The court, though, granted Trustee's motion for summary judgment only in part because there remained some tracing issues concerning the Section 548(c) value defense. The court, based upon the uncontested record at that time, was able to conclude that the first check that Huntington received directly from Teleservices was attributable entirely to monies stolen from finance companies. However, the court was unable to reach the same conclusion with respect to the remaining eight checks because either Cyberco or related entities had by then begun redepositing monies into Teleservices' account. Consequently, there was at least a possibility that some of the amounts Huntington received through the remaining eight checks were traceable to a source other than the victimized finance companies.[82]

Both parties offered expert testimony concerning the tracing issue at the ensuing trial. Moreover, this court has already evaluated that testimony in conjunction with deciding Huntington's motions for substantive consolidation which were tried at the same time. Its conclusion was that all

---

like Michigan courts, apply the alter ego doctrine only to avoid an injustice. *Pauley Petroleum Inc. v. Cont'l Oil Co.*, 43 Del. Ch. 516, 521, 239 A.2d 629, 633 (1968); *Alberto v. Diversified Grp., Inc.*, 55 F.3d 201, 205-06 (5th Cir. 1995) (citing *Pauley Petroleum*).

[81]Sept. 25, 2009 Bench Opinion at 83 [DN 175].

[82]*Id.* at 84-87.

32

of the amounts associated with the eight remaining checks were attributable to only monies that had been stolen from various equipment finance companies. *Cyberco*, 431 B.R. at 434-35.

Therefore, for these reasons, the court now makes the final determination that Huntington's alter ego argument must fail with respect to all nine of the checks it received from Teleservices because of the resulting injustice that would be wrought. Consequently, Huntington's Section 548(c) defense to Trustee's avoidance of the nine direct transfers as fraudulent under Section 548(a) must fail because the transfers received were not in exchange for value given to Teleservices.[83]

Direct Transfers - Huntington's Section 548(c) Good Faith Defense

The court is not required to make any further determination with respect to Huntington's Section 548(c) defense because its two elements are in the disjunctive. Nonetheless, the court concludes that Huntington has also failed to establish its good faith regarding the receipt of the nine Teleservices checks. The court, though, will defer giving its reasons until later in this opinion when it also considers Huntington's good faith under Section 550(b)(1).[84]

Direct Transfers - Huntington's Section 550(a)(1) Liability

Section 548 provides only for the avoidance of the targeted transfer and, in some situations, avoidance is enough. *Suhar v. Burns (In re Burns)*, 322 F.3d 421, 427-28 (6th Cir. 2003). If, for example, the fraudulent transfer had been a mortgage, avoidance of the lien would be sufficient. If,

---

[83]Sept. 25, 2009 Bench Opinion at 84-87.

[84]*See infra* Assessing Huntington's Section 548(c) and Section 550(b)(1) Good Faith.

33

though, the transfer had been jewelry, Section 550 complements the avoidance by also providing for the ordered return of the jewelry or, when appropriate, the payment of its value.[85]

Section 550(b), like Section 548(c), provides an affirmative defense. However, that defense is not available to initial transferees and Huntington was clearly the initial transferee of the nine Teleservices checks. *Cf.* 11 U.S.C. § 550(b). Therefore, Huntington must account to Trustee for the $7,395,283.04 it received as a result of these now avoided transfers.

Indirect Transfers - Cyberco as a Necessary Party

The indirect transfers that Trustee also wishes to avoid and recover adds another $65,640,146.53 to her claim.[86] As just noted, Section 548 and Section 550 are separate Code provisions that provide different forms of relief. Indeed, the relief afforded by Section 550 is available only if the pertinent transfer is first avoided under Section 548 or one of the other avoidance sections it references.[87]

---

[85]    Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer of the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

[86]Trustee's amended complaint alleges the amount of the indirect fraudulent transfers to be only $43,763,321.50. However, Trustee's pending motion for summary judgment regarding the remaining issues to be decided seeks the recovery of this much larger amount. *See* Trustee Brief, May 26, 2010, Ex. A.

[87]Section 550(a) specifically states that a trustee may seek a recovery only:

34

Huntington focused upon this distinction in a prior motion for summary judgment. It argued that Trustee's attempt to recover the indirect transfers to Huntington as a subsequent transferee under Section 550 was procedurally deficient because Trustee had failed first to avoid under Sections 548 or 544(b) the initial transfers from Teleservices to Cyberco. Moreover, Huntington contended that Trustee was no longer capable of avoiding these underlying transfers because the applicable statute of limitations under Section 546 had already run for bringing this separate action against Cyberco.

This court, though, did not grant Huntington's motion.[88] It agreed with Huntington that the initial transfers from Teleservices to Cyberco had to be first avoided before any recovery could be had against it under Section 550(a). However, the court further determined that Trustee could accomplish that avoidance with Huntington as the named defendant as opposed to Cyberco. In other words, Huntington was just as capable as Cyberco in asserting under Section 548 that the transfers Cyberco had received from Teleservices were not actually or constructively fraudulent.[89] Moreover, this court was satisfied that Trustee's amended complaint was sufficiently pled to put Huntington

---

> [t]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(b) of this title . . . .

See also *Harrison v. Brent Towing Co., Inc. (In re H & S Transp. Co., Inc.)*, 939 F.2d 355, 359 (6th Cir. 1991).

[88]October 7, 2009 Bench Opinion [DN 202].

[89]Indeed, if Huntington were claiming good faith as a later transferee under Section 550(b)(2), it would not be successful unless it also was able to establish the Section 550(b)(1) credentials of some transferee further up the chain. That is, the Section 550(b)(2) defense is conditioned upon the claimant also establishing that some earlier transferee met the more restrictive requirements of the Section 550(b)(1) defense. But if this is so, then the court sees no reason why Huntington, in defending against Trustee's Section 550 recovery against it, is not capable of also substituting for Cyberco in order to challenge the avoidability of the transfer itself under Section 548(a). After all, Huntington's stake in the outcome is certainly much greater than that of the now defunct Cyberco.

on notice that she was seeking as relief not only a recovery from Huntington under Section 550 but also an avoidance of the underlying transfers from Teleservices to Cyberco under Sections 548(a) and 544(b).

Indirect Transfers - Section 548(a) Avoidance of Underlying Transfers

Whether Teleservices had the requisite intent, either actual or constructive, under Section 548(a) was not specifically at issue in connection with this portion of the bifurcated trial concerning the indirect transfers. Therefore, a further evidentiary hearing may be required before this court can make final findings as to this aspect of Trustee's indirect transfer claims against Huntington.[90] Nonetheless, it is fair to say at this point in time that the proofs already offered overwhelmingly support the conclusion that all of the underlying transfers by Teleservices to Cyberco's Huntington accounts were made with both the actual and the constructive intent to defraud required under Section 548(a).[91]

Indirect Transfers - Section 544(b) Avoidance of Underlying Transfers

As with the direct transfers, Trustee has offered the alternative theory that the underlying transfers from Teleservices to Cyberco are avoidable under Section 544(b) and its incorporation of Michigan's own fraudulent transfer laws. Although most of the indirect transfers that Trustee seeks

---

[90]The court says "may" because, as already noted, Trustee has filed a new motion for summary judgment and she contends in that motion that there remains no genuine issue of fact with respect to the Section 548(a) elements vis-a-vis Teleservices' transfers to Cyberco.

[91]The court recognizes Huntington's insistence throughout this proceeding that Teleservices was a ruse and that all of the transfers actually were from Cyberco. It has argued this position through various applications of the alter ego doctrine and as part of its separate motions for substantive consolidation. This court, though, has consistently rejected Huntington's position. *See Cyberco*, 431 B.R. 404 and Sept. 25, 2009 Bench Opinion at 84-87 [DN 175].

36

to recover fall within the one year avoidance period then permitted by Section 548,[92] some do not.[93]

Therefore, Trustee must rely on this alternative theory with respect to these few remaining transfers.

Moreover, the court will not make a final determination as to whether these transfers are avoidable

under this theory until that issue is properly before it at some later date.  However, the court does

note at this point that the requirements for avoiding fraudulent transfers under Michigan's version

of the Uniform Fraudulent Transfer Act[94] are similar to the requirements of Section 548(a).  As such,

the proofs already offered strongly suggest that the few transfers to Cyberco that Trustee will have

to avoid under Section 544(b) were fraudulent as well.[95]

Indirect Transfers - Cyberco's Section 548(c) and MCL Section 566.38 Defenses

It does not appear that Section 548(c) is available to a subsequent transferee like Huntington

when defending against a recovery under Section 550(a).[96]  In any event, the proofs offered to date

---

[92]Section 548, as currently enacted, permits the trustee to avoid fraudulent transfers made within two years preceding the commencement of the case. *See* 11 U.S.C. § 548(a)(1).  However, Teleservices' petition was filed prior to the amendment that extended the avoidance period to two years. *See supra* n.5.  As a consequence, Trustee's Section 548 claim is limited to only the one year avoidance period previously provided under that section. *Gordon v. Kinney (In re Gallagher)*, 417 B.R. 677, 682 (Bankr. W.D.N.Y. 2009); *Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626, 640 n.11 (Bankr. S.D.N.Y. 2009).

[93]Of the eighty-one indirect transfers totaling $65,640,146.53, thirteen of those transfers allegedly occurred more than a year before Teleservices' petition.  These thirteen transfers total $11,761,034.56. *Cf.* Trustee's Brief, May 26, 2010, Ex. A.

[94]MICH. COMP. LAWS §§ 566.31, *et seq.*

[95]*See, e.g.,* MICH. COMP. LAWS § 566.34.  Of course, Trustee will also have to establish Section 544(b)(1)'s separate requirement that the Teleservices estate has at least one unsecured creditor whose claim was in existence at the time of these earlier transfers.

[96]Section 550(a) limits recovery only "**to the extent** a transfer is avoided under section ... 548 ...." (emphasis added).  But avoidance occurs under subpart (a) of Section 548, not subpart (c).  Indeed, subpart (c) does not even speak of avoidance.  Rather, it addresses only the

overwhelmingly suggest that Cyberco neither gave value in exchange nor was Cyberco in good faith with respect to the fraudulent transfers that Cyberco itself was receiving from Teleservices. The same is true with respect to the defense that would be afforded to Cyberco under MICH. COMP. LAWS § 566.38(1)[97] vis-a-vis the few indirect transfers that would have to be avoided under Section 544(b) and Michigan's fraudulent transfer laws. Nonetheless, the court will not at this time make a final determination on these issues since they too were to be deferred to a later date under the order to bifurcate the trial.

Indirect Transfers - Section 550(a) Recovery - Initial or Subsequent Transferee[98]

Trustee argued in opposition to Huntington's unsuccessful motion for summary judgment that Huntington, not Cyberco, was in fact the initial transferee of even the indirect transfers. She based her contention upon Huntington, as Cyberco's depository bank, being the entity that actually received each wire transfer that Teleservices initiated. Of course, treating Huntington as the initial

---

circumstances under which the initial transferee will be awarded a lien in the transfer already avoided under subpart (a).

[97]     A transfer or obligation is not voidable under . . . [§ 566.34] . . . against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

MICH. COMP. LAWS § 566.38(1).

[98]Although avoidance of the indirect transfers made outside the one-year period must be accomplished through Section 544(b) and Michigan's fraudulent transfer laws, recovery of any transfer avoided thereunder is governed by Section 550, as opposed to its state law counterpart. 11 U.S.C. § 550(a). *See also Suhar v. Burns (In re Burns)*, 322 F.3d 421 (6th Cir. 2003).

transferee would have eliminated its eligibility for the Section 550(b)(1) defense and would have brought Section 548(c) into play instead.[99]

The court at this time reaffirms its rejection of this argument.[100]  Suffice it to say here that as tempting as it may be to treat wire transfers and checks as the transfer being avoided, wire transfers and checks are simply devices to facilitate the actual transfer – that is, whatever the debtor desires the intended recipient to receive.  Or, to put it differently, if, as clearly was the case, Teleservices intended to transfer value to Cyberco, it should make no difference under either Section 548 or Section 550 whether Teleservices fulfilled that intention by wire transfer, check, or bales of one dollar bills delivered in a dump truck.  In every event, Cyberco, as opposed to the facilitating entities, should be treated as the initial recipient of the transfer to be avoided.[101]

Indirect Transfers - Tracing Issues

Tracing of the indirect transfers is another issue not yet addressed.  While Huntington concedes that whatever Teleservices transferred into Cyberco's accounts was subject to setoff,

---

[99]Although Trustee did not realize it then, this argument actually favors Huntington.  *See infra* n.251.

[100]*Cf.* Oct. 7, 2009 Bench Opinion [DN 202].

[101]*Cf. First Independence Capital Corp. v. Merrill Lynch Bus. Fin. Servs. Inc. (In re First Independence Capital Corp.)*, 181 Fed. Appx. 524 (6th Cir. 2006).  In *First Independence*, owners of the corporate debtor wrote checks payable to Merrill Lynch and then deposited them in their own Merrill Lynch brokerage account.  The bankruptcy court concluded that Merrill Lynch was a subsequent transferee of those checks, with the owners/depositors presumably being the initial transferees.  Neither party appealed that determination.

Huntington does not agree that all such deposits were in fact then setoff.  Huntington contends instead that at least some of these amounts were spent by Cyberco before any setoff took place.[102]

As with other issues remaining to be tried, the court will defer decision on the tracing issue at this time.  However, the court will note at this juncture that Trustee may not in the end have to trace these deposits because the deposits themselves may have constituted the actual transfers to Huntington.  Consider a slightly different scenario of the initial transferee receiving the fraudulent transfer in cash and then depositing that cash with its bank.  In concept, the deposit is a second transfer.  That is, the initial transferee would have relinquished both possession and ownership of the cash to another party, albeit the other party here would also be bound with respect to that transfer to honor the terms of the agreement previously reached concerning the administration of such deposits.

If, though, deposited cash constitutes a second transfer, the analysis should be no different if the same result is accomplished through a check or a wire transfer.  Consequently, it would certainly appear that the proper approach whenever checks or wire transfers are involved is to treat whoever is intended by the debtor to actually receive the value of whatever the debtor has to transfer as the initial transferee and to then treat the depositing bank as a subsequent transferee.  The

---

[102]White testified that the Teleservices wire transfers were being deposited into the account upon which Cyberco wrote its own checks.  White at 263, Nov. 5, 2009 [DN 290].  Therefore, Cyberco checks that cleared the account on the same day that a Teleservices wire transfer was credited would have presumably reduced the amount that Huntington then swept from the account at the end of the day.

depositing bank in turn would presumably be protected in most, but not all instances, by the Section 550(b)(1) defense.[103]

However, the court, in making this observation, has tread into a very confusing area concerning the interpretation of Section 550(a).[104] Moreover, neither Trustee nor Huntington has had an opportunity to brief this particular issue. Therefore, the court leaves the matter open for further consideration whenever tracing is formally presented for final disposition by this court.

Indirect Transfers - Huntington's Section 550(b)(1) Value Defense

As already discussed, Section 550(b) shields subsequent recipients of an avoided fraudulent transfer in a manner that is similar to the protection Section 548(c) affords to the initial transferee of the same avoided transfer. Specifically, Section 550(b)(1) offers an absolute defense to any subsequent transferee provided he took the transfer (1) for value, including satisfaction of antecedent debt; (2) in good faith; and (3) without knowledge of the voidability of the transfer avoided. 11 U.S.C. § 550(b)(1).[105]

---

[103]*See supra* n.101. *First Independence* also addressed Merrill Lynch's successful Section 550(b)(1) defense as the recipient of checks the corporate debtor's owners had deposited into their Merrill Lynch account. 181 Fed. Appx. 524. Value was clearly exchanged because of the debtor-creditor relationship created between Merrill Lynch and its account holders. As for *First Independence*'s conclusions concerning Merrill Lynch's good faith and lack of knowledge, they are discussed in detail later in this opinion. *See infra* Nordic Village and *First Independence*.

[104]That Huntington's security interest attached to each Teleservices transfer as it was deposited and that Huntington had setoff rights as well confuses Huntington's Section 550(a) transferee status even more. *Cf. Richardson v. Huntington Nat'l Bank (In re Cyberco Holdings, Inc.)*, 382 B.R. 118, 133-35 (Bankr. W.D. Mich. 2008).

[105]Indeed, if the targeted transferee himself took from a subsequent transferee who himself qualified under Section 550(b)(1), the targeted transferee would not even have to establish value or lack of knowledge. Only his good faith would be required. *Compare* 11 U.S.C. § 550(b)(2). *See also infra* Huntington's Section 550(b)(1) Knowledge.

41

With respect to value, the court finds that Huntington did give value in exchange for whatever setoffs it took against the deposits in Cyberco's accounts. Granted, the value given in each instance was the reduction of antecedent debt owed to Huntington by Cyberco, not Teleservices. However, unlike the comparable definition given for "value" in Section 548(d)(2)(A), Section 550(b)(1) "value" is indifferent as to the recipient of the value. Indeed, the Section 550(b)(1) defense would only rarely be available if value had to be exchanged with the debtor given that the subsequent transfer likely would not have involved him. *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 897 (7th Cir. 1988); 5 *Collier on Bankruptcy* ¶ 550.03[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2010).

<u>Direct and Indirect Transfers - The Section 548(c) and Section 550(b) Good Faith Defense</u>

Most courts begin their discussion concerning Section 548(c) or Section 550(b) good faith with the observation that it is a vague concept that defies precise definition.[106] Almost as many courts have also said that good faith must be decided on a case-by-case basis.[107] Nonetheless, the

---

[106]*Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 984 (1st Cir. 1983) ("[G]ood faith requirement . . . [under 548(c)] . . . is not susceptible of precise definition"); *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1995) (citing *Roco*); *Hayes v. Palm Seedlings Partners-A (In re Agri. Research and Tech. Grp., Inc.)*, 916 F.2d 528, 536 (9th Cir. 1990) (citing *Roco*); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 659 (Bankr. M.D. Fla. 2002) ("Good faith is not a precise, defined term."); *Helms v. Roti (In re Roti)*, 271 B.R. 281, 295-96 (Bankr. N.D. Ill. 2002); *Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 736 (B.A.P. 9th Cir. 2008) (citing *Agri. Research, Sherman*).

[107]*Sherman*, 67 F.3d at 1355 (citing *Roco*); *Slone v. Lassiter (In re Grove-Merritt)*, 406 B.R. 778, 810 (Bankr. S.D. Ohio 2009) (citing *Roco, Sherman*); *Coleman v. Home Sav. Ass'n (In re Coleman)*, 21 B.R. 832, 836 (Bankr. Tex. 1982); *Eder v. Queen City Grain, Inc. (In re Queen City Grain, Inc.)*, 51 B.R. 722, 728 (Bankr. Ohio 1985); *Gallant v. Kanterman (In re Kanterman)*, 97 B.R. 768, 779 (Bankr. S.D.N.Y. 1989); *CCEC Asset Mgmt. Corp. v. Chemical Bank (In re Consol. Capital Equities Corp.)*, 175 B.R. 629, 637 (Bankr. N.D. Tex. 1994); *Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 797 (Bankr. S.D. Fla. 2000); *Gold v. Laines (In re Laines)*, 352 B.R. 397, 406 (Bankr. E.D. Va. 2005) (citing *Sherman, Roco,*

42

clear trend since the Code's adoption has been towards an objective interpretation of good faith.[108]

---

*Grove-Merritt); Doeling v. Grueneich (In re Grueneich)*, 400 B.R. 688, 693 B.A.P. 8th Cir. 2009 (citing *Sherman*).

[108]Courts applying an objective standard of good faith under Section 548(c) are: *Hayes v. Palm Seedlings Partners-A (In re Agri. Research and Tech. Group, Inc.)*, 916 F.2d 528, 535-35 (9th Cir. 1990) (analyzing good faith under Hawaii's Uniform Fraudulent Transfer Act, with analogies made to Section 548(c)); *Sherman*, 67 F.3d at 1355 (citing *Agri. Research* and *Bonded Fin.*); *Jobin v. Ripley (In re M & L Bus. Mach., Co., Inc.)*, 84 F.3d 1330, 1338 (10th Cir. 1996) (citing *Agri. Research*); *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 230 B.R. 546, 592 (Bankr. W.D. Tenn. 1999) (*rev'd on other grounds*, 277 F.3d 838 (6th Cir. 2002) (citing *Sherman and M & L Bus. Mach.*); *Kaler v. McLaren (In re McLaren)*, 236 B.R. 882, 902 (Bankr. D. N.D. 1999) (citing *Sherman and M & L Bus. Mach.*); *Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 878 (Bankr. N.D. Ill. 2000) (citing *M & L Bus. Mach.*); *Helms v. Roti (In re Roti)*, 271 B.R. 281, 296 (Bankr. N.D. Ill. 2002) (citing *Sherman, M & L Bus. Mach.*); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 659 (Bankr. M.D. Fla. 2002) (citing *M & L Bus. Mach.* and others); *Soule' v. Alloit (In re Tiger Petroleum Co.)*, 319 B.R. 225, 235-36 (Bankr. N.D. Okla. 2004) (citing *M & L Bus. Mach.*); *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 203 (Bankr. D. N.J. 2006) (citing *Sherman*); *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 359 B.R. 510, 523-24 (Bankr. S.D.N.Y. 2007) (citing *Agri. Research*); *Leonard v. Coolidge (In re Nat'l Audit Def. Network)*, 367 B.R. 207, 224 (Bankr. D. Nev. 2007) (citing *Agri. Research, Sherman, M & L Bus. Mach.*); *Bowers and Merena Auctions, LLC v. Lull (In re Lull)*, 386 B.R. 261, 271 (Bankr. D. Hawaii 2008) (citing *Agri. Research*); *Bayou Accredited Fund, LLC v. Redwood Grp. Partners (In re Bayou Group, LLC)*, 396 B.R. 810, 844-45 (Bankr. S.D.N.Y. 2008) (citing *Agri. Research, Sherman, M & L Bus. Mach.*, and others); *Slone v. Lassiter (In re Grove-Merritt)*, 406 B.R. 778, 810 (Bankr. S.D. Ohio 2009) (citing *Sherman*) (Section 548(c)); *Strauss v. Isaacks (In re Supinger)*, No. 08-4238, 2009 WL 3254462, at *5 (Bankr. W.D. Mo. 2009); *Official Comm. of Unsecured Creditors v. Citicorp N. Am., Inc. (In re TOUSA, Inc.)*, 422 B.R. 783, 869 (Bankr. S.D. Fla. 2009) (citing *Sherman, M & L Bus. Mach.*).
Courts applying an objective standard of good faith under Section 550(b) are: *Bonded Fin.*, 838 F.2d at 897-98; *Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 736 (B.A.P. 9th Cir. 2008) (citing *Agri. Research, M & L Bus. Mach., Sherman*); *Gallant v. Kanterman (In re Kanterman)*, 97 B.R. 768, 779 (Bankr. S.D.N.Y. 1989) (citing *Bonded Fin.*); *Lustig v. Hickey (In re Hickey)*, 168 B.R. 840, 848-49 (Bankr. W.D.N.Y. 1994) (citing *Bonded Fin.* and others); *Tavenner v. Smoot (In re Smoot)*, 265 B.R. 128, 140 (Bankr. E.D. Va. 1999) (citing *Bonded Fin..* and others); *Gold v. Laines (In re Laines)*, 352 B.R. 397, 406 (Bankr. E.D. Va. 2005) (citing *Agri. Research, Sherman* and others); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*, 340 B.R. 180, 208 (Bankr. S.D.N.Y. 2006) (citing *M & L Bus. Mach.*); *Riske v. David Austin Seitz Irrevocable Trust (In re Seitz)*, 400 B.R. 707, 721 (Bankr. E.D. Mo. 2008) (citing *Sherman*); *CLC Creditors' Grantor Trust v. Howard Sav. Bank (In re Commercial Loan Corp.)*, 396 B.R. 730, 744-75 (Bankr. N.D. Ill. 2008) (citing *Bonded Fin.*).
And courts applying an objective standard of good faith under both Sections 548(c) and

43

*M & L Business Machine*[109] is illustrative:

> [G]ood faith under § 548(c) should be measured objectively and that
> "if the circumstances would place a reasonable person on inquiry of
> a debtor's fraudulent purpose, and a *diligent* inquiry would have
> discovered the fraudulent purpose, then the transfer is fraudulent."

84 F.3d at 1338 (citations omitted) (emphasis in original).[110]

---

550(b) are: *Doeling v. Grueneich (In re Grueneich)*, 400 B.R. 688, 693 (B.A.P. 8th Cir. 2009) (citing *Agri. Research*); *Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 797-98 (Bankr. S.D. Fla. 2000) (citing *Agri. Research, M & L Bus. Mach.* and others).

[109] *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1338 (10th Cir. 1996).

[110] However, a few courts have eschewed this approach and have instead given good faith its traditional meaning. For example, in *Drake v. Peeples (In re Topgallant Group, Inc.)*, No. 91-4142, 1996 WL 33366594 (Bankr. S.D. Ga. 1996), the court observed that while the concept of good faith may appear in the Code in a number of different contexts, it "always means about the same thing: fair dealing without evil intent." *Id.* at *20. It therefore concluded that:

> "[T]he good faith exception of 550(b)(1) was intended for those
> situations in which a bad faith transferee materially assists in, or in
> fact enables, the transferring of funds which can not then be
> recovered, and who derives some demonstrable benefit thereby."

*Id.* (quoting *Friedman v. Vinas (In re Trauger)*, 109 B.R. 502, 505 (Bankr. S.D. Fla. 1989)).

Likewise, *Sisti v. Cahill (In re Colonial Realty Co.)* quoted with approval this passage from *Collier:*

> "[G]ood faith requires an arm's length transaction, as well as the
> following three factors: (i) an honest belief in the propriety of the
> activities in question; (ii) no intent to take unconscionable advantage
> of others; and (iii) no intent to, or knowledge of the fact that the
> activities in question will hinder, delay, or defraud others."

210 B.R. 921, 923 (Bankr. D. Conn.1997) (citations omitted).

An objective approach, though, draws attention away from what has traditionally distinguished good faith from bad faith. For example, in *Bayou Group*,[111] the court recognized that good faith has customarily involved a moral judgment. "In common parlance," *Bayou Group* observed "'good faith' . . . denotes a conformity with accepted standards of integrity, trust and good conduct . . . ." 396 B.R. at 847. On the other hand, it noted that bad faith implies conduct that typically would be described as "wrongful, improper or legally or ethically deplorable . . . ." *Id.* The court also offered "dishonesty," "deceit," and "intent to harm" as additional terms an ordinary person might use to describe bad faith. *Id.*

But with this said, *Bayou Group* declared that Section 548(c) good faith is "somewhat different" from a layman's understanding. 396 B.R. at 847. According to it, Section 548(c) "is not a punitive provision designed to punish the transferee, but is instead an equitable provision that places the transferee in the same position as other similarly situated creditors who did not receive fraudulent conveyances." *Id.* at 827. *Bayou Group* reasoned, then, that a transferee's lack of Section 548(c) good faith "does not necessarily entail a finding . . . that he was guilty of any sort of *mala fides* or otherwise deserving of opprobrium." *Id.* at 848. Rather, the test of a transferee's Section 548(c) good faith is to be an objective one based upon inquiry notice.

> Thus, it is important for the trier of fact to understand that the test for good faith under Section 548(c) is not whether the defendant was guilty of any sort of bad faith in requesting and receiving the transfer. The test is whether the defendant requested redemption after learning of a "red flag" which, under an "objective" standard, should have put

---

[111]*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC)*, 396 B.R. 810, 847 (Bankr. S.D.N.Y. 2008) *rev'd in part*, 439 B.R. 284 (S.D.N.Y. 2010).

the defendant on "inquiry notice" of some infirmity in Bayou or the integrity of its management.

*Bayou Group*, 396 B.R. at 848.[112]

This same reasoning – i.e., that Section 548(c) is "somewhat different"[113] – underlies the many other recent decisions that have strayed from traditional notions of good faith in interpreting Section 548(c) and the related Section 550(b).[114]

---

[112]Not surprisingly, Trustee has incorporated *Bayou*'s red flag metaphor to highlight the various events that she contends should have compelled Huntington to conduct a more diligent inquiry. *See, e.g., infra* n.165.

[113]*Bayou Group*, 396 B.R. at 847.

[114]Two Sixth Circuit decisions mention Section 548(c) and Section 550(b)(1) good faith. *IRS v. Nordic Village, Inc. (In re Nordic Village, Inc.)*, 915 F.2d 1049 (6th Cir. 1990), *rev'd on other grounds*, 503 U.S. 30, 112 S. Ct. 1011 (1992) and *First Independence Capital Corp. v. Merrill Lynch Bus. Fin. Servs. Inc. (In re First Independence Capital Corp.)*, 181 Fed. Appx. 524 (6th Cir. 2006). *Nordic Village* suggests, but only briefly, that a subjective approach is to be used. "It is not apparent from the facts that the IRS had actual notice - that it did not accept the check in good faith . . . ." 915 F.2d at 1056. On the other hand, *First Independence*, which is the later decision, questioned whether *Nordic Village* was definitive. "*Even if* 'good faith' under Section 550(b) means a lack of actual notice or, as First Independence also contends, a lack of illicit intent . . . ." (emphasis added). 181 Fed. Appx. at 528.

As for Sixth Circuit cases that have discussed good faith in other bankruptcy contexts, they suggest that the Sixth Circuit continues to embrace the more traditional notions of honesty and integrity.

(1)   Interpreting good faith purchaser under Section 363(m):

> [T]he debtor must demonstrate that there was fraud or collusion between the purchaser and the seller or the other bidders, or that the purchaser's actions constituted an attempt to take grossly unfair advantage of other bidders. The good-faith requirement "speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings."

*Made In Detroit, Inc. v. Official Comm. of Unsecured Creditors of Made In Detroit, Inc. (In re Made In Detroit, Inc.)*, 414 F.3d. 576, 581 (6th Cir. 2005).

(2)     Interpreting good faith voting under Section 1126(e):

> In *Young v. Higbee Co.*, 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890 (1945), the Supreme Court analyzed the good-faith requirement under the predecessor statute to § 1126(e), and concluded that its purpose was to prevent the use of "obstructive tactics and hold-up techniques," which would in turn give some creditors an unfair advantage over other creditors in the confirmation process. *Id.*

*255 Park Plaza Assos. Ltd. P'ship v. Conn. Gen. Life Ins. Co. (In re 255 Park Plaza Assocs. Ltd. P'ship)*, 100 F.3d 1214, 1219 (6th Cir. 1996).

(3)     Interpreting good faith extension of credit under Section 364(e):

> Even if section 364(e) applies, as we have held, appellant contends that it does not protect the Banks in this case because they did not extend credit in good faith. The Bankruptcy Code does not attempt to define the term "good faith." The definition most often used is that of the Uniform Commercial Code at section 1-201(19): "Good faith means honesty in fact in the conduct or transaction concerned."

*Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 834 F.2d 599, 605 (6th Cir. 1987).

(4)     Interpreting implied good faith vis-a-vis Section 707(b) abuse:

> In determining whether to apply § 707(b) to an individual debtor, then, a court should ascertain from the totality of the circumstances whether he is merely seeking an advantage over his creditors, or instead is "honest," in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings
> . . . .

*In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989).

(5)     Interpreting implied good faith vis-a-vis Section 707(a) dismissal:

> In an effort to offer some guidelines, this circuit has cautioned that dismissal for lack of good faith "should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to

47

Convention, then, would have this court also abandon familiar good faith concepts like "honesty" and "integrity"[115] for the new, morally indifferent standard that *Bayou Group* and other courts have embraced. However, the court submits that this objective approach is not well grounded in the law. Rather, its current popularity reflects only the inertia of a seminal case – *In re Agricultural Research*[116] – that has been cited again and again without the benefit of reflection.[117]

---

fraud, misconduct or gross negligence."

*Mich. Nat'l Bank v. Charfoos (In re Charfoos)*, 979 F.2d 390, 393 (6th Cir. 1992) (citations omitted). *See also Indus. Ins. Servs., Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1129 (6th Cir. 1991).

(6)    Interpreting Section 1325(a)(3) good faith:

> We should not allow a debtor to obtain money, services or products
> from a seller by larceny, fraud or other forms of dishonesty and then
> keep his gain by filing a Chapter 13 petition within a few days of the
> wrong. To allow the debtor to profit from his own wrong in this way
> through the Chapter 13 process runs the risk of turning otherwise
> honest consumers and shopkeepers into knaves.

*Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 432 (6th Cir. 1982). *See also Metro Empls. Credit Union v. Okoreeh-Baah (In re Okoreeh-Baah)*, 836 F.2d 1030, 1033 (6th Cir. 1988).

[115]*Id.* at 847.

[116]*Hayes v. Palm Seedlings Partners-A (In re Agri. Research and Tech. Group, Inc.)*, 916 F.2d 528 (9th Cir. 1990).

[117]The court has also described this phenomenon as stamp collecting. *In re Sturgis Iron & Metal Co., Inc.*, 420 B.R. 716, 725-26 (Bankr. W.D. Mich. 2009). It derives from the distinction Lord Rutherford made between physics and the rest of the sciences ("All science is either physics or stamp collecting."). The court by no means shares with Lord Rutherford what is perhaps better described as his outright contempt for anyone who was other than a physicist. Collecting and assessing prior decisions is without question important to the administration of the Bankruptcy Code. It gives both insight and perspective. There is also value in the uniformity that follows when one judge defers to what already has been decided by another. Indeed, when the Supreme Court or its circuit court has spoken, a bankruptcy court is obliged to conform. However, with the exception of

48

What is lacking in the recent case law is any critical analysis of *Agricultural Research*, the Code, or the former Act. Also absent is consideration of three important but uniformly ignored Supreme Court cases – *Coder*, *Van Iderstine*, and *Dean*.[118]

Agricultural Research

*Bayou Group* and every other court that has recognized the objective approach to establishing Section 548(c) or Section 550(b) good faith cite *M & L Business Machine*,[119] *Sherman*,[120] or *Agricultural Research*[121] as controlling. *M & L Business Machine* and *Sherman* in turn incorporate this quote from *Agricultural Research* into their own reasons for adopting the approach:

> [C]ourts look to what the transferee objectively 'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint.

*Agri. Research*, 916 F.2d at 535-36.[122]

---

such binding decisions, deference must still leave room for critical thought.

[118]Trustee and Huntington also overlooked *Coder*, *Van Iderstine*, and *Dean* in their post-trial briefing.

[119]*Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330 (10th Cir. 1996).

[120]*Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348 (8th Cir. 1995).

[121]*Hayes v. Palm Seedlings Partners-A (In re Agri. Research and Tech. Group, Inc.)*, 916 F.2d 528 (9th Cir. 1990).

[122]*See M & L Bus. Mach.*, 84 F.3d at 1336; *Sherman*, 67 F.3d at 1355. Numerous other cases adopting the objective approach have also relied upon this same quote. Among the courts citing to *Agri. Research* with respect to Section 548(c) are: *Kaler v. McLaren (In re McLaren)*, 236 B.R. 882, 902 (Bankr. D. N.D. 1999); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 659 (Bankr. M.D. Fla. 2002); *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 359 B.R. 510, 523-24 (Bankr. S.D.N.Y. 2007); *Leonard v. Coolidge (In re Nat'l Audit Def. Network)*, 367 B.R. 207, 224 (Bankr. D. Nev. 2007); *Bowers and Merena Auctions, LLC v. Lull (In re Lull)*, 386 B.R. 261, 271 (Bankr. D. Hawaii 2008); *Bayou Group*, 396 B.R. at 845.
Other courts citing to *Agri. Research* with respect to Section 550(b) are: *Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 736 (B.A.P. 9th Cir. 2008); *Gold v. Laines (In re*

49

Therefore, it is fair to treat *Agricultural Research* as the authoritative source for this relatively recent departure from traditional notions of good faith.[123] However, *Agricultural Research* itself offers just four short paragraphs as explanation. Indeed, neither Section 548(c) nor Section 550(b) was even at issue. Rather, the court there was analyzing Hawaii's own fraudulent transfer laws and Section 548 came up only by analogy.

As for the limited analysis *Agricultural Research* does provide, one would have expected references to recent case law or treatises calling for a break with tradition. But there are none. Rather, the two "pronouncements" *Agricultural Research* relied upon come from Supreme Court cases decided way back in the 1800s – *Shauer v. Alterton*, 151 U.S. 607, 14 S. Ct. 442 (1894) and

---

*Laines)*, 352 B.R. 397, 406 (Bankr. E.D. Va. 2005); *Riske v. David Austin Seitz Irrevocable Trust (In re Seitz)*, 400 B.R. 707, 721 (Bankr. E.D. Mo. 2008).

And finally, two cases have relied upon *Agri. Research* in interpreting both Sections 548(c) and 550(b): *Doeling v. Grueneich (In re Grueneich)*, 400 B.R. 688, 693 (B.A.P. 8th Cir. 2009) and *Dev. Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 797-98 (Bankr. S.D. Fla. 2000).

[123]A few bankruptcy courts had suggested an approach based upon reasonable inquiry even before *Agricultural Research* was decided. *See, e.g., Walker v. Littleton (In re Littleton)*, 82 B.R. 640, 644 (Bankr. S.D. Ga. 1988), *rev'd on other grounds*, 888 F.2d 90 (11th Cir. 1989) ("[A]ctual knowledge . . . or the knowledge it would have obtained if it had made a reasonable investigation . . . is sufficient to preclude a finding of good faith . . . ."); *Armstrong v. Ketterling (In re Anchorage Marina, Inc.)*, 93 B.R. 686, 693 (Bankr. D. N.D. 1988) ("Transferees are not acting in good faith when they have knowledge sufficient to put them on at least inquiry notice . . . ."); *Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 862 (D. Utah 1987); *McColley v. Rosenberg (In re Candor Diamond Corp.)*, 76 B.R. 342, 351 (Bankr. S.D.N.Y. 1987); *Williams v. Kidder Skis Int'l (In re Fitzpatrick)*, 73 B.R. 655, 658 (Bankr. W.D. Mo. 1985), *aff'd in part and rev'd in part*, 60 B.R. 808 (W.D. Mo. 1985); *Sanitary Ice Vending Co., Inc. v. Harris (In re Polar Chips Int'l, Inc.)*, 18 B.R. 480, 484 (Bankr. S.D. Fla. 1982).

However, *Agricultural Research* was the first to specifically adopt an objective standard in place of a subjective one. *Agricultural Research* was also the first appellate court to adopt this break from tradition. *Cf. Bayou Group*, 396 B.R. at 847-48.

*Harrell v. Beall*, 84 U.S. (17 Wall) 590 (1873). In particular, *Agricultural Research* lifted this quote from *Shauer*:

> "[A transferee's] knowledge or actual notice of circumstances sufficient to put him, as a prudent man, upon inquiry as to whether his brother intended to delay or defraud his creditors ... should be deemed to have notice ... as would invalidate the sale to him."

*Agri. Research*, 916 F.2d at 535 (citing *Shauer*, 151 U.S. at 621, 14 S. Ct. at 446).

*Shauer*, though, was no more a bankruptcy case than was *Agricultural Research*. Rather, the Court in that instance was reviewing a fraudulent conveyance under the laws of what was then the Dakota territory.

Granted, the other case cited, *Harrell v. Beall*, did involve fraud in the bankruptcy context. But the entire opinion in *Harrell* is barely more than a page. Moreover, *Harrell* speaks only of the debtor's "barefaced fraud," the transferee's "intentionally shut ... eyes to the truth," and the absence of even the "slightest effort" by the transferee to make an inquiry. 84 U.S. (17 Wall) at 591. As such, it is difficult to characterize *Harrell* as having established a standard where the transferee's good faith is to be tested by the inquiries of a reasonably prudent man as opposed to the transferee's own honesty and integrity. To the contrary, *Harrell* seems to be more a harbinger of what is now known as "willful blindness" – i.e., inexcusable avoidance of the obvious.[124]

### *Coder*, *Van Iderstine*, and *Dean*

*Agricultural Research*'s reliance upon *Shauer* and *Harrell* is also suspect because the Supreme Court issued three later opinions that offer considerably more insight as to the role good faith is to play in evaluating a bankruptcy trustee's right to recover transfers once they have been

---

[124]*See infra* Proving Section 548(c) and Section 550(b)(1) Good Faith.

avoided.   Each involved allegedly fraudulent transfers made under Section 67e of the former Bankruptcy Act.[125]

The first is *Coder v. Arts*, 213 U.S. 223, 29 S. Ct. 436 (1909).   Arts, a banker, was owed a considerable amount of money by the debtor.   The debtor in turn granted Arts a mortgage in a large tract of land approximately three months before he was adjudicated a bankrupt.   Coder, the bankruptcy trustee, later challenged the mortgage as both a preference and a fraudulent transfer.

The second, *Van Iderstine v. Nat'l Disc. Co.*, 227 U.S. 575, 33 S. Ct. 343 (1913), also involved a transfer claimed to be both a preference and a fraudulent conveyance.   In that instance, National Discount had received various accounts from the debtor as collateral for an advance made only days before the bankruptcy petition.   The trustee, Van Iderstine, asserted that the debtor had intended either to prefer or to defraud his creditors because the proceeds had been used to pay a bank note that the owner's son-in-law had endorsed.

The final case is *Dean v. Davis*, 242 U.S. 438, 37 S. Ct. 130 (1917).   As in *Coder*, a debtor farmer owed money to the bank.   However, in this case, the debtor's brother-in-law, Dean, rescued him with a loan that debtor secured with both his farm and a country store that he also owned.   An involuntary petition was then filed and the trustee ultimately avoided Dean's mortgage as a preference.   However, the Court chose instead to consider Dean's appeal on the alternative theory that he had received a fraudulent transfer.

These three cases are instructive because they illustrate during the early development of the bankruptcy laws the fundamental difference between preferences and fraudulent transfers.   Indeed,

---

[125]The Bankruptcy Act of 1898, § 67e (11 U.S.C. § 107), Ch. 541, 30 Stat. 544, 564 (1898) (repealed) (hereinafter "Bankruptcy Act 1898, § 67e").

52

a considerable portion of *Coder* is directed to explaining that difference. It begins with these general

observations:

> A consideration of the provisions of the bankruptcy law as to preferences and conveyances shows that there is a wide difference between the two, notwithstanding they are sometimes spoken of in such a way as to confuse the one with the other. A preference, if it have the effect prescribed in § 60, enabling one creditor to obtain a greater portion of the estate than others of the same class, is not necessarily fraudulent. . . . [sic] *In Re Maher*, 144 Fed. 503-505, it was well said by the district court of Massachusetts:
>
> 'In a preferential transfer the fraud is constructive or technical, consisting in the infraction of that rule of equal distribution among all creditors which it is the policy of the law to enforce when all cannot be fully paid. In a fraudulent transfer the fraud is actual,-the bankrupt has secured an advantage for himself out of what in law should belong to his creditors, and not to him.'

*Coder*, 213 U.S. at 241, 29 S. Ct. at 443.

*Coder* then observed that the notion of the debtor intending to hinder, delay, or defraud his

creditors, which distinguished a fraudulent conveyance from a preference, had to be actual.

Moreover, it noted that the concept was not new.

> What is meant when it is required that such conveyances, in order to be set aside, shall be made with the intent on the bankrupt's part to hinder, delay, or defraud creditors? This form of expression is familiar to the law of fraudulent conveyances, and was used at the common law, and in the statute of Elizabeth, and has always been held to require, in order to invalidate a conveyance, that there shall be actual fraud; and it makes no difference that the conveyance was made upon a valuable consideration, if made for the purpose of hindering, delaying, or defrauding creditors. The question of fraud depends upon the motive. The mere fact that one creditor was preferred over another, or that the conveyance might have the effect to secure one creditor and deprive others of the means of obtaining payment, was not sufficient to avoid a conveyance; but it was uniformly recognized that, acting in good faith, a debtor might thus prefer one or more creditors.

*Coder*, 213 U.S. at 242, 29 S. Ct. at 443-44 (citations omitted).

*Van Iderstine* also recognized the difference.  It said:

> The statute recognizes the difference between the intent to defraud and the intent to prefer, and also the difference between a fraudulent and a preferential conveyance. One is inherently and always vicious; the other innocent and valid, except when made in violation of the express provisions of a statute. One is *malum per se* and the other *malum prohibitum*,-and then only to the extent that it is forbidden. A fraudulent conveyance is void regardless of its date; a preference is valid unless made within the prohibited period. It is therefore not in itself unlawful to prefer, nor fraudulent for one, though insolvent, to borrow in order to use the money in making a preference.

227 U.S. at 582, 33 S. Ct. at 345.[126]

There was, then, an early recognition in both the bankruptcy laws and by the Court that fraudulent transfers should be recovered because the debtor had engaged in a wrongful act whereas preferences were to be recovered simply as a matter of statutory policy – in this case, the legislative desire to treat similarly situated creditors equally.  Moreover, this same distinction is evident in the modern Code.  On the one hand, Section 548(a)(1)(A) renders voidable any transfer made by the debtor "with actual intent to hinder, delay, or defraud" a creditor.  It makes no difference whether value is exchanged or whether the debtor is insolvent.  The debtor's intent alone makes the act "*malum per se.*"  *Van Iderstine*, 227 U.S. at 582, 33 S. Ct. at 345.

---

[126]Black's Law Dictionary does not define *malum per se*.  It does, though, define *malum in se*:

> A wrong in itself; an act or case involving illegality from the very nature of the transaction, upon principles of natural, moral, and public law.

*Id.* at 959 (6th ed. 1990).

This definition is consistent with *Van Iderstine*'s reference to an inherently vicious act.

On the other hand, the debtor's intent is completely irrelevant to whether a transfer is avoided under Section 547(b) as a preference. More important to that consideration is the question of whether the creditor receiving the transfer gained an advantage over others. *See, e.g.,* 11 U.S.C. § 547(b)(5). Indeed, the only consideration given to the debtor himself is whether he was insolvent or not at the time the transfer was made. 11 U.S.C. § 547(b)(3).[127]

However, it is the transferee, not the debtor, who is ultimately the target whenever a trustee in fact seeks the recovery of either a fraudulent or a preferential transfer. Consequently, the focus must inevitably turn upon the circumstances under which the recipient of the avoided transfer should return it. What *Coder*, *Van Iderstine*, and *Dean* establish is that when an actually fraudulent transfer is at issue, the recipient's accountability to the estate is to be gauged based upon the same notion that a transfer of this type is *malum per se*.

---

[127]*Collier* draws the same distinction between fraudulent transfers and preferences:

> Fraudulent transfers under section 548 differ greatly from preferences under section 547. In the simplest form, fraudulent transfer law is part of the general debtor-creditor relationship, applicable to all transactions, while preference law holds sway only in bankruptcy. Thus, while fraudulent transfers are generally condemned under the common law and statutory provisions of most states, preferences generally have life only in bankruptcy, and may not be brought by individual creditors outside of bankruptcy. This limitation is consistent with the main purpose of preference law to ensure and [sic] equitable and ratable distribution among creditors in bankruptcy. But this justification has no place outside of bankruptcy: solvent debtors have always had the ability to prefer one creditor over other creditors outside of bankruptcy. No law, however, permits transfers in fraud of creditors.

5 *Collier on Bankruptcy* ¶ 548.01[3][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2010) (footnotes omitted).

For example, in *Van Iderstine*, the Court concluded that National Discount could retain its interest in the assigned accounts because it did not have the requisite awareness of the debtor's fraudulent intent.

> The transfer, therefore, was not a preference to the Discount Company, and could not be set aside without proof that it knew that Fellerman [the debtor] not only intended to pay some of his creditors, but to defraud others.

*Van Iderstine*, 227 U.S. at 583, 33 S. Ct. at 345.[128]

But in *Dean*, the Court affirmed the lower court's avoidance of the mortgage granted because the debtor in that instance had intended to defraud his creditors and Dean, the recipient, had been a knowing participant. Indeed, *Dean* equated the absence of such knowledge with good faith.

> The lower courts were justified in concluding that he intended the necessary consequences of his act; that he willingly sacrificed his property and his other creditors to avert a threatened criminal prosecution; **and that Dean, who, knowing the facts, cooperated in the bankrupt's fraudulent purpose, lacked the saving good faith.**

*Dean*, 242 U.S. at 445, 37 S. Ct. at 132 (emphasis added).

In sum, then, these three Supreme Court decisions laid out a fundamental distinction between the recovery of actually fraudulent transfers on the one hand and the recovering of other avoidable transfers on the other hand. The former is *malum per se*; the latter only *malum prohibitum*. Moreover, in drawing this distinction, the Court recognized that the transferee's good faith – i.e., his

---

[128]Van Iderstine, the trustee, had argued in the alternative that the assignment of accounts resulted in the debtor preferring National Discount over the debtor's other creditors. The Court, though, rejected Van Iderstine's preference argument because National Discount was not a creditor of the debtor and because it had no relationship with the son-in-law. 227 U.S. at 583, 33 S. Ct. at 345.

56

own behavior regarding the fraud being perpetrated – would be dispositive of whether he would have to return a transfer by the debtor that had been fraudulently intended.

Or, to put it differently, these three cases all stand for the proposition that the *malum per se / malum prohibitum* dichotomy that distinguishes an actually fraudulent transfer from one that is merely preferential carries over to the recipient of the transfer as well. Consequently, the estate's recovery of a preferential transfer has no moral undertones – whether the transferee must return the property received is simply a function of whatever Congress has decided is appropriate. However, when an inherently vicious act like an actually fraudulent transfer is involved (*cf. Van Iderstine*, 227 U.S. at 582, 33 S. Ct. at 345), then whether the recipient knew of the fraud or not becomes crucial, for that knowledge reflects his own honesty and integrity – i.e., his good faith.

Good Faith Under Former Section 67

*Coder*, *Van Iderstine*, and *Dean* all interpreted an early version of former Section 67. At that time, the Bankruptcy Act did not include what is commonly known today as a "constructively" fraudulent transfer – i.e., a transfer that can be avoided without a showing of actual intent, provided the transfer was made while the debtor was insolvent and without reasonable consideration being received in exchange. *Cf.* 11 U.S.C. § 548(a)(1)(B). Rather, Section 67 at that time required the trustee to establish in all instances that the transfer was made "with the intent and purpose on his part to hinder, delay, or defraud his creditors." Bankruptcy Act 1898, § 67e. In turn, the same subsection excepted from recovery of an actually fraudulent transfer "purchasers in good faith and for a present fair consideration."[129]

---

[129]Bankruptcy Act 1898, § 67e.

It is easy, then, to see in this early effort to codify the bankruptcy laws the same notion of *malum per se* that the Court discerned in *Coder, Van Iderstine*, and *Dean*. The recipient of an actually fraudulent transfer had nothing to fear provided he had paid fair consideration and he had taken in good faith. If, though, he had taken with knowledge of the debtor's intent to defraud his creditors, then it made no difference what he had paid, for he was just as culpable as the debtor himself. Or, as the Court concluded in *Dean*, he would have "lacked the saving good faith."[130] Therefore, not only would a transferee taking in bad faith have to return the fraudulently transferred property, he would also forfeit the consideration he had paid.[131] As stated in *Coder*:

> [I]t makes no difference that the conveyance was made upon a valuable consideration, if made for the purpose of hindering, delaying, or defrauding creditors. The question of fraud depends upon motive.

213 U.S. at 242, 29 S. Ct. at 443-44.

However, the 1938 Chandler Act, among many other things, amended former Section 67e (which then became Section 67d) to add constructive fraud as an alternative means for avoiding

---

[130]*Dean*, 242 U.S. at 445, 37 S. Ct. at 132.

[131]But, as the Court pointed out in *Coder, Van Iderstine*, and *Dean*, what Congress decides regarding the recovery of *malum prohibitum* transfers like a preference is left entirely to its discretion. Unlike actually fraudulent transfers, there are no moral considerations with respect to this type of avoidable transfer. For instance, former Section 60, which is the predecessor to current Section 547, at one time permitted a transferee to retain a preference so long as he did not have "reasonable cause to believe" that the debtor had intended to prefer him. Bankruptcy Act 1898 at § 60b. Reasonable cause, though, falls short of knowledge or willful blindness, which Congress could have just as easily chosen. Moreover, Congress elected to eliminate this particular exception altogether when it overhauled the former Act in 1938 and it has remained unavailable as a defense ever since. Indeed, whether a transferee today must return a preference turns for the most part upon a purely economic issue – i.e., value exchanged. *See also infra* Actually Fraudulent Transfers, Constructively Fraudulent Transfers, and Section 547 Preferences.

transfers under that section.[132] It also overhauled the corresponding defenses. The revised provision continued to protect a good faith purchaser who had paid fair consideration, albeit "bona fide" and "present fair equivalent value" replaced the former terms. Chandler Act 1938 at § 67d(6). More significant, though, was the addition of a new defense for the transferee who had paid something short of the property's fair equivalent value but who was nonetheless in good faith. What is interesting is that Congress did not use "good faith" to describe this second requirement. It chose the absence of "actual fraudulent intent" instead. *Id.*[133] The question, of course, is why?

This court submits that it was the addition of constructive fraud as an alternative to actual fraud that prompted the change. As already noted, only actual fraudulent transfers were avoidable under former Section 67e prior to the Chandler Act. Therefore, recovering a fraudulent transfer was a relatively straight forward issue. Either the transferee was aware of the debtor's fraud and, as a result, took in bad faith, or he was not aware of the fraud, and took in good faith. If it also happened

---

[132]Chandler Act 1938 at §§ 67(d)(2), (3), (4), Ch. 575, 52 Stat. 875 (1938) (repealed) (hereinafter "Chandler Act 1938").

[133]The revised defense appeared as subsection (6) to former Section 67d:

> (6) A transfer made or an obligation incurred by a debtor adjudged a bankrupt under this Act, which is fraudulent under this subdivision d against creditors of such debtor having claims provable under this Act, shall be null and void against the trustee, except as to a bona-fide purchaser, lienor, or obligee for a present fair equivalent value: *Provided, however,* that such purchaser, lienor, or obligee, who without *actual fraudulent intent* has given a consideration less than fair, as defined in this subdivision d, for such transfer, lien, or obligation, may retain the property, lien, or obligation as security for repayment.

Chandler Act 1938, § 67d(6) (emphasis added with respect to "actual fraudulent intent").

59

that the bad faith transferee had given consideration as well, that was just too bad. The law had no sympathy for conduct that was *malum per se.*

A constructively fraudulent transfer, though, is not *malum per se* because, by definition, it does not require the debtor to have engaged in what *Van Iderstine* early on described as inherently vicious behavior. 227 U.S. at 582, 33 S. Ct. at 345. Indeed, a constructively fraudulent transfer involves no ill will on the part of the debtor. All that is required is the debtor's insolvency and an absence of reasonably equivalent consideration in exchange. Such a transfer, then, is more akin to a preference, which, again, is *malum prohibitum.* In other words, constructively fraudulent transfers, like preferences, are not avoidable because they are inherently bad. Rather, they are avoidable only because Congress has prohibited them in order to accomplish a fairer distribution of the debtor's assets.[134]

However, the morally neutral character of this new avoidance power created a problem whenever the consideration paid by the transferee fell short of a reasonably equivalent amount. While a transferee with knowledge of an actually fraudulent transfer might not deserve credit for

---

[134]It is worth mentioning again the passage from *Maher* that *Coder* quoted with approval: "In a preferential transfer the fraud is constructive or technical, consisting in the infraction of that rule of equal distribution among all creditors, which it is the policy of the law to enforce when all cannot be fully paid." *In re Maher*, 144 F. 503, 509 (D. Mass. 1906).

Therefore, with all due respect, this court submits that *Bayou Group* was wrong when it equated Section 548(c) good faith with the equitable redistribution that is often the consequence of an avoided transfer. Preferences, unauthorized postpetition transfers, and even constructively fraudulent transfers all fall within this realm. However, actually fraudulent transfers have always been different. Notwithstanding *Bayou Group*'s statement to the contrary, a transferee's lack of good faith under Section 548(c) does entail a finding that he was guilty of "*mala fides*" and "deserving of opprobrium." *Cf.* 396 B.R. at 828. Moreover, the absence of good faith in an actually fraudulent transfer is intended to punish the recipient by not only requiring him to return the transfer received but also by requiring him to forfeit whatever consideration he may have paid. *See infra* n.136.

60

whatever he had paid to the debtor as part of that fraud, it did not follow that the recipient of a constructively fraudulent transfer should likewise forfeit whatever he had given in exchange to the debtor. Therefore, at the same time Congress expanded the trustee's avoidance powers to include constructively fraudulent transfers it added the proviso that a recipient of such a transfer who gave less than fair consideration would nonetheless receive credit for that consideration provided that the transferee himself was "without actual fraudulent intent."[135]  In other words, if the avoided transfer was actually fraudulent (i.e., *malum per se*) and the transferee was aware of its fraudulent purpose, then it continued to make no difference whether the recipient paid all or a portion of the property's fair value in exchange. It was forfeited.[136]  However, if the transferee was not himself tainted with dishonesty – which might be the case if the debtor's own fraudulent intent was actual but would always be the case if the debtor's fraudulent intent was only constructive – then the transferee would be protected to the extent of the consideration paid.

Section 548(c) Good Faith

No further changes were made to the two separate Section 67d defenses until Congress replaced the former Act altogether with the Bankruptcy Code. Current Section 548(c) is different. For example, it no longer includes a provision for transferees who paid a "present fair equivalent

---

[135]Indeed, this addition under the Chandler Act also improved the lot of good faith recipients of actually fraudulent transfers because the previous law did not protect good faith transferees who had given some consideration but not a "present fair consideration." Bankruptcy Act 1878 at § 67e.

[136]One ordinarily thinks of an intentionally fraudulent transfer being accomplished through a gift and, of course, forfeiture is not a risk when all that is involved is the gift's return. However, actually fraudulent transfers are not confined to only gifts. For example, a debtor could also perpetrate a fraud upon his creditors by selling a valuable asset – say, his vacation home – for fair value and then hiding the proceeds in an offshore account. If the purchaser was privy to the scheme (i.e., in bad faith), he not only would have to return the home; he would also lose any claim to the offshore account if it too was recovered.

61

value" and another provision for purchasers who had given "consideration less than fair." Rather, Section 548(c) combines the two into the single concept of "value." Similarly, Section 548(c) has eliminated the requirements of "bona fide purchaser" and "without actual fraudulent intent" that had also appeared in former Section 67d, replacing them instead with "good faith" once again.

However, apart from such streamlining, Section 548(c) affords the same protections as its predecessor. For instance, it continues to assure recipients of constructively fraudulent transfers that they will be credited for whatever consideration may have passed in exchange. Conversely, Section 548(c) includes the same risk of forfeiture in the event the transferee took in bad faith. In short, the *malum per se / malum prohibitum* distinction embodied in former Section 67d(6) continues in Section 548(c).

These last observations, though, assume that Congress, in enacting Section 548(c), intended good faith to still have the same meaning as it did under the former Act. Such an assumption certainly seems warranted. After all, Section 548(c) is not *tabula rasa*. It instead finds roots not only in former Section 67e but also in the early Supreme Court decisions of *Coder*, *Van Iderstine*, and *Dean*. Moreover, that same Supreme Court now instructs the lower courts again and again to interpret the current Code in a manner that is consistent with prior bankruptcy practice unless Congress has expressly indicated a different intent.[137]

---

[137]*Hamilton v. Lanning*, ---- U.S. ----, 130 S. Ct. 2464, 2473 (2010); *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 454, 127 S. Ct. 1199, 1206-07 (2007); *Lamie v. U.S. Trustee*, 540 U.S. 526, 539, 124 S. Ct. 1023, 1033 (2004); *Cohen v. de la Cruz*, 523 U.S. 213, 221, 118 S. Ct. 1212, 1218 (1998); *Dewsnup v. Timm*, 502 U.S. 410, 419, 112 S. Ct. 773, 779 (1992); *Pennsylvania Dept. of Pub. Welfare v. Davenport*, 495 U.S. 552, 563, 110 S. Ct. 2126, 2133 (1990); *Midlantic Nat'l Bank v. New Jersey Dept. of Envtl. Prot.*, 474 U.S. 494, 501, 106 S. Ct. 755, 759-60 (1986).