**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN**

In re:

Case No.  HG 05-00690

TELESERVICES GROUP, INC.,

     Debtor.

_____/

MARCIA R. MEOLI, Trustee,

     Plaintiff,

vs.

Adv. Pro. No.  07-80037

THE HUNTINGTON NATIONAL BANK,

     Defendant.

_____/

## OPINION RE: HUNTINGTON'S JULY 13, 2011 MOTION - AMENDMENT TO APRIL 28, 2009 PRETRIAL ORDER - CONSTITUTIONAL AUTHORITY

The Huntington National Bank ("Huntington") has filed a motion to amend my[1] April 28, 2009 pretrial order.  The requested amendment would eliminate the order's designation of this adversary proceeding as a matter in which I can enter a final determination subject only to ordinary appellate review.  Huntington contends that I lack the constitutional authority to enter what in this instance could be a multi-million dollar judgment against it arising from fraudulent transfers.  For the reasons stated in this opinion, I agree that I do not have that authority.[2]

---

[1] I typically write my opinions now in the third person in order to impress upon the reader that I am speaking on behalf of the court.  However, Huntington's motion calls into question whether I am acting on behalf of any court.  Therefore, I have chosen the first person in this instance.

[2] Both parties have submitted comprehensive briefs.  Although a hearing is scheduled for oral argument on September 1, 2011, I am cancelling that hearing because of the thoroughness of the written submissions.

*Stern v. Marshall* and its Fallout

For over twenty-five years, my colleagues and I have operated with the understanding that we were properly constituted judges capable of rendering final judgments in many, but not all, matters arising in connection with a bankruptcy proceeding. That understanding derives from 28 U.S.C. § 157 (hereinafter "Authority Section 157")[3] and its identification of so-called "core proceedings." Under this paradigm, bankruptcy judges are enabled to enter final orders or judgments concerning matters that are typically associated with the administration of a bankruptcy proceeding. However, we do not have that ability when the matter arises outside of this core. For example, a trustee's effort to collect an account receivable from a debtor's customer is considered non-core.[4]

Authority Section 157 itself establishes this distinction by providing a long list of matters that would fall within the parameters of a core proceeding. Some seem obvious – e.g., objections to discharge,[5] confirmations of plans,[6] and orders to turnover property of the estate.[7] Others are intentionally vague but still seem to fit. For instance, any matter "concerning the administration of

---

[3]Although 28 U.S.C. § 157 sounds jurisdictional, it is not. *Stern v. Marshall*, ____ U.S. ____, 131 S. Ct. 2594, 2607 (2011). Rather, it only establishes the circumstances where a district court can authorize the bankruptcy court as its adjunct to exercise on its behalf the jurisdiction that only the district court enjoys under 28 U.S.C. § 1334. Although clumsy, designating this section as "Authority Section 157" is necessary to distinguish it from the many more references I make in this opinion to sections of the Bankruptcy Code. 11 U.S.C. § 101 *et seq.*

[4]*Cf. Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S. Ct. 2858 (1982).

[5]28 U.S.C. § 157(b)(2)(J).

[6]28 U.S.C. § 157(b)(2)(L).

[7]28 U.S.C. § 157(b)(2)(E).

the estate" is a core proceeding.  28 U.S.C. § 157(b)(2)(A).[8]  Moreover, the list provided is not exclusive.  "Core proceedings include, but are not limited to . . . ." 28 U.S.C. § 157(b)(2).

This system has worked well for the most part.  Although it is the district court that actually has the jurisdiction to hear bankruptcy matters,[9] I am one of the three bankruptcy judges who actually oversee the thousands of cases filed in this district each year.[10]  Moreover, in exercising my delegated authority, I have entered countless orders as final without a second thought about the legitimacy of what I was doing.

However, *Stern v. Marshall*[11] reveals how misplaced my confidence has been.  As the Court itself observed, the underlying proceedings in *Stern* rivaled Dickens' infamous *Jarndyce and Jarndyce* in both complexity and endurance.[12]  Nonetheless, *Stern* can be summarized as a dispute over a considerable inheritance and a stepmother's effort to employ the bankruptcy court to recover

---

[8]*See also* 28 U.S.C. § 157(b)(2)(O).

[9]
> (a) Except as provided in subsection (b) of this section, **the district courts** shall have original and exclusive jurisdiction of all cases under title 11.
>
> (b) Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the **district courts** shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under chapter 11.

28 U.S.C. §§ 1334(a) and (b) (emphasis added).

[10]Our authority derives from the district court's referral through W.D. LCivR 83.2 of all bankruptcy matters to the bankruptcy judges. *See also* 28 U.S.C. § 157(a).

[11]_____ U.S. _____, 131 S. Ct. 2594 (2011).

[12]*See* Charles Dickens, BLEAK HOUSE (1852-53).

3

what that court finally determined was a multi-million dollar tort claim against the deceased husband's son. At issue was the bankruptcy judge's ability to enter a final judgment on account of that claim. Had the estate simply sued the stepson, it is unlikely that the case would have reached the Court a second time.[13] *Northern Pipeline* had already answered that question.[14] However, the estate's action had been brought as a counterclaim to the stepson's own tort claim against the bankruptcy estate and Authority Section 157(b)(2)(C) identified such counterclaims as being "core."[15] Indeed, when the stepson challenged the judgment that the bankruptcy court had entered against him, the Court determined not only that the bankruptcy judge had the statutory authority to make that award but also that the stepson had long ago waived any right to contest it.[16] However, the Court then dropped a bombshell by declaring that the judgment was nonetheless invalid because it violated the Constitution.

---

[13]The Court had already decided a different issue a few years earlier in *Marshall v. Marshall*, 547 U.S. 293, 126 S. Ct. 1735 (2006).

[14]Ironically, it is *Northern Pipeline* that inspired the enactment of Authority Section 157. Congress had originally intended for the courts it had created to administer the new Bankruptcy Code to have the authority to enter final orders and judgments in all matters that came before them. However, the Court in *Northern Pipeline* determined that such courts could not adjudicate traditional state law claims brought by the estate against a third party who had not given his consent because the bankruptcy judges assigned to those cases lacked the independence of a judge appointed under Article III of the Constitution. Authority Section 157 reflects Congress' attempt in 1984 to remedy that defect.

[15]The son had actually filed both a proof of claim against the estate and a separate nondischargeability action against his stepmother. The counterclaim arose in connection with both the stepmother's defense of the adversary proceeding and the estate's objection to the son's proof of claim.

[16]*Stern*, 131 S. Ct. at 2607-08.

In fairness, bombshell is an exaggeration if surprise alone is to be the measure. After all, the Court had already expressed its constitutional concerns in *Northern Pipeline*. *Stern* merely repeats the Court's prior declarations that the separation of powers requires a judiciary that is independent of the legislative and executive branches. *Stern* also reminds us that bankruptcy judges lack that independence because they do not have the life tenure or the salary security that Article III demands of anyone who is charged with exercising the "judicial power of the United States."[17] Consequently, it made no difference to the Court in *Stern* how the estate's tort claim against the stepson came to the bankruptcy judge's attention. As Chief Justice Roberts observed:

> [I]t is hard to see why Pierce's [the stepson's] decision to file a claim should make any difference with respect to the characterization of Vickie's [the stepmother's] counterclaim. " '[P]roperty interests are created and defined by state law,' and '[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.' " Pierce's claim for defamation in no way affects the nature of Vickie's counterclaim for tortious interference as one at common law that simply attempts to augment the bankruptcy estate—the very type of claim that we held in *Northern Pipeline* and *Granfinanciera* must be decided by an Article III court.

*Stern*, 131 S.Ct. at 2616 (citation omitted).

For what it is worth, I believe that *Stern*'s reasoning is sound. I may take umbrage at the suggestion that my independence as a decision-maker would ever be compromised by the threat of not being reappointed or having my compensation reduced. But there remains the appearance that I could be so influenced and that alone is enough. Moreover, the historical argument that the Court

---

[17]131 S. Ct. at 2620.

5

makes is compelling, as is its argument that constitutional principles cannot be overlooked simply because the issue raised is mundane or the potential infringement is innocuous. *Id.* at 2609, 2620.

However, bombshell does fairly describe *Stern*'s impact upon the more practical issue of how bankruptcy judges are to perform what the Code still calls us to do. *Stern* is careful to limit its holding to only the specific issue that was before the Court. Unfortunately, this is not a situation where those who labor in the fields can wait until the next fistfight between an expectant heir and his stepmom finds its way to the Court. Everyday I am presented with numerous orders that Congress expects me to either sign as final or forward on with a report and recommendation. However, prior to *Stern*, I did have a standard – 28 U.S.C. § 157(b)(2) – to serve as my guide. But now I am told that that standard is unreliable when tested against the Constitution itself.

My frustration with *Stern* is that it offers virtually no insight as to how to recalibrate the core/non-core dichotomy so that I can again proceed with at least some assurance that I will not be making the same constitutional blunder with respect to some other aspect of Authority Section 157(b)(2). *Stern* certainly reaffirms that only an Article III judge can enter a judgment associated with the estate's recovery of contract and tort claims designed to augment the estate. *Stern* also emphasizes that the guaranty of such oversight cannot be avoided by making the recovery part of the claims allowance process.

But *Stern* is silent as to how much further this constitutional protection extends into the bankruptcy process. For example, Authority Section 157(b)(2) also gives me the statutory authority to enter final orders regarding objections to claims,[18] the estate's procurement of credit,[19] and the

---

[18]28 U.S.C. § 157(b)(2)(B) and 11 U.S.C. § 502.

[19]28 U.S.C. § 157(b)(2)(D) and 11 U.S.C. § 365.

6

turnover of the estate's property.[20]  I would assume that a few of these activities remain within the authority that I am able to exercise independent of an Article III judge.  However, *Stern*'s reticence leaves me wondering whether my assumption is a good one.  At most, I am told that a judicially recognized "public rights" exception might permit a non-Article III judge to act on his own with respect to some aspects of the bankruptcy process.[21]  However, as *Stern* itself concedes,[22] the Court has yet to give clear definition to this exception as a general proposition, let alone as to how it might apply in the bankruptcy arena.[23]

Moreover, the problem presented by *Stern* goes beyond my own frustration.  For instance, Congress, through Section 363(b) of the Bankruptcy Code,[24] has directed that the estate's property cannot be disposed of by the bankruptcy trustee outside of the ordinary course without "notice and a hearing."  Likewise, Sections 1129, 1225, and 1325 all contemplate a court confirming plans

---

[20]28 U.S.C. § 157(b)(2)(E) and 11 U.S.C. § 542.

[21]*Northern Pipeline*, 458 U.S. at 69-72, 102 S. Ct. at 2870-72; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51, 109 S. Ct. 2782, 2795-96 (1989); and *Stern*, 131 S. Ct. at 2610.

[22]*Stern*, 131 S. Ct. at 2611.

[23]For example, *Northern Pipeline* states that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power . . . may well be a 'public right'." *Northern Pipeline*, 458 U.S. at 71, 102 S. Ct. at 2871.  Yet *Granfinanciera* later explains in a footnote that the Court there was not suggesting "that the restructuring of debtor-creditor relations is in fact a public right." 492 U.S. at 56 n. 11, 109 S. Ct. at 2798 n.11.  And in *Stern*, the Court actually declined the opportunity to rectify the situation, stating instead that it would not "reconsider the public rights framework for bankruptcy." 131 S. Ct. at 2614 n.7.

[24]11 U.S.C. § 363(b).  Teleservices' petition pre-dates the October 17, 2005 effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L.No. 109-8, § 1501(b)(1), 119 Stat. 23.  Therefore, unless otherwise indicated, all citations in this opinion to the Bankruptcy Code will be to the Bankruptcy Code as written prior to the BAPCPA amendments.  The citation will be "Section _____."

7

submitted in cases filed under Chapters 11, 12, and 13. If I continue to order sales as I did prior to *Stern*, is not the purchaser of that property left with the risk that the sale will be later declared null because it was not authorized by the right court? *Cf.* 11 U.S.C. § 549(a)(2)(B). And is not the debtor of a Chapter 13 plan confirmed by me post-*Stern* left to wonder whether the discharge he is to receive as a consequence of the ordered plan will really protect him from a creditor's subsequent efforts to collect?

One alternative would be to play it safe and simply refer without reflection every future determination I make to a district judge for his or her final review. However, I do not see how I can do so in good faith given Authority Section 157(b)(3)'s direction that I must decide even in instances when not requested whether I have the ability or not under that section to enter a final order. *Cf.* 28 U.S.C. § 157(b)(3). Moreover, I suspect that the Article III judges in my district would not be pleased with the extra workload such an approach would impose upon them.[25]

Therefore, for all of these reasons, I have concluded that I cannot decide the specific issue that Huntington now raises without first having a better understanding of whether, in light of *Stern*, I have the authority to enter final orders with respect to any issue arising in this case, no matter how "core" it might be. It is, then, with this purpose that I consider the broader implications of *Stern* upon my ability to function independently without running afoul of the Constitution and the protections it affords through Article III.

---

[25] Justice Breyer, in his dissent, described the volume of bankruptcy cases as "staggering." *Stern*, 131 S. Ct. at 2630 (Breyer, J., dissenting). For purposes of comparison, he noted that there were "almost 1.6 million filings last year, compared to a federal district court docket of around 280,000 civil cases and 78,000 criminal cases." *Id.* (citation omitted). Moreover, the 1.6 million filings he referenced do not reflect the numerous adversary proceedings that were commenced in connection with those bankruptcy cases.

Summary / Plenary Approach

It is tempting to interpret both *Northern Pipeline* and *Stern* as only retrofitting the bankruptcy courts with the limited summary jurisdiction that my predecessors were recognized as having under the former Bankruptcy Act. The Court in *Northern Pipeline* had explained that the federal district courts were the "bankruptcy courts" prior to the Code and that I and my colleagues were referred to back then as only "referees."[26] Therefore, most "judicial" functions associated with a bankruptcy proceeding remained with the district courts. Nonetheless, the referee was "vested with 'summary jurisdiction' – that is with the jurisdiction over controversies involving property in the actual or constructive possession of the court." *Northern Pipeline*, 458 U.S. at 53, 102 S. Ct. at 2862. Moreover, the "referee" had "jurisdiction over some 'plenary' matters – such as disputes involving property in the possession of a third person" provided there was consent. *Id.*

Adopting this approach once again does commend itself if for no other reason than that it went without constitutional challenge for so long under the former Act. However, the fact remains that Congress intended to eliminate the summary/plenary distinction as part of the bankruptcy reforms it was implementing in 1978. Congress also envisioned the new bankruptcy courts being created as having significantly more authority than did the referees under the former system. Indeed, Congress had the opportunity in 1984 to revert to the more familiar summary/plenary approach yet it chose not to do so. Therefore, it is fair to say that Congress, in responding to *Northern Pipeline*'s

---

[26]*Northern Pipeline*, 458 U.S. at 53, 102 S. Ct. at 2862. Referees were transformed into "bankruptcy judges" even before the Code was enacted. However, I will refer to all of my pre-Code counterparts as referees, as did the Court in *Northern Pipeline*. *Id.* at 458 U.S. 52 n.2.

9

rebuke, still intended the bankruptcy courts to have as much independent authority as the Constitution will permit.[27]

There is also the question of whether the Court's recent determinations concerning the relationship between the bankruptcy court and Article III courts are consistent with how it had previously viewed that relationship under the former summary/plenary distinction. For example, the Court in *Sampsell*[28] saw no problem with the referee there ordering the return of fraudulently transferred property since at that time it was generally accepted that property held by another without colorable title fell squarely within the referee's summary jurisdiction. *Cf. Harrison v. Chamberlin*, 271 U.S. 191, 193-94, 46 S. Ct. 467, 468 (1926). But *Stern*, when combined with *Granfinanciera*, at the very least suggests that a bankruptcy court's entry of a money judgment in connection with an avoided fraudulent transfer is constitutionally suspect.

Or, as another example, in *Katchen v. Landy*,[29] the Court concluded that the bankruptcy referee, in exercising his summary jurisdiction, could order the surrender of avoidable preferences as part of the claim allowance process on the theory that requiring a subsequent plenary matter to do so would be a "meaningless gesture." 382 U.S. at 334, 86 S. Ct. at 475. However, the Court came to that conclusion only because it believed that a later court, in exercising its plenary jurisdiction to recover the same preference, would have been obligated to treat the referee's determinations as res judicata. *Id.* The problem, of course, is that *Stern* and *Granfinanciera* now seem to hold that only

---

[27]This intention is also evidenced by Congress' decision to define core proceedings under Authority Section 157(b)(2) only by example and its decision not to offer within that section corresponding examples of what would constitute non-core proceedings.

[28]*Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 61 S. Ct. 904 (1941).

[29]382 U.S. 323, 86 S. Ct. 467 (1966).

10

an Article III court would be capable of entering the money judgment needed to recover that preference. Therefore, one must ask how that court could be bound to follow the bankruptcy court's prior determination in the claims allowance process without forsaking the independence that Article III is supposed to guaranty. Again, as the Chief Justice observed in *Stern*, the constitutional analysis that the majority was employing there should not be affected at all by the context within which it comes up. *Stern*, 131 S. Ct. at 2616.

But even if the summary/plenary distinction could still be tweaked to accommodate the issues now raised by *Northern Pipeline*, *Granfinanciera*, and *Stern*, all that one would be doing is replacing one set of words – summary/plenary – for another – core/non-core. What remains under either distinction – or, for that matter, a public/private rights distinction – is still the unanswered question of how far can Congress go in enacting uniform bankruptcy laws without intruding upon the judicial power that the Constitution reserves for only those courts acting under the authority of Article III. Indeed, it was the incredible confusion that arose in distinguishing between the referee's summary jurisdiction and the district court's plenary jurisdiction over controversies in a bankruptcy proceeding that led Congress in 1978 to jettison that system for one where everything was being decided by a single bankruptcy court exercising complete jurisdiction. Therefore, agreeing upon the appropriate label is not as important as understanding why some things I do seem to fit naturally within a "core" set of activities for bankruptcy judges while other activities are more suitable for an Article III court.

Historical Approach

History has unquestionably influenced the Court's recent efforts to reconcile Article III with the judicial involvement the Bankruptcy Code contemplates. *Northern Pipeline* and *Stern* reference Hamilton, Madison, Montesquieu and even the Declaration of Independence in their explanations

for why the Framers were so adamant about creating a separate judicial branch with independent judges. Our forefathers had witnessed first hand how George III had abused the colonial courts by making "Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries." *Stern*, 131 S. Ct. at 2609 (quoting THE DECLARATION OF INDEPENDENCE para. 11 (U.S. 1776)).

> In sum, our Constitution unambiguously enunciates a fundamental principle – that the "judicial Power of the United States" must be reposed in an independent Judiciary. It commands that the independence of the Judiciary be jealously guarded, and it provides clear institutional protections for that independence.

*Northern Pipeline*, 458 U.S. at 60, 102 S. Ct. at 2866.

Moreover, this fundamental principle applies no less to "mundane" issues than it does to the "glamorous" ones. *Stern*, 131 S. Ct at 2609 (quoting *Northern Pipeline*, 458 U.S. at 86 n.39, 102 S. Ct. 2878 n.39).

As for the "judicial power" Article III protects, *Stern* says that it is "the stuff of traditional actions of common law tried by the courts at Westminster in 1789." *Id.* at 2609 (quoting *Northern Pipeline*, 458 U.S. at 90, 102 S. Ct. at 2881 (Rehnquist, J., concurring)). And *Stern* explains elsewhere that it is to include "any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Id.* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 284). *See also Northern Pipeline*, 458 U.S. at 67, 102 S. Ct. at 2869.

The problem with the Bankruptcy Code and its enforcement is that it reflects the fusion of two very distinct approaches to addressing insolvency. On the one hand, there was the retaliatory approach that went back to Roman times. It involved the forcible seizure of both the bankrupt

himself and his properties with the purpose being to liquidate the debtor's assets for his creditor's benefit. It usually was limited to insolvent merchants and it did not include until a later date any discharge as part of the process.[30]

The other, more cooperative approach finds its roots in the English common law and its provision for contracts of assignment and composition. Those laws, which were often referred to as insolvency laws, recognized a process whereby a debtor, with some but not all of his creditors' consent, could voluntarily turnover his assets for liquidation and then distribution. This approach also in time included a discharge, with it being granted first only by creditor agreement and then later by statute.[31]

How governments administered various combinations of these two approaches were just as diverse. For example, England adopted a system in the 17th and 18th centuries specifically designed for bankrupts that was administered by special commissioners appointed by the Lord Chancellor. These commissioners were not judges although they had many judge-like powers. Pennsylvania also had a similar system when the Constitution was created and it is from the English and Pennsylvania bankruptcy systems that my own role as a bankruptcy judge can be traced.[32]

However, other types of insolvency proceedings continued to evolve in the common law courts in England and then in many of the colonies as all of these courts became more comfortable with debtors seeking relief from them. Therefore, Judge Rehnquist's reference to traditional actions

---

[30]Rep. of Comm'n on the Bankr. Laws of the U.S., H.R. Doc. No. 93-137, 93d Cong., 1st Sess., pt I, Ch. 3 § B(1) (1973).

[31]*Id.*

[32]Plank, *Why Bankruptcy Judges Need Not and Should Not be Article III Judges*, 72 Am. Bankr. L.J. 567 (Fall, 1998).

of common law in 1789 as being the "stuff" reserved for Article III judges seems to square with at least some of the historical roots from which the current Bankruptcy Code derives. Indeed, given that the English system established by the Lord Chancellor at that same time permitted access to both the law and equity courts,[33] an argument can certainly be made that Article III judges, and only Article III judges, are to oversee the bankruptcy process right down to the most routine of orders.

This, then, is why the lack of guidance in *Stern* is so disappointing. Chipping away at Authority Section 157(b)(2) subpart by subpart is a disservice to both the district courts and the bankruptcy courts if, in the end, the outcome is for the bankruptcy courts to have no independent authority at all. Again, I suspect that everyone involved, including the Court, envisions some arrangement under which the bankruptcy courts are still capable of standing on their own, just as the commissioners did centuries ago in England and Pennsylvania. However, unless some rationale is found to justify a different outcome, *Stern*'s sweeping statements concerning Article III's reach portend a new world where my colleagues and I will in fact become only the functional equivalents of "magistrate judges, law clerks and the Judiciary's administrative officials." 131 S. Ct. at 2627 (Breyer, J., dissenting).

Legislative Courts

*Northern Pipeline* stated without qualification that Congress did not create legislative courts when it restructured the bankruptcy system in 1978.[34] Nor did Congress, in reacting to that decision, do so in 1984. There is no question that Authority Section 157 contemplates the bankruptcy courts continuing as adjuncts of the federal judiciary. Consequently, *Stern*'s declaration that a court that

---

[33] *Id.*

[34] 458 U.S. at 64, 102 S. Ct. at 2868.

14

enters the type of orders that that section authorizes can be the adjunct of no one poses a real dilemma.[35]

However, the appellant in *Northern Pipeline* never actually argued that the bankruptcy courts were legislative courts. Rather, the argument was that bankruptcy courts were only **like** legislative courts and, as such, had the same ability to enter final orders even though they were adjuncts of another branch. Nor did *Northern Pipeline* reject the argument out of hand. The Court instead held only that the bankruptcy court in that particular instance was not acting like a legislative court because it was adjudicating a matter – in that case, a state law claim brought against a third party – that could only be decided by a judge vested with the constitutional independence required by Article III.[36]

There is room, then, even after *Stern* to consider further the appellant's argument in *Northern Pipeline* that a bankruptcy court can still enter at least some orders as if it were an independent legislative court. However, in doing so, I suggest that it is better to focus attention upon the more fundamental question of whether Congress needs a court at all with respect to much of what is required of me under the Bankruptcy Code as now enacted. Or, to frame the question another way: Are many of the court-like functions I perform as a bankruptcy judge even necessary?

---

[35]*Stern*, 131 S. Ct. at 2611.

[36]*Northern Pipeline*, 458 U.S. at 87, 102 S. Ct. at 2880.

*Murray's Lessee*

It is ironic that *Murray's Lessee*,[37] upon which *Stern* relies so heavily, also offers insight to this much different question. It is surprising that such an innocuous set of facts as those presented in that case gave rise to the fundamental constitutional issue that *Murray's Lessee* ended up having to address. The dispute arose because the federal government had employed a fellow named Swartwout to collect customs duties at the port of New York. Unfortunately, Swartwout had fallen behind on his accounting, which prompted the U.S. Treasury to not only assess Swartwout for the missing duties but also to levy and sell his property under a distress warrant issued by the solicitor of the treasury. All of this, though, was done without the benefit of any court. Therefore, when the purchaser of a particular property under the warrant attempted to evict an unwanted tenant, the tenant responded with a constitutional challenge. Specifically, "Murray's lessee"[38] maintained that only an Article III court could have ordered the seizure and sale of the property that the purchaser claimed.

The quote *Stern* takes from *Murray's Lessee* – that Congress cannot "withdraw from judicial cognizance any matter which . . . is the subject of a suit of the common law, or in equity, or admiralty . . ."[39] – appears in the latter part of a long opinion and only as a response to a very specific argument the tenant was making. Although Congress had clearly empowered a treasury official to assess the

---

[37]*Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272 (1856).

[38]The appellants in *Murray's Lessee* were actually "John Den, *ex dem.* James B. Murray and John C. Kayser" with "*ex dem.*" (or *ex demissione*) meaning "upon the demise." Although not altogether clear, it appears that "John Den" is a variation of John Doe and that Murray and Kayser, who were the landlord/owners, were using this fictional character so that they could themselves defend against the common law ejectment action that had been brought against their tenant (i.e., Murray's lessee).

[39]*Stern*, 131 S. Ct. at 2609 (quoting *Murray's Lessee*, 59 U.S. at 284).

16

obligation and then issue a warrant without the aid of a court, Congress had also provided in the same act for Swartwout to apply to the federal courts for relief if he so chose. What the tenant argued was that Congress could confer upon the courts only matters that involved a judicial controversy. Therefore, he reasoned that Congress, by giving Swartwout recourse to the federal courts, must have created a judicial controversy that only the judiciary could address.

It is in this context, then, that the Court in *Murray's Lessee* went on to distinguish between the remedying of public and private wrongs. It is also at the end of this discussion, and only after the Court had concluded that Congress could have afforded Swartwout this judicial remedy yet still have allowed the treasury department to summarily act as it did, that the Court made the comment upon which *Stern* relies. Here is the entire quote, unedited:

> To avoid misconstruction upon so grave a subject, **we think it proper to state that we do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty;** nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination. At the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.

*Murray's Lessee*, 59 U.S. at 284[40] (emphasis added).

---

[40]The Court reached the same conclusion again in the waning paragraphs of its opinion, albeit less emphatically.

> But it seems to us that the just inference from the entire law is, that there was such a necessity for the warrant and the commencement of the levy, but not for its completion, if the collector should interpose, and file his bill and give security. The provision that he may file his bill and give security, and thus arrest the summary proceedings, only proves that congress thought it not necessary to pursue them, after

The Chief Justice was also referring to this passage when he made the important statement in *Stern* that "[t]he point of *Murray's Lessee* was simply that Congress may set the terms of adjudicating a suit when the suit could not otherwise proceed at all." *Stern*, 131 S. Ct. at 2612.

However, while the latter portion of *Murray's Lessee* certainly has bearing upon the question at hand,[41] it is the first part of *Murray's Lessee*, which *Stern* did not discuss, that proves more important to its decision that subpart (C) of Authority Section 157(b)(2) intruded into areas that the Framers intended to have only an independent judiciary decide. *Murray's Lessee*, like *Stern*, recognized that the question before it arose because of the separation of powers between Congress and the federal judiciary. However, the Court in *Murray's Lessee* had the additional insight of recognizing that the real issue was the Fifth Amendment and its guaranty of due process.[42] Here, in fact, is how *Murray's Lessee* actually sets forth the question that the tenant there had forced the Court to answer:

> [W]hether, under the constitution of the United States, a collector of the customs, from whom a balance of account has been found to be

> such security should be given, until a decision should be made by the court. **It has no tendency to prove they were not, in the judgment of congress, of the highest necessary under all other circumstances; and of this necessity congress alone is the judge**.

*Murray's Lessee*, 59 U.S. at 285 (emphasis added).

[41]To add irony to irony, this portion of *Murray's Lessee* actually addresses the question of when can Congress legitimately delegate to the federal judiciary something that is reserved for it under Article I, with the Court there stating that it can do so in some instances – e.g., a matter that has the characteristics of both a "public right" and a "private right." As such, this part of *Murray's Lessee* addresses an entirely different constitutional issue raised by Authority Section 157. *See infra.*

[42]The Court has since acknowledged *Murray's Lessee* as in fact its first detailed analysis of the due process clause. *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 29-31, 111 S. Ct. 1032, 1049-50 (1991).

18

due by accounting officers of the treasury, designated for that purpose by law, **can be deprived of his liberty, or property, in order to enforce payment of that balance, without the exercise of the judicial power of the United States**, and yet by due process of law, within the meaning of those terms in the constitution; and if so, then, secondly, whether the warrant in question was such due process of law?

*Murray's Lessee*, 59 U.S. at 275-76 (emphasis added).[43]

_____

[43]Lest there be any doubt that *Murray's Lessee* raised a Fifth Amendment issue, the Court said in the immediately preceding paragraph that the question of whether the summary proceeding employed was in fact an exercise of the judicial power was "best" considered under another inquiry:

> [Whether] the effect of the proceedings authorized by the act in question is to deprive the party, against whom the warrant issues, of his liberty and property, 'without due process of law;' and, therefore, **is in conflict with the fifth article of the amendments of the constitution**.

59 U.S. at 275 (emphasis added).

The Court also noted the important role that the Fifth Amendment plays in limiting Congress' legislative power.

> It is manifest that it was not left to the legislative power to enact any process which might be devised. The article [i.e., the Fifth Amendment] is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave congress free to make any process 'due process of law,' by its mere will.

*Id.* at 276.

And finally, it is equally clear from *Murray's Lessee* that the deprivation of judicial due process that concerned the Court there was not only the treasury's summary seizure of Swartwout's property, but also the treasury's summary assessment of the debt itself. For instance, the Court made no distinction between the two in framing the issue.

> It must be admitted that, if the auditing of this account, and the ascertainment of its balance, and the issuing of this process, was an exercise of the judicial power of the United States, the proceeding was void; for the officers who performed these acts could exercise no

19

What *Murray's Lessee* held was that Congress' establishment of the summary procedure used by the treasury to collect the debt owed by Swartwout did not deprive him of his right to due process even though the federal judiciary had not been involved at all. Indeed, it was only after the Court had reached this important conclusion that it delved into the separate question of whether the judicial remedy that Congress had added to this summary proceeding made it a judicial process nonetheless.

How, though, could the Court have reached that conclusion? Doesn't the Constitution guaranty an independent judiciary for just this type of a situation? As *Stern* itself observed:

> In establishing the system of divided power in the Constitution, the Framers considered it essential that "the judiciary remain[ ] truly distinct from both the legislature and the executive." The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton). As Hamilton put it, quoting Montesquieu, " 'there is no liberty if the power of judging be not separated from the legislative and executive powers.' " *Ibid.* (quoting 1 Montesquieu, Spirit of Laws 181).
>
> . . .
>
> Article III protects liberty not only through its role in implementing the separation of powers, but also by specifying the defining characteristics of Article III judges. The colonists had been subjected to judicial abuses at the hand of the Crown, and the Framers knew the

> part of that judicial power. They neither constituted a court of the United States, nor were they, or either of them, so connected with any such court as to perform even any of the ministerial duties which arise out of judicial proceedings.

*Id.* at 275. *See also id.* at 280 ("That the auditing of the accounts of a receiver of public monies may be, in an enlarged sense, a judicial act, must be admitted.").

Therefore, *Murray's Lessee* is on all fours with *Stern*. Each is about Congress' use of an extrajudicial device to recover an amount claimed. In *Murray's Lessee*, it was treasury's summary proceedings against Swartwout; in *Stern*, it was a non-Article III judge's entry of a final judgment against the stepson. And in each instance, the device employed raised questions whether the person targeted was being denied the due process rights the Fifth Amendment guarantees through the establishment of an independent Article III judiciary.

main reasons why: because the King of Great Britain "made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries." The Declaration of Independence ¶ 11. The Framers undertook in Article III to protect citizens subject to the judicial power of the new Federal Government from a repeat of those abuses. By appointing judges to serve without term limits, and restricting the ability of the other branches to remove judges or diminish their salaries, the Framers sought to ensure that each judicial decision would be rendered, not with an eye toward currying favor with Congress or the Executive, but rather with the "[c]lear heads ... and honest hearts" deemed "essential to good judges." 1 Works of James Wilson 363 (J. Andrews ed. 1896).

*Stern*, 131 S. Ct. at 2608-09.[44]

Interestingly, *Murray's Lessee* resolved this conflict by examining what was meant by due process both historically and under comparable systems at the time of the Constitution's enactment. In particular, it considered the circumstances under which the English and state governments were allowed to seize an individual's property without having to go through a judicial proceeding. What it discerned was that a hearing presided over by a judge was not regarded by others as being necessary to meet the requirement of due process when the taking involved only the government itself attempting to recover collections owing from its own agent. Therefore, the Court was satisfied that Swartwout had been afforded whatever process was due him even though the assessment and seizure was made without an Article III judge having taken part in the proceeding.

The Bankruptcy Clause

It is fair to say that a historical comparison similar to the one done in *Murray's Lessee* might have led to the opposite conclusion had the Court's focus in that case been instead upon the bankruptcy laws. After all, as already noted, the common law courts in both England and the states

---

[44]*Stern* could have made its point just as well had it started the second paragraph with "property" instead of "liberty."

21

were administering bankruptcy-like laws when the Constitution was being debated. Should not, then, courts, and, in particular, courts that guaranty the type of due process contemplated in the Fifth Amendment, also be a mainstay of whatever bankruptcy system Congress might devise?[45]

However, when the states delegated to Congress the authority to replace their insolvency laws with new ones, it was without reservation. There may be disagreement as to whether the Bankruptcy Clause preempts the various states from filling in gaps that the Bankruptcy Code has left. *See, e.g., In re Jones*, 428 B.R. 720 (Bankr. W.D. Mich. 2010) and *Richardson v. Schafer (In re Schafer)*, 2011 WL 650545 (B.A.P. 6th Cir. 2011). There is, though, no dispute that Congress is to have a free hand whenever it does take the initiative to devise its own set of bankruptcy laws. Incorporating courts into that system is certainly an option, as evidenced by what Congress attempted to accomplish when it enacted the Bankruptcy Code in 1978. But is it the only option?

---

[45]Justice White's answer in *Northern Pipeline* to this question was no. His reasoning was that Congress could have, in the exercise of its own authority to enact the bankruptcy laws, avoided the issue altogether by simply assigning all bankruptcy matters to the state courts. *Northern Pipeline*, 458 U.S. at 116, 102 S. Ct. at 2895 (White, J., dissenting). However, the plurality in *Northern Pipeline* had its own answer:

> But, of course, virtually all matters that might be heard in Art. III courts could also be left by Congress to state courts. This fact is simply irrelevant to the question before us. Congress has no control over state-court judges; accordingly the principle of separation of powers is not threatened by leaving the adjudication of federal disputes to such judges. The Framers chose to leave to Congress the precise role to be played by the lower federal courts in the administration of justice. But the Framers did not leave it to Congress to define the character of those courts—they were to be independent of the political branches and presided over by judges with guaranteed salary and life tenure.

*Northern Pipeline*, 458 U.S. at 64 n.15, 102 S. Ct. at 2868 n.15 (citations omitted).

22

As will be seen, much of what Congress can accomplish through enacting uniform bankruptcy laws can be done without a judicial officer's involvement at all. The only restraint is that whatever is enacted must also comport with protections that the Constitution provides, including the Fifth Amendment's promise that property will not be taken from a person without due process of law. That is the premise upon which the Court in *Murray's Lessee* began its analysis. And both *Northern Pipeline* and *Stern* rely upon that same premise when they remind us that the augmentation of the bankruptcy estate through the adjudication of a contract or a tort claim is no less deserving of oversight by an Article III judge than when that claim is pursued in any other situation. As *Stern* observed: "The structural principles secured by the separation of powers protect the individual as well."[46]

Administrative Orders

It is, then, within this framework that each function Congress has assigned a bankruptcy judge under the current Code must be assessed. Take, for instance, the bankruptcy estate itself. As was the case under the former Act, all bankruptcy proceedings involve a separate entity – the estate – that is to serve (1) as the receptacle of all property that is to be subject to the proceeding, and (2) as the vehicle through which that property is to be administered and then distributed. However, the Bankruptcy Code contemplates a trustee administering this estate with much less oversight than had previously been the custom. *In re Dalen*, 259 B.R. 586, 596-98 (Bankr. W.D. Mich. 2001). A Code trustee, unlike his predecessor under the former Act, is not expected to first secure authority from the bankruptcy court before engaging in any of the mundane tasks that he encounters from day-to-

---

[46]*Stern*, 131 S. Ct. at 2609 (quoting from *Bond v. U.S.*, _____ U.S. _____, _____, 131 S. Ct. 2355, 2365 (2011)).

day. His authority derives instead from Section 704(a)(1)'s simple direction to "collect and reduce to money the property of the estate . . . and close such estate as expeditiously as is compatible with the best interests of parties in interest . . . ." Indeed, Section 726(a) complements Section 704(a)(1) by also empowering a modern Chapter 7 trustee to distribute, without order, the estate's property among those making claims. All that serves as his guide is the Code itself.[47]

On the other hand, the Bankruptcy Code still requires "notice and a hearing" in any number of endeavors before the trustee may proceed. But these particular exceptions to the trustee's otherwise intended emancipation from the bankruptcy court's grip only raises the separate question of whether any oversight is required at all. A bankruptcy proceeding and a private trust created under state law actually have much in common. Both involve the creation of a legal fiction called an estate that holds property administered by a trustee for the benefit of others. However, given this similarity, is there anything that precludes Congress from emulating this model further by giving the bankruptcy trustee the same free rein that many private trustees enjoy so long as (1) there is an accounting to the estate's claimants at some point in time; and (2) the bankruptcy trustee is faced with the threat of personal liability should that accounting fall short?

Consider, then, Sections 363(b) and (c). The latter permits the bankruptcy trustee to enter into "transactions, including the sale or lease of the property of the estate" without notice or a hearing if the transaction is in the ordinary course of the debtor's business. 11 U.S.C. § 363(c)(1). However, if that condition is not met, the bankruptcy trustee cannot sell or lease property of the estate without all creditors and the debtor receiving notice. *Cf.* 11 U.S.C. §§ 363(b) and 102(1)(B) and FED. R. BANKR. P. 2002(a)(2). Moreover, if the bankruptcy trustee requests a hearing or a

---

[47]*See also In re Engman*, 395 B.R. 610 (Bankr. W.D. Mich. 2008).

hearing is otherwise required because of a creditor's objection,[48] the bankruptcy trustee cannot proceed with the contemplated sale or lease without first securing from the court the authority to do so.

All that has been just described should be familiar to bankruptcy practitioners. Nonetheless, *Stern* forces even the familiar to be examined. Fortunately, though, it would appear that Section 363(b) involves no taking of property, at least if there are not competing interests in what is being sold.[49] After all, the debtor would have long ago acquiesced to the trustee's disposing of his property as part of his decision to file a voluntary petition.[50] *Cf.* 11 U.S.C. § 541(a). And the unsecured creditors' rights in that property would be tangential, at most. Indeed, the fact that unsecured creditors have no interest in the debtor's property is what distinguishes them from their secured counterparts.

---

[48]*Cf.* 11 U.S.C. § 102(1)(B).

[49]The estate's sale of both its own interest and another party's interest in the same property could raise *Stern*-type issues. A trustee always has the option of selling only the estate's interest under Section 363(b) and letting the purchaser simply take subject to the competing interest. However, selling a co-tenant's interest as well under Section 363(h) or selling the estate's interest free and clear of a secured creditor's lien under Section 363(f) would likely bring *Stern* into play.

[50]On the other hand, an involuntary bankruptcy proceeding, if opposed, does create constitutional problems under *Stern* because it by definition could result in the unwanted transfer of a reluctant debtor's property to the bankruptcy estate. *See* 11 U.S.C. §§ 303(a) and 541(a). Therefore, it is fair to question whether *Stern* would permit anyone but an Article III judge to effect such an involuntary taking through the entry of a contested order for relief. *Cf.* 11 U.S.C. § 303(h). Indeed, *Stern* and *Murray's Lessee* could prompt a constitutional challenge to the immediate seizure of the insolvent's property upon only the commencement of a case given that Sections 303 and 541 involve no judicial oversight at all. However, it is equally fair to say that once the involuntary transfer has been properly ordered, the trustee's ability to administer the interests then transferred is no more constitutionally suspect in an involuntary case than it would be in one where the debtor had voluntarily turned over his property at the outset.

In reality, then, Section 363(b) is only an administrative hurdle that Congress itself has imposed upon the bankruptcy trustee with respect to a process that it could have left entirely to the trustee without any oversight whatsoever. It is better, therefore, to view Section 363(b) as an authorization-type requirement to ensure that someone other than the trustee himself will consider the objections of the bankruptcy estate's beneficiaries (i.e., the debtor's creditors) and then decide whether the trustee should have authority to proceed notwithstanding. But *Murray's Lessee* instructs that restrictions of this type are properly left to Congress. Again, "[T]he point of *Murray's Lessee* was simply that Congress may set the terms of adjudicating a suit when the suit could not otherwise proceed at all." *Stern*, 131 S. Ct. at 2612. Congress was therefore well within its rights to delegate the decision under Section 363(b) to authorize out-of-the-ordinary-course sales to a tribunal of its own choosing.[51] It could have even permitted such sales to proceed with no hearing at all as it did with Section 363(c) sales.

Therefore, I am satisfied even in the wake of *Stern* that I am still constitutionally capable of entering final orders in at least those instances where the order involves only empowering the estate's representative to engage in an activity that he could have done on his own had Congress chosen that alternative instead. Apart from Section 363(b), other estate activities requiring this type of "court" order include lending orders under Section 364(b) and (c), assumptions or rejections of leases and

---

[51]*Cf. Northern Pipeline*, 458 U.S. at 83, 102 S. Ct. at 2878 ("But when Congress creates a statutory right . . . it may also provide that persons seeking to vindicate that right must do so before particularized tribunals . . . .").

executory contracts under Section 365(a), and the distribution of proceeds to competing lien creditors under Section 725.[52]

Automatic Stay and Discharge Injunction

Relief from the automatic stay and denial of a debtor's discharge are also worth considering. Key to the analysis in either of these areas is deciding whether Congress, in exercising its powers to enact uniform bankruptcy laws, can impose by fiat broad, statutory restraints like the automatic stay and the discharge injunction without violating the Fifth Amendment's guaranties. If Congress cannot, issues far more serious than those raised in *Stern* must first be addressed. If, though, as all seem to agree, Congress has the ability to unilaterally impose such restraints, then a compelling argument can be made that bankruptcy judges are also capable of making these types of decisions without any Article III judge's supervision.

Ironically, the Section 524 injunction deprives a debtor's creditors of exactly what *Stern* protects – access to a traditional court. And the same can be said of the automatic stay. Both contract law and tort law are grounded upon the premise that the aggrieved party may recover money

---

[52]A related type of order is one that approves a settlement under FED. R. BANKR. P. 9019(a). Many courts have in fact held that a trustee may not bind the estate to a settlement without first obtaining a Rule 9019(a) order. *See, e.g., Billingham v. Wynn & Wynn, P.C. (In re Rothwell)*, 159 B.R. 374, 379 (Bankr. D. Mass. 1993). However, I and a few other courts have concluded that Rule 9019(a) cannot be a prerequisite to the trustee's authority to settle because it would contradict what is otherwise contemplated under the Code itself. *See, e.g., In re Novak*, 383 B.R. 660 (Bankr. W.D. Mich. 2008); *In re Telesphere Commc'n, Inc.*, 179 B.R. 544, 551-52 (Bankr. N.D. Ill, 1994); *Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346 (3rd Cir. 1999). I have instead determined that Rule 9019(a) approval is merely a mechanism whereby the trustee can secure a formal declaration from the bankruptcy court that his decision to enter into the settlement contemplated is consistent with his fiduciary obligations to the estate and its claimants. *Cf. Dalen*, 259 B.R. 586 and *Novak*, 383 B.R. 660. But even with this distinction, Rule 9019(a) orders still fall within the administrative-type orders I am empowered under Authority Section 157(b)(2)(A) and (O) to sign.

on account of a debt owed or an injury incurred through first a court's entry of a final judgment and then a court's enforcement of that judgment with the collection tools the government also provides. From a creditor's perspective, the only difference between these two impediments is that the automatic stay is temporary whereas the discharge, once granted, is permanent.

But depriving a claimant access to the courts is not the same as depriving someone of a property interest already held. Indeed, Sections 524(a)(1) and (a)(2) are very clear that the injunction created by these subsections apply only to the debtor's personal liability arising from the creditor's claim. Any interest against property that the debtor might also keep as part of the bankruptcy process is not affected.[53] Therefore, it would certainly seem that the power given to me by Authority Section 157(b)(2)(J) to decide objections to the granting of a debtor's discharge can be exercised independent of the oversight of an Article III judge without conflicting with either *Stern* or the Fifth Amendment.[54]

The automatic stay, though, does add a twist because it also keeps landlords, secured creditors, and others with valid rights in what has become the bankruptcy estate's property from enforcing those rights. Consequently, a final decision by me not to modify the stay as requested by one of those interest holders might be construed as an unconstitutional taking of its property.

---

[53]*See, e.g., Johnson v. Home State Bank*, 501 U.S. 78, 84-86, 111 S. Ct. 2150, 2154-55 (1991).
Section 522(c) imposes a similar injunction upon prepetition claimants of the debtor proceeding against property that the debtor has exempted from the estate. However, creditors holding liens against such property are likewise excepted from this injunction provided their liens are not subject to avoidance. *Cf.* 11 U.S.C. § 522(c)(2)(A).

[54]Similarly, it would appear that I legitimately have the ability under Authority Section 157(b)(2)(I) to enter final orders concerning the dischargeability of a particular debt. *Cf.* 11 U.S.C. § 523(a).

However, in reality, there has been no taking at all. Rather, my decision to deny the lift of stay would have only continued to deprive the creditor of access to other courts or to that creditor's own self-help remedies, and then only for so long as the stay, which is temporary, remains in place.[55] Therefore, it does not appear that *Stern* limits my ability under Authority Section 157(b)(2)(G) to enter final orders regarding the modification of the automatic stay either.

Claims Allowance

As a last example, another integral part of the bankruptcy process is the allowance of claims. As for my role in that procedure, it would certainly seem like I am doing something judge-like. Indeed, Section 502(b)(1) directs me to consider "any agreement or applicable law" in deciding whether the claim should be allowed or not. However, applying fact to law does not necessarily require the offices of an Article III judge.

> That the auditing of the accounts of a receiver of public moneys may be, in an enlarged sense, a judicial act, must be admitted. So are all those administrative duties the performance of which involves an inquiry into the existence of facts and the application to them of rules of law. In this sense the act of the President in calling out the militia under the act of 1795, or of a commissioner who makes a certificate for the extradition of a criminal, under a treaty, is judicial. **But it is not sufficient to bring such matters under the judicial power, that they involve the exercise of judgment upon law and fact.**

*Murray's Lessee*, 59 U.S. at 280 (citations omitted) (emphasis added).

Moreover, when all is said and done, claims allowance is nothing more than a final step in an overall process chosen by Congress whereby it has allowed a debtor to voluntarily turnover his property for distribution to his creditors in exchange for certain protections in return – to wit, the automatic stay and, later, the discharge. In fact, in fashioning this aspect of that process, Congress

---

[55]*Cf.* 11 U.S.C. § 362(c).

itself has already established much of the distribution scheme without the involvement of a court at all by requiring proofs of claim,[56] by establishing priorities,[57] and by setting the criteria for claim allowance.[58] It stands to reason, then, that Congress has the ability as well to delegate to whomever it chooses the task of completing whatever remains of the allowance process so that a final distribution can be made and the case closed. After all, the point of *Murray's Lessee* is that Congress can set the terms of the process, including who is to make decisions as part of that process, if without Congress there would be no process in the first place.[59] *Cf. Stern*, 131 S. Ct. at 2612. The only restraint, as *Stern* itself correctly instructs, is that Congress cannot within that process include

---

[56]11 U.S.C. § 501.

[57]11 U.S.C. § 507.

[58]11 U.S.C. § 502(b).

[59]*Stern* suggests that the bankruptcy court could not have decided the estate's tort claim against the stepson even had it been raised as only an affirmative defense – i.e., as a setoff rather than as a counterclaim for affirmative relief. *Stern*, 131 S. Ct. at 2616-18. It is also in the same discussion that the Court distinguishes *Katchen v. Landy* on the basis that it involved a bankruptcy specific cause of action – i.e., a preference – whereas the estate's claim before it was based purely upon state law.

However, these are distinctions without substance. The real issue in both *Stern* and *Katchen* was whether the relief sought by the estate included the involuntary recovery of property from a third party. *Northern Pipeline*, *Granfinanciera*, and *Stern* all referred to such recoveries as augmenting the estate. *See, e.g., Stern*, 131 S. Ct. at 2616. Put simply, it is irrelevant whether the defense is based upon state law or a preference received if all that is at issue is claims allowance – i.e., what will be a particular claimant's share in the estate's distribution vis-a-vis all other claimants. In either instance, the non-Article III judge is competent to make that decision. On the other hand, if the trustee is using the allowance process to also add to the estate's coffers at the claimant's expense, then the claimant who is being asked to return perhaps millions in preferences should be just as deserving of an Article III judge's independence as an accused tortfeasor defending against a trustee's state law counterclaim.

30

mechanisms whereby a person would be deprived of either his liberty[60] or his property without that decision maker also being vested with the independence guaranteed by Article III of the Constitution.[61]

In sum, I am satisfied that Congress has the authority under the Constitution to designate someone other than an Article III judge to make final decisions concerning the administration of the bankruptcy estate it has created and the enforcement of the statutory injunctions it has imposed. Moreover, I am satisfied that the power that Congress gives me through Authority Section 157(b)(2)(B) to oversee a trustee's administration of claims made against that estate is constitutional even when those claims may be the "stuff" that common law courts or courts in equity also handle.[62] And finally, I am satisfied that the authority I exercise in these areas is not dependent upon consent

---

[60]The taking of one's liberty as part of a bankruptcy proceeding seems farfetched today. However, it was a very real possibility earlier in our history. If *Bleak House* illustrates Dickens' disdain for the law, *David Copperfield* and *Little Dorrit* reveal his utter contempt for debtors prisons and work houses. Indeed, a key motivation for states delegating their power to enact bankruptcy laws to the federal government was to eliminate the wide discrepancies among the states regarding when a debtor should be imprisoned. *See, e.g., Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 364-69, 126 S. Ct. 990, 997-1000 (2006).

[61]The Court came to this same conclusion in earlier cases not cited in *Stern*. For instance, in *Wright v. Union Cent. Life Ins. Co.*, the Court, in recognizing Congress' power to affect property rights through the enactment of bankruptcy laws, also said that Congress could do so only within the limits of the due process clause. 304 U.S. 502, 518, 58 S. Ct. 1025, 1034 (1938).

The Court also said without qualification a few years earlier that "The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment." *Louisville Joint State Land Bank v. Radford*, 295 U.S. 555, 589, 55 S. Ct. 854, 863 (1935). Granted, *Radford* was decided based upon the Fifth Amendment's taking clause as opposed to its due process clause and the Court effectively reversed *Radford*'s specific ruling only two years later. *Cf. Wright v. Vinton Branch of Mountain Trust Bank*, 300 U.S. 440, 57 S. Ct. 556 (1937). Nonetheless, *Radford*'s declaration that the bankruptcy power must yield to the Fifth Amendment still holds true, as both *Northern Pipeline* and *Stern* clearly demonstrate.

[62]*Northern Pipeline*, 485 U.S. at 90, 102 S. Ct. at 2881 (Rehnquist, J., concurring).

31

being given by the intended parties.  My authority instead arises simply from Congress' own authority to establish uniform bankruptcy laws.

Applying *Stern v. Marshall*

*Stern* without doubt brings confusion once again to an issue that all hoped had been resolved with the enactment of Authority Section 157.  Moreover, I fear that my effort here to validate at least some of my remaining ability under Authority Section 157(b)(2) will not measurably ease the task that I and others still face as we continue to decide order by order whether we are facilitating the involuntary taking of a non-debtor's property.  For instance, Section 1123(b)(6)'s license to include within a Chapter 11 plan "any . . . appropriate provision not inconsistent with the applicable provisions" of the Bankruptcy Code can easily transform what would appear to be a purely core, administrative process – plan confirmation – into a probing inquiry as to whether the ensuing order will result in an unconstitutional taking.

However, application of *Stern* to the matter at hand is easy.  This is admittedly a complex case and the wide variety of arguments made have posed any number of challenges.[63]  But, in the end, all that is before me is simply an action by the Teleservices's trustee to compel Huntington to account under Section 550(a) for fraudulent transfers she has traced to Huntington either directly or through a related company, CyberCo.  There is also no question that if Trustee prevails, the relief awarded will be a money judgment because the transfers themselves were in the form of money.  Indeed, whatever was transferred to Huntington has long ago lost its identity.  And finally, it is clear

---

[63]The underlying facts of this adversary proceeding are set forth in *Meoli v. Huntington Nat'l Bank (In re Teleservices Group, Inc.)*, 444 B.R. 767 (Bankr. W.D. Mich. 2011).  Other published opinions regarding this case and the related Cyberco case are *Richardson v. Huntington Nat'l Bank (In re Cyberco Holdings, Inc.)*, 382 B.R. 118 (Bankr. W.D. Mich. 2008) and *In re Cyberco Holdings, Inc.*, 431 B.R. 404 (Bankr. W.D. Mich. 2010).

32

from the energy and creativity already expended that Huntington has no intention of having the federal government assist Trustee in depriving it of millions of dollars without being afforded all that is meant by the Fifth Amendment's guaranty of due process.

Therefore, while *Granfinanciera*'s historical references to the recovery of fraudulent conveyances and preferences through the common law courts offers additional insight, it is not a necessary component to my decision that any judgment that will enter against Huntington in this adversary proceeding must be entered by an Article III judge. *Stern*, coupled with the Court's earlier decision in *Murray's Lessee*, is all that is needed to realize that the taking that Trustee has in mind in this adversary proceeding requires the oversight of a judicial officer with the independence that is only guaranteed by life tenure and salary protection.

But, with this said, I believe that I could still enter a final judgment against Huntington in this case were Huntington and Trustee both to consent. As the Court in *Stern* emphasized early in its opinion, the delegation of authority by the district courts to the bankruptcy courts as their adjuncts is not jurisdictional. *Stern*, 131 S. Ct. at 2606-7. Indeed, the Court concluded that the stepson's consent in *Stern* to having his own claim decided by the bankruptcy court would have precluded him from objecting to that court's authority under 28 U.S.C. § 157(b)(2)(C) to also adjudicate the estate's counterclaim against him had not the constitutional issue been raised.[64] And common sense also suggests that if the parties before a district court may consent to binding arbitration as a form of

---

[64]"Although we conclude that § 157(b)(2)(C) permits the Bankruptcy Court to enter final judgment on Vickie's counterclaim, Article III of the Constitution does not." *Stern*, 131 S. Ct. at 2608.

33

alternative dispute resolution, then they certainly should be able to choose the bankruptcy judge as their arbiter if that is the alternative they prefer.[65]

Huntington, though, clearly has not given its consent when that consent is now recognized for what it must be – a knowing waiver of Huntington's right to have an Article III judge, as opposed to me, make the final decision of whether the federal government will assist Trustee in depriving Huntington of its property.[66] Granted, I have heard twelve days of testimony and examined

---

[65]The bankruptcy appellate panel service authorized by 28 U.S.C. § 158(b) is another example. Only the district court has jurisdiction to hear the immediate appeal of a bankruptcy court decision. 11 U.S.C. § 158(a). However, subsection (b) also permits a panel of bankruptcy judges to sit in the district court's stead. But a panel can do so only if (1) the district judges, by a majority vote, have authorized the use of this service with respect to appeals made from their district's bankruptcy court, 28 U.S.C. § 158(b)(6); and (2) all of the parties to the appeal have also agreed to utilize the service. 28 U.S.C. § 158(b)(1).

[66]Trustee cites *McFarland v. Leyh (In re Texas Gen. Petroleum Corp.)*, 52 F.3d 1330 (5th Cir. 1995) as instructive. In particular, she quotes this passage:

> A party who fails to object to a bankruptcy court's assumption of core jurisdiction consents to that court's entry of final judgment. McFarland did not object to bankruptcy court jurisdiction before or during the hearing on the standing issue. By failing to object in the bankruptcy court, McFarland consented impliedly to the court's assumption of core jurisdiction. His objection to jurisdiction at this stage "more closely resembles an afterthought than a bona fide objection." We conclude that McFarland's failure to object to bankruptcy court jurisdiction allowed the court to enter judgment against him.

*McFarland*, 52 F.3d at 1337 (citations omitted).

However, in describing the case, Trustee omitted that McFarland had not challenged the bankruptcy court's order until after it had become final and then appealed to the district court. Therefore, the circuit panel's conclusion that McFarland had implicitly consented to the bankruptcy court entering a final order in that instance is understandable.

In this case, though, a final judgment has yet to be entered. I also do not accept Trustee's argument that Huntington has already given its consent or that there has been a forfeiture. Trustee contends that if Huntington did not want me to enter a final judgment in this adversary proceeding,

34

a huge number of exhibits. I have also issued a 127 page opinion that sets forth my assessment of

the same. However, I perceive no prejudice to Trustee if I at this time were to convert my endeavor

---

it should have asked for the reference to be withdrawn to the district court long ago. As such, Trustee views Huntington's belated challenge to my authority as nothing more than sandbagging now that I have decided adversely to it on a key element of Huntington's defense – i.e., its good faith.

As support, Trustee references *Stern*'s own comments about sandbagging. However, Trustee misinterprets *Stern*, for that discussion arose before the Court addressed the constitutional issue raised by the stepson there and Huntington here. The issue instead arose in *Stern* as part of the stepson's argument that the bankruptcy court lacked the ability under Authority Section 157 itself to enter the judgment against him. And what the Court held was that not only could the stepson have submitted under that section to the bankruptcy court's authority but that he in fact did so by choosing to file his defamation claim with that court and by otherwise expressing his satisfaction that the bankruptcy court would be adjudicating the matter. As the Court put it: "Pierce [the stepson] repeatedly stated to the Bankruptcy Court that he was happy to litigate there. We will not consider his claim to the contrary, now that he is sad." *Stern*, 131 S. Ct. at 2608.

All of this, though, was premised upon Authority Section 157(b)(2)(C) empowering the bankruptcy court in the first place to act upon that consent as it did. Consequently, while the stepson certainly had consented in one sense, that consent was not so broad as to also cover the constitutional issue that the Court then found hidden within Authority Section 157(b)(2)(C).

Whether Huntington has sandbagged here is an open question. Huntington certainly could have sought the removal of the reference at any time if it had concerns about my authority. One might also infer that Huntington had even looked forward to me making a final determination concerning its good faith right up to the point I made my March 17, 2011 decision. However, Huntington did so all in the context of Authority Section 157(b)(2)(H), which provides without qualification that I do have the ability to enter a final judgment in fraudulent transfer actions like the one that Trustee has brought.

Trustee contends that this is no excuse – that Huntington should have been aware of the constitutional deficiencies of this subsection as well because of the Court's prior rulings in *Granfinanciera* and *Northern Pipeline*. But the same accusation could have been made against the stepson in *Stern* yet the Court still allowed him to proceed with his constitutional challenge. Therefore, I see no reason why Huntington should be treated any differently here.

Nor do I find any significance in Trustee's argument that the related substantive consolidation motions Huntington brought should be interpreted as Huntington having filed an informal claim in this case. As discussed elsewhere, the filing of a proof of claim, whether formal or informal, and the consent it may imply, has no bearing on what is really at issue here – whether the Fifth Amendment prevents me from assisting Trustee in augmenting the estate through my entry of a final judgment against Huntington.

35

to a report and recommendation so that a district court judge may later make his or her own independent assessment of Trustee's claim and Huntington's defenses.[67]

The Other Constitutional Issue

As already suggested,[68] *Murray's Lessee* raises a second constitutional issue that remains unanswered – Can Congress repose with the judicial branch the various bankruptcy functions it could have legitimately assigned to its own court or even no court at all?   Granted, the primary question in *Murray's Lessee* involved the Fifth Amendment – whether Congress could enable the treasury to summarily collect Swartwout's debt without violating his due process rights.   However, a separation of powers question also arose because of an inconsistency that the tenant saw in the statute permitting that summary procedure.   If, the tenant asked, it was okay for treasury to have taken Swartwout's property without judicial process, wasn't Congress then improperly delegating its authority to another branch by still allowing in the statute the opportunity for the judiciary to intervene at the tax collector's request?

> In short, the argument is, that if this were not, in its nature, a judicial
> controversy, congress could not have conferred on the district court
> power to determine it upon a bill filed by the collector.  If it be such
> a controversy, then it is subject to the judicial power alone; and the

---

[67]Although I do not believe that Huntington has waived its constitutional right to have my decision reviewed de novo by an Article III judge, an argument can still be made that Huntington has waived the right to retry the issues that have already been litigated before me.  I see no purpose, constitutional or otherwise, to spend another twelve days going over or even supplementing evidentiary matters that all parties, including Huntington, had more than a fair opportunity to address.  Therefore, I will recommend to the district court as part of my report that no further evidence be admitted concerning Huntington's good faith.  However, it will ultimately be up to the district judge to decide whether proofs will be reopened or not.

[68]*Supra* n.41.

> fact that congress has enabled the district court to pass upon it, is conclusive evidence that it is a judicial controversy.

*Murray's Lessee*, 59 U.S. at 282.

Or, to put it differently, the power to take Swartwout's property had to be with one branch of the government or the other. It could not, the tenant maintained, be with both.

The Court, though, was unwilling to take such a black and white view. It said instead that in some instances Congress, in enacting a measure that was clearly within its purview, might still include provisions that would permit the matter to be properly before the federal judiciary as a "judicial controversy." And it is in this context that the Court in turn made the now infamous distinction between "public" and "private" rights, or, perhaps more accurately, public and private wrongs.[69]

Dickens would have undoubtedly been amused by the *Jarndyce*-like explanation *Murray's Lessee* offered. The Court began by noting that both a private individual and the government itself have the ability to redress wrongs without invoking the judicial process and, in the case of Swartwout, the government had done just that. That is, the treasury, through its solicitor, had used the summary authority Congress had granted it both to assess a debt and also to sell property in order to collect it. Moreover, as the Court had already concluded, the process employed had not violated Swartwout's Fifth Amendment rights.

What the Court then did was turn the illustration around and examine what right a victim of such extra-judicial remedies might have. If Swartwout's property had been simply seized by an

---

[69]"It is necessary to take into view some settled rules. Though, generally, both **public and private wrongs** are redressed through judicial action . . . ." *Murray's Lessee*, 59 U.S. at 283 (emphasis added).

37

individual using a self-help remedy, the Court noted that Swartwout could have had redress against that individual from a court because that court would have had the ability to hold the offending individual accountable. However, Swartwout's problem was that the self-help seizure employed against him was undertaken by a public official acting under the lawful authority of the government. As the Court itself put it: "He [the solicitor of the treasury] cannot be made responsible in a judicial tribunal for obeying the lawful command of the government; and the government itself, which gave the command, cannot be sued without its own consent." *Id.* at 283.

In effect, then, the Court in *Murray's Lessee* was saying that if the treasury's solicitor had acted inappropriately as he summarily collected the debt due, Congress could have legitimately denied Swartwout recourse to the courts notwithstanding his grievance because the wrong committed was public in nature and the public (i.e., the government), as well as its agents, had immunity from the courts. However, the Court also recognized that the government, if it chose, could waive its immunity. And, more important for this discussion, the Court determined as well that the government activity in Swartwout's case had attributes of a matter that typically would be addressed by a court. "At the same time there can be no doubt that the mere question, whether a collector of the customs is indebted to the United States, may be one of judicial cognizance." *Murray's Lessee*, 59 U.S. at 283. The Court therefore saw no problem with the judiciary considering the issue under such circumstances.

> The United States consents that this fact of indebtedness may be drawn in question by a suit against them. Though they might have withheld their consent, we think that, by granting it, **nothing which**

> **may not be a subject of judicial cognizance** is brought before the
> court.

*Id.* at 284 (emphasis added).

The correct interpretation, then, of the public versus private rights distinction that is attributed to *Murray's Lessee* is that there are some public activities that Congress can legitimately engage in without enlisting the assistance of the federal judiciary – in that instance, the treasury's summary collection of Swartwout's debt – but which Congress can also, if it chooses, still delegate to the federal judiciary.  The only caveat is that the issue delegated must be the type of controversy that falls within the purview of an Article III court's authority – that is a judicial controversy.  And, again, the Court in *Murray's Lessee* was satisfied that Congress in that instance had in fact delegated to the federal judiciary the "stuff" a court would typically handle if only private individuals were involved – to wit, the recovery of debt.

However, *Murray's Lessee* was also quick to recognize that this permissible overlap between the two branches must be limited because of the separation of powers the Constitution requires.  Indeed, the Court did not want to be misconstrued "upon so grave a subject."  It said:

> [W]e think it proper to state that we do not consider congress can
> either withdraw from judicial cognizance any matter which, from its
> nature, is the subject of a suit at the common law, or in equity, or
> admiralty; **nor, on the other hand, can it [Congress] bring under
> the judicial  power a matter which, from its nature, is not a
> subject for judicial determination**.

*Murray's Lessee*, 59 U.S. at 284 (emphasis added).[70]

---

[70]The plurality in *Northern Pipeline* essentially came to the same conclusion without even citing *Murray's Lessee*.

> The constitutional system of checks and balances is designed to guard
> against "encroachment or aggrandizement" by Congress at the

Although it is the first part of this quote that *Stern* focuses upon, it is the second, highlighted

portion that should also give pause.  I understand why the Constitution prohibits Congress from

including provisions in the Bankruptcy Code that would allow for the involuntary taking of property

without it being ordered by an Article III judge.[71]  I also understand how the Court in *Murray's*

*Lessee* was able to reconcile in that particular case the apparent inconsistency of two branches being

empowered to address the same issue without there being a violation of the separation of powers.

However, it is not clear to me at all why the looming debates over *Stern*'s effect upon a

bankruptcy judge's independent authority should depend upon whether the restructuring of debtor-

creditor relations can be characterized as a public right, albeit that is certainly where *Northern*

*Pipeline*, *Granfinanciera*, and now *Stern* seem to be leading the conversation.[72]  As the illustrations

in this opinion show, the Bankruptcy Code includes any number of steps where Congress has chosen

---

> expense of the other branches of government. But when Congress creates a statutory right, it clearly has the discretion, in defining that right, to create presumptions, or assign burdens of proof, or prescribe remedies; **it may also provide that persons seeking to vindicate that right must do so before particularized tribunals created to perform the specialized adjudicative tasks related to that right. Such provisions do, in a sense, affect the exercise of judicial power, but they are also incidental to Congress' power to define the right that it has created.**

*Northern Pipeline*, 458 U.S. at 83, 102 S. Ct. at 2858 (citation and footnote omitted) (emphasis added).

[71]A similar situation under the Bankruptcy Code would be my ordering the debtor to turnover possession of his property to the trustee.  Although the order, once enforced, would constitute a taking, it would nonetheless be appropriate so long as the debtor had voluntarily submitted himself to the bankruptcy process in the first place.

[72]*See, e.g., Husky Int'l Elec's., Inc. v. Ritz (In re Ritz)*, 2011 WL 3439246 (Bankr. S.D. Tex. 2011); *Samson v. Blixseth (In re Blixseth)*, 2011 WL 3274042 (Bankr. D. Mont. 2011).

to impose the judgment of some arbiter as part of the restructuring. However, unlike the challenged process in *Murray's Lessee*, these congressionally created events are not also judicial controversies. Again, the separation of powers issue posed in *Murray's Lessee* was resolved only because the Court there found that the subject matter of the challenged summary process – i.e., the executive branch's pursuit of its own agent – was also judicially cognizable because it involved the collection of a debt the agent owed. But when Congress, in fashioning the bankruptcy laws, decides that a bankruptcy trustee must first seek a bankruptcy judge's authorization before he may proceed with, say, the sale of the estate's property, there is no Swartwout from whom a debt is being collected. Indeed, there would be no judge either had Congress chosen instead to permit the trustee to sell all of the estate's property, whether in or outside the ordinary course, without any oversight whatsoever. *Cf.* 11 U.S.C. § 363(c).

I, then, am satisfied that there is no need to get ensnarled in the public rights/private rights debate to answer whether a particular order issued by the bankruptcy court is final or not. Congress, without question, has the ability under its authority to enact uniform bankruptcy laws to incorporate into the Bankruptcy Code court-like features just as Congress had the ability under its authority to collect taxes and duties to adopt a summary procedure for the treasury to collect a debt from one of its agents. *Cf. Murray's Lessee*, 59 U.S. at 281. Indeed, the question raised by the tenant in *Murray's Lessee* and the stepson in *Stern* is the same. In *Murray's Lessee*, it was whether the summary proceeding the treasury had employed was actually an exercise of the judicial power protected by Article III just as the question in *Stern* was whether the bankruptcy court's entry of a final judgment was an exercise of that same protected power. Therefore, what the Court said in the opening paragraphs of *Murray's Lessee* is just as true for *Stern* – that "whether these acts were an

41

exercise of the judicial power of the United States, can best be considered under another inquiry," that being whether "the effect of the proceedings . . . [deprived] the party . . . of his liberty and property, 'without due process of law;' and, therefore, is in conflict with the fifth article of the amendments of the constitution." *Murray's Lessee*, 59 U.S. at 275. And what distinguishes *Murray's Lessee* from *Stern* is that the Court in *Murray's Lessee* was able to find a historical exception to the due process clause whereas the Court in *Stern* did not even attempt to find one because there was none to be found.

> What is plain here is that this case involves the most prototypical exercise of **judicial power**: the entry of a final, binding judgment by a court with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime. If such an exercise of judicial power may nonetheless be taken from the Article III Judiciary simply by deeming it part of some amorphous "public right," then Article III would be transformed from the guardian of individual **liberty** and separation of powers we have long recognized into mere wishful thinking.

*Stern*, 131 S.Ct. at 2615 (emphasis added).

Substitute "guaranteed due process" for "judicial power" and "property" for "liberty" and that statement directly covers this case. *Id.*

However, *Murray's Lessee* compels me, as it should others, to consider further the dilemma that was presented in its final pages. That is, if there are tasks which Congress can legitimately assign to a bankruptcy judge as opposed to an Article III judge, how can Congress then delegate the task to an Article III court (or to me as its adjunct) without violating the separation of powers? Congress, in overhauling the bankruptcy laws in 1978, clearly wanted the referees who had previously been charged with overseeing the trustee's administration of a bankruptcy case to act

more like traditional courts.[73]  Moreover, when a party objects to a motion that is properly put to a

bankruptcy judge (e.g., a Section 363(b) motion), the ensuing final order represents the resolution

of what had without question been a contested matter.  But, as *Murray's Lessee* makes very clear,

matters that are contested are not the same as judicial controversies and it is only the latter type of

disputes that Article III judges have the authority to decide without themselves violating the

separation of powers that is to be maintained.

> To avoid misconstruction upon so grave a subject, we think it proper
> to state that we do not consider congress can either withdraw from
> judicial cognizance any matter which, from its nature, is the subject
> of a suit at the common law, or in equity, or admiralty; **nor, on the
> other hand, can it [Congress] bring under the judicial power a
> matter which, from its nature, is not a subject for judicial
> determination**.

*Murray's Lessee*, 59 U.S. at 284 (emphasis added).

"[W]hy the fuss?"[74]  There would be none if this portion of *Murray's Lessee* can just be

ignored.  It is possible, after all, to continue under the core/non-core rubric if the only questions that

keep surfacing are whether I, as an adjunct of an Article III court, can enter a final order without

---

[73]But, with this said, the Bankruptcy Code includes within it very untraditional tasks for the bankruptcy court to perform.  For instance, Section 707(b) now provides that I can become both prosecutor and judge by filing my own motion to dismiss a Chapter 7 case if it appears that there has been an abuse.  As other examples, Section 727(a) directs me to grant the debtor a discharge unless certain exceptions exist.  Likewise, Sections 1129, 1225, and 1325 state that I am to confirm a debtor's plan provided certain standards are met.  None of these directives, however, are conditioned upon an objection first being made.  Indeed, the Court in *United Student Aid Funds, Inc. v. Espinosa*, _____ U.S. _____, 130 S. Ct. 1367 (2010) actually admonished the bankruptcy judge there for failing to discern an inappropriate plan provision prior to confirmation notwithstanding the creditor's own failure to catch the offending term.  *Espinosa*, 130 S. Ct. at 1380-81 ("[T]he bankruptcy court must make an independent determination of undue hardship before a plan is confirmed, even if the creditor fails to object or appear in the adversary proceeding.").

[74]*Stern*, 131 S. Ct. at 2620.

43

depriving the affected person of his Fifth Amendment right to due process. However, quite a fuss will arise if another "clever tenant" includes this portion of *Murray's Lessee* in his objection the next time a critical industry is at risk of collapsing and the solution lies in a quick Section 363(b) sale of its desirable assets. Does anyone really want to wait until then to see whether the Court will again cite *Murray's Lessee*, but this time for the proposition that the sale order is invalid because it could **NOT** be signed by an Article III court or its adjunct?

## CONCLUSION

My purpose has not been to make a confusing issue even more confusing. I would have much preferred continuing under the mistaken impression that Authority Section 157 solved the constitutional questions that have plagued the new bankruptcy court system since its inception. Unfortunately, *Stern* has not only corrected my misunderstanding but has also raised yet another constitutional problem. The result is that there is no easy solution to what I suspect will be years of uncertainty as the bankruptcy process grinds on.[75] But, with this said, it is better to address these new complications head on rather than haphazardly.

As for the specific issue at hand, an order granting Huntington's motion will enter concurrently with this opinion. The relief will be an amendment to the April 28, 2009 pretrial order that acknowledges that Huntington has not consented to the entry of a final judgment in this adversary proceeding and that, for that reason, this court's decisions in the matters presented to it will be submitted to the district court as a non-core matter on report and recommendation. That

---

[75]For example, the solution most frequently offered – just make all bankruptcy judges Article III judges – may not be a solution at all if the Court at some time interprets *Murray's Lessee* as preventing Article III judges from deciding "core" matters such as the trustee's authority to sell property of the estate and a creditor's motion for modification of the automatic stay.

court in turn will have to decide whether to accept my report in making its own decision as to whether a final judgment should enter against Huntington and, if so, in what amount.[76]

8/17/11

Hon. Jeffrey R. Hughes
United States Bankruptcy Judge

Signed this 17th day of August, 2011
at Grand Rapids, Michigan.

---

[76]Trustee has asked that if I do amend the pretrial order with respect to the adversary proceeding that I not amend it as well with respect to the substantive consolidation motions that were also covered by that pretrial order. For the reader's benefit, I denied both of those motions in a final order entered on July 2, 2010 in this case and the related Cyberco case. *Cf. In re Cyberco Holdings, Inc.*, 431 B.R. 404 (Bankr. W.D. Mich. 2010).

It is possible that I would have treated the substantive consolidation motions as non-core had I had the benefit of *Stern* at that time. However, I decided those motions long ago and, as such, a constitutional challenge could now be raised only with the appellate court before whom the appeal of my July 2, 2010 order is currently pending. Therefore, any constitutional challenge of that order would appear to be too late. *McFarland*, 52 F.3d at 1337. But, in any event, it is beyond my authority at this time to change.

45