# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

Case No.  HG 05-00690

TELESERVICES GROUP, INC.,

    Debtor.

_____/

MARCIA R. MEOLI, Trustee,

    Plaintiff,

vs.

Adv. Pro. No.  07-80037

THE HUNTINGTON NATIONAL BANK,

    Defendant.

_____/

## OPINION RE: TRUSTEE'S MAY 13, 2011 MOTION - SUMMARY JUDGMENT

Trustee Marcia Meoli has sued The Huntington National Bank ("Huntington") to recover over $72 million dollars in transfers Huntington received either directly from Teleservices Group, Inc. ("Teleservices") or indirectly through a related company, Cyberco Holdings, Inc. ("Cyberco").[1] This opinion addresses Trustee's most recent motion for summary judgment in this complicated case.[2]

## JURISDICTION / STANDARD FOR SUMMARY JUDGMENT

There is jurisdiction to hear this adversary proceeding.  28 U.S.C. §§ 1334 and 157(b)(1). *See also* W.D. Mich. LCivR 83.2.  The issue raised is also a core matter.  28 U.S.C. § 157(b)(2)(H).

---

[1]Cyberco also operated under a number of assumed names, including CyberNET Group and Cybernet Engineering.

[2]This has been a hard-fought case with neither side leaving any stone unturned or opportunity not taken.  The court compliments all counsel involved for both their creativity and their scholarship.

However, for the reasons stated in a previous opinion,[3] the Constitution prohibits this court from entering a final judgment notwithstanding. Therefore, the determinations set forth in this opinion will be incorporated into a report and recommendation that will be prepared for the district court's de novo review.

Summary judgment is appropriate if there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. FED. R. BANKR. P. 7056 and FED. R. CIV. P. 56(a). The court, in considering such a motion, is to focus only upon material facts; that is, the court is to consider only those facts that are important vis-a-vis the applicable substantive law. However, in determining whether there is a genuine dispute, the court is also to draw all inferences from the record before it in the light most favorable to the non-moving party. But if that party could not prevail before a rational trier of fact under even these circumstances, summary judgment must be granted.

## FACTUAL BACKGROUND[4]

Huntington is a regional bank with its headquarters in Columbus, Ohio. Cyberco had a short but tumultuous relationship with Huntington. It lasted only from September 2002 to October 2004.

Cyberco's lending arrangement with Huntington was typical for a company its size. Included were a revolving line of credit, some term notes, and a few letters of credit. Cyberco's indebtedness

---

[3] *Meoli v. Huntington Nat'l Bank (In re Teleservices Group, Inc.)*, 456 B.R. 318 (Bankr. W.D. Mich. 2011).

[4] This summary has been taken from the court's opinion concerning the good faith defenses that were tried earlier in a bifurcated twelve-day trial. *See Meoli v. Huntington Nat'l Bank (In re Teleservices Group, Inc.)*, 444 B.R. 767 (Bankr. W.D. Mich. 2011). A much more detailed explanation of what occurred between Huntington, Cyberco and Teleservices is provided in that opinion. *Id.* at 776-86, 818-30.

to Huntington was originally about $9 million dollars. However, by the spring of 2004 it had grown to over $16 million dollars.

Like many commercial loans, Cyberco's obligation was collateralized by most of its assets, including Cyberco's substantial accounts receivable. Huntington had intended to monitor those receivables through a lockbox. However, what Huntington discovered about a year into the relationship was that Cyberco was instead receiving most of its cash through large and regular transfers from Teleservices. No one at Huntington recognized that name and, when asked, Barton Watson, Cyberco's CEO, answered Huntington's inquiries by falsely explaining that Teleservices was a related company and that it was merely collecting Cyberco's own receivables on Cyberco's behalf. In truth, the transferred funds were actually the proceeds of a fraud that Watson, through Cyberco and Teleservices, was perpetrating on unsuspecting equipment finance companies.

Huntington learned of the Teleservices transfers because Cyberco maintained its bank accounts at Huntington. Cyberco had deposited a $2.3 million dollar check from Teleservices that Teleservices' own bank, Silicon Valley, had returned for insufficient funds. While the check ultimately cleared, the incident prompted a meeting with Watson and it was at this meeting that Watson lied about Teleservices.

Watson was both intelligent and intimidating. He also was a crook. Local court records revealed that the National Association of Securities Dealers had permanently revoked his license because of questionable conduct. There were also civil judgments against him in Michigan for bank fraud and in California for an earlier fraud. One scam had even landed him in federal prison for three years.

3

Although Huntington did not learn of Watson's past until months later, the relationship was already sufficiently strained by the fall of 2003 to convince Huntington that Cyberco should leave the bank. Here is a brief chronology of subsequent events:

| | | |
|---|---|---|
| January 2004 | - | Cyberco was asked to find a different bank. |
| April 2004 | - | Cyberco was given a second ninety-day extension to accomplish this exit strategy. |
| Summer 2004 | - | Cyberco did not find a new lender but instead began paying down the Huntington loan with even more funds received from Teleservices. |
| Fall 2004 | - | Huntington was repaid in full through a combination of setoffs against Cyberco's bank accounts and several checks from Teleservices itself. |

The Fraud

Cyberco held itself out as providing computer-related services and Cyberco still had some real customers in 2002 when Huntington became involved. However, by that time, Watson was resorting more and more to fraud to generate Cyberco's revenues. Indeed, by late 2004 virtually all of Cyberco's income was illegitimate.

Watson's scheme was simple.[5] He would tell banks, leasing companies, and other similar institutions that Cyberco needed financing to acquire more servers and related computer hardware for its rapidly growing global business. However, none of the equipment that Cyberco was supposedly purchasing ever existed. Rather, Watson would represent that Teleservices was Cyberco's vendor for the desired items and, as a consequence, the finance companies would unwittingly forward the necessary funds to Teleservices' Silicon Valley account in California.

_____

[5]Watson did not testify because he took his life shortly after the fraud was revealed. However, those who were familiar with Watson identified him as the mastermind.

Watson would then have Teleservices issue false invoices and other documents to evidence the supposed transactions. As for Cyberco, Watson packed its computer room with both real and fake servers. He would also swap serial numbers to further deceive his victims whenever a collateral audit was attempted.

Teleservices, of course, did not keep its ill-gotten gains. Rather, it funneled them back to Cyberco and Cyberco in turn would use its own accounts at Huntington to (1) pay the ever-growing number of leases and other obligations Cyberco had signed in connection with prior nonexistent purchases; and (2) pay Cyberco's other operating expenses, including the handsome salaries and expense accounts of Watson and his fellow cheats.[6] As for Cyberco's Huntington accounts, they had been set up in conjunction with the line of credit to assist Cyberco in the management of its cash. By agreement, Huntington would "zero out" all accounts at the end of each day and either apply the net deposits to pay down the line of credit or advance upon the line of credit to cover any negative balance due.[7]

---

[6]Huntington states in its brief that "The Cyberco principals moved the funds between the Silicon Valley Bank account and accounts of various other Cyberco entities on a near daily basis" but provides nothing in support. (Hunt. Br. in Opp'n to Mo. for Summary Judgment, 31, June 10, 2011 (DN 382) (hereinafter "Hunt. Br., DN 382")). The record in fact establishes that (1) all of the transfers Trustee seeks to recover were either paid directly to Huntington by check or transferred by wire into a Cyberco account at Huntington; and (2) with the exception of a few inconsequential transfers by Cyberco or related entities to Teleservices during Cyberco's waning months, the flow of money between Cyberco and Teleservices was entirely one-way – i.e., from Teleservices to Cyberco. *See, e.g.,* Trustee Trial Exs. 266C, 266D.

[7]This is how Huntington itself describes the arrangement:

> Cyberco's line of credit and cash-management accounts operated so as to allow Cyberco full access to its funds while at the same time minimizing the accrual of interest on its line of credit. On any given day, demands on the Concentration Account would cause an automatic draw on the line of credit to fund one or more of the zero-

Trustee's Motion

Trustee has sued Huntington on the theory that it received fraudulent transfers from Teleservices that are avoidable under either Sections 548 or 544(b).[8]  Some of the targeted transfers were in the form of checks drawn on Teleservices' own Silicon Valley account and made payable directly to Huntington.  However, a much larger portion of what Trustee seeks to recover relates to the regular deposits Teleservices was making into Cyberco's Huntington accounts.

Several previous motions and a twelve-day trial have already decided these critical issues:

- That the $7,395,283.04 in checks that Huntington received directly from Teleservices are avoidable as actually fraudulent transfers under Section 548(a)(1)(A) and that Huntington did not receive any of these checks either for value or in good faith under Section 548(c); and

---

balance accounts, or the zero-balancing process would result in funds in the Concentration Account automatically being used to reduce the balance on the line of credit.

*See* Hunt. Br., DN 382 at 11 (citations and footnotes omitted).

Huntington has also offered a number of examples of how the cash management system operated on a given day. *Id.* at 11-14.

[8]11 U.S.C. §§ 548 and 544(b).  Debtor's petition pre-dates the October 17, 2005 effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, § 1501(B)(1), 119 Stat. 23.  Unless otherwise indicated, all citations in this opinion to the Bankruptcy Code will be to the Bankruptcy Code as written prior to the BAPCPA amendments.  The citation will be "Section _____."

- That to the extent the $65,356,244.36[9] in deposits that Teleservices transferred into Cyberco's Huntington accounts are avoidable: (1) Huntington has not established its Section 550(b)(1) good faith with respect to any of the deposits made after April 30, 2004;[10] and (2) Huntington had Section 550(b)(1) knowledge of their avoidability at an even earlier date.[11]

Trustee's pending motion targets the remaining issues. Most are set forth in this court's May 24, 2011 order.[12] However, Huntington raised one new issue at the final pretrial conference held earlier this month.

---

[9]The amount that Trustee intends to avoid and recover beyond the checks Huntington received directly from Teleservices has fluctuated over the course of this adversary proceeding. However, the figure is now set by this court's September 13, 2011 order (DN 413), which in turn references Exhibit 1 attached to Trustee's May 20, 2011 motion for leave to amend (DN 373). That exhibit puts the total amount of indirect transfers from Teleservices to Cyberco's Huntington accounts at $66,356,244.36. However, the parties have since agreed that the transfer of $1,000,000.00 identified as having been made on July 12, 2004 should be deleted, thereby reducing this portion of the claimed recovery to $65,356,244.36. Stip. Re: Hunt. Statement, 1-2, Feb. 27, 2012 (DN 461).

[10]*Cf. Teleservices*, 444 B.R. at 818-30. The court found that Huntington had established its good faith up until April 30, 2004 but that it had failed to meet its burden from that date on. The court also found that by July 30, 2004, Huntington had actually turned a "blind eye" to the suspect transfers it continued to receive from Teleservices either by check or indirectly through Cyberco.

[11]*Id.* at 830-40. This court, though, would not have made this particular determination had it not been obligated to follow the precedent set by the Sixth Circuit in *IRS v. Nordic Village, Inc. (In re Nordic Village, Inc.)*, 915 F.2d 1049 (6th Cir. 1990), *rev'd on other grounds*, 503 U.S. 30, 112 S. Ct. 1011 (1992).

[12]Am. Order Re: April 21, 2011 Status Conf., May 24, 2011 (DN 379) (hereinafter the "May 24, 2011 Order"). The original order was entered on April 29, 2011 (DN 363). However, it was amended at Huntington's request to add some additional issues and to supplement another. Other issues have also been added as a consequence of this court's granting Trustee leave to amend her complaint to formally include transfers from Teleservices into Cyberco's Huntington accounts made in 2003 that are avoidable only under Michigan's own version of the fraudulent transfer laws. *See* Order Re: Trustee's May 20, 2011 Leave to Amend, Sept. 13, 2011 (DN 413) and *infra* Section 544(b)/MUFTA Transfers.

7

Huntington's Position

Huntington is not contesting every issue identified in the May 24, 2011 Order.[13] Rather, Huntington concentrates what amounts to its final defense upon five key arguments: (1) Cyberco, not Teleservices, was the real owner of the Silicon Valley account; (2) Huntington in no event should be liable for anything more than the $16,967,390.65[14] it actually used from the transfers to pay down Cyberco's debt; (3) there are judicial exceptions to the strict enforcement of Section 550(a); (4) variations in the state fraudulent transfer laws prevent at least the 2003 transfers from being

_____

[13]Two issues that Huntington is conceding are:

1.   Whether Teleservices actually or constructively intended to defraud its creditors with respect to the transfers made to Cyberco; and

2.   Whether Cyberco itself received any of those transfers in good faith and for value.

Huntington has presumably ignored these issues because of its position that there were really never any transfers from Teleservices to Cyberco in the first place. However, this court's rejection once again of Huntington's attempt to treat Cyberco and Teleservices as one continues to make these issues relevant. Therefore, this court now determines that there is no genuine question of fact regarding either Teleservices' fraudulent intent or Cyberco's lack of a statutory defense. Cf. FED. R. BANKR. P. 7056 and FED. R. CIV. P. 56(g). Specifically, the court concludes that (1) Teleservices actually intended to defraud its creditors (i.e., the duped equipment finance companies) each time it wire transferred funds to Cyberco's Huntington accounts, 11 U.S.C. § 548(a)(1) and MICH. COMP. LAWS § 566.34; (2) Cyberco did not receive any of these transfers in good faith, 11 U.S.C. § 548(c) and MICH. COMP. LAWS § 566.38(2)(b); and (3) Cyberco did not give value for any of these transfers, as Huntington agrees that none of the transfers were on account of a debt Teleservices owed to Cyberco. Hunt. Br., DN 382 at 27. It further follows that if Cyberco did not give value in exchange, the transfers it received from the insolvent Teleservices were constructively fraudulent as well. 11 U.S.C. § 548(a)(2) and MICH. COMP. LAWS § 566.35.
There may also be some lingering differences between Trustee and Huntington regarding the exact dates of some of the transfers in 2003 and perhaps even in 2004. However, nothing included in the record suggests that any difference would be more than a few days or that a variation that small would affect any of these conclusions.

[14]This amount consists of the $7,395,283.04 in checks that Huntington received directly from Teleservices and another $9,572,107.61 in setoffs taken by Huntington against Cyberco's accounts.

8

recovered; and (5) Huntington should get credit for the avoidable transfers the Cyberco estate itself has recovered from the equipment finance companies. Trustee also raises the separate question of whether the estate is entitled to prejudgment interest.

## OWNERSHIP OF THE SILICON VALLEY ACCOUNT

Huntington's insistence that Teleservices' Silicon Valley account actually belonged to Cyberco is only the most recent variation of an all too familiar theme – that Teleservices was "fake."[15] For example, Huntington has already argued without success that Cyberco and Teleservices should be regarded as a "singular fraudulent enterprise" for purposes of its Section 548(c) defense.[16] Likewise, Huntington's failed attempt to substantively consolidate the two bankruptcy estates centered upon its contention that "the assets of Teleservices and Cyberco were one and the same."[17]

Nor has Huntington offered at this time anything else to make its argument more persuasive. There has never been any question that Teleservices was a shell corporation whose sole purpose was to perpetrate a fraud. And the court does not have to be reminded by Huntington yet again that Teleservices had no assets to speak of beyond some bank accounts nor directors, officers, or employees to act upon its behalf.[18] Huntington established these facts long ago.

---

[15]Hunt. Br., DN 382 at 1.

[16]Hunt. Memo. in Opp. to Trustee's Mo. for Part. Summary Judgment, 29, Aug. 14, 2009 (DN 144) (hereinafter "Hunt. Memo. Opp. Mo. for PSJ, DN 144"). Although Section 550(b)(1) controls whether Huntington has a defense to the transfers Teleservices was depositing into Cyberco's Huntington accounts, Section 548(c) controlled the already decided issue of whether Huntington must account for the over $7 million in checks it received directly from Teleservices.

[17]Hunt. Pre-Hrg. Br. in Support of Sub. Con., *In re Cyberco*, No. 04-14905, 23 (Bankr. W.D. Mich. Oct. 23, 2009) (DN 1092).

[18]James Horton, Cyberco's president, previously testified that Watson and he, as well as others, would pretend to be employees of Teleservices whenever someone attempted to contact it.

9

Indeed, it is only Huntington's attempt to switch scoundrels that distinguishes this motion from the rest. Huntington's past efforts have always pegged Watson as the "accomplished fraudster."[19] For instance, it was Watson who "engaged in a massive, multi-million dollar fraud"[20] and it was Watson who "repeatedly defrauded Huntington."[21] And always before it was Watson who "dominated and controlled" both Cyberco and Teleservices as mere "corporate instrumentalities."[22]

Yet Huntington prefers today to reverse these roles by having Cyberco be the master and Watson the tool. Huntington's new story is that Cyberco, not Watson, was in command and that it was Cyberco who "solely performed these actions."[23] As Huntington puts it now:

> Cyberco's employees fraudulently obtained the funds. Cyberco's employees controlled the funds. Cyberco's employees transferred the funds from the Silicon Valley Bank account. And Cyberco's employees used the funds.[24]

If all the world's a stage, then Huntington certainly has reason to recast roles here. But Huntington had it right the first time – Watson was the real star of this production. Cyberco and Teleservices were just his props. Or, as Huntington itself has explained in the past "Watson . . . **used**

---

For example, when Huntington followed up on Watson's suggestion to contact Teleservices as a credit reference, the loan officer's notes indicate that she had spoken with a Dan Roland. However, it is likely as not that "Roland" was actually Watson.

[19]Hunt. Post-Tr. Memo., 78, Feb. 19, 2010 (DN 309) (hereinafter "Hunt. Post-Tr. Memo., DN 309").

[20]Hunt. Memo. Opp. Mo. for PSJ, DN 144 at 1.

[21]Hunt. Post-Tr. Memo., DN 309 at 78.

[22]*Id.* at 1.

[23]Hunt. Br., DN 382 at 23.

[24]*Id.* at 22.

10

Cyberco and Teleservices to engage in a variety of different fraudulent schemes against banks and various lenders."[25]

But Watson is not on trial here. This court's task is instead to apply the fraudulent transfer laws within the legal framework that Watson created and within which all, including Huntington, operated as the fraud ran its course. Huntington, for obvious reasons, would like to replace this "reality" with a new one that better suits its defenses. However, as Huntington has acknowledged again and again during this litigation, it was Watson who was the fraudster, not Cyberco. And, in order to accomplish that deceit, Watson clearly needed two separate corporations, not just one.

Therefore, it is not by happenstance that Watson arranged for his attorneys to transform a Delaware shelf corporation into Teleservices.[26] Huntington seems to think that the scam could have been pulled off just as well had Watson acted through Cyberco alone. However, his scheme worked only if the equipment finance companies believed that Teleservices was an independent seller of computer equipment with no connection whatsoever to Cyberco. While certainly brazen, Watson was nobody's fool. Therefore, one must wonder why he would have even considered having Cyberco own the Silicon Valley account when the law itself so conveniently provided the illusion needed – Teleservices Group, Inc.

It is also difficult to imagine how Watson could have misled Huntington as he did had Cyberco owned the Silicon Valley account instead. Remember, all of Cyberco's receivables were

---

[25]Hunt. Trial Memo., 9, Oct. 23, 2009 (DN 216) (emphasis added).

[26]Horton Tr., 93-94, Jan. 4, 2010 (DN 295). A shelf corporation is a corporation that has been organized but which has not yet been activated. In this instance, the inactive entity had been warehoused at some Boston or Grand Rapids law firm. According to Horton, Watson had taken it off the firm's shelf and renamed it Teleservices a few years before in connection with some other transaction involving his wife and him. *Id.*

supposed to have been deposited by its customers into a Huntington lockbox. Watson's explanation for why that was not happening – that its receivables were being collected by a related company, Teleservices – was certainly plausible. As one of Huntington's employees testified, "[I]t appeared they were intercompany deposits and we see that sort of thing all the time."[27]

However, this court doubts that Huntington would have tolerated for a moment Watson's explanation had he said instead that Cyberco itself was collecting the receivables and depositing them in an account it held with some California bank thousands of miles away. Huntington would have without question demanded an immediate resumption of the lockbox deposits which, of course, would have in turn unraveled the fraud. Nor would Cyberco's use of Teleservices as an assumed name have likely worked given that wire transfers were constantly being made from the Silicon Valley account and given that those transfers would have undoubtedly disclosed the actual holder of that account.[28] And again, why would Watson have risked detection at all with an assumed name when it was much easier to actually incorporate Teleservices and have it own the account instead?

Teleservices' Bankruptcy Schedules

Huntington argues at the very least that a genuine issue of fact exists concerning both Teleservices' corporate status and Cyberco's actual ownership of the Silicon Valley account because of what Teleservices itself filed in the underlying bankruptcy proceeding. By way of background, Dan Yeomans, operating through Management Services Realty, Inc., had been appointed as the receiver for both Cyberco and Teleservices at about the same time the FBI raided Cyberco's offices

---

[27]Hunt. Post-Tr. Memo, DN 308 at 78 (quoting Tr. Trans. G. White, Nov. 5, 2009, at 260:6-13).

[28]Trustee Trial Ex. 268.

in late November 2004. Yeomans' tenure as Cyberco's receiver was brief because Cyberco was almost immediately placed into an involuntary Chapter 7 proceeding. However, two months passed before Yeomans himself filed a voluntary Chapter 7 petition on Teleservices' behalf. Yeomans also prepared Teleservices' bankruptcy schedules which, as Huntington points out, do not include the Silicon Valley account or anything else as being owned by Teleservices. Moreover, Huntington notes that Yeomans "took care to put quotation marks around the word 'corporation' when describing Teleservices . . . ." Hunt. Br., DN 382 at 22.

What Huntington would like this court to infer from all of this is that Yeomans himself had concluded that Teleservices was fake and that Cyberco in fact owned the Silicon Valley account. However, Huntington has offered no affidavit from Yeomans that he actually reached either of these conclusions. Moreover, all agree that the Silicon Valley account was held in Teleservices' name, not Cyberco's. Why, then, did not the schedules at least acknowledge its existence? It is more likely that Yeomans simply was not aware of either the Silicon Valley account or the other two Teleservices accounts that he also did not list.[29] After all, Yeomans had been Teleservices' receiver for only a few months and Teleservices was but one of many related Cyberco companies that Yeomans had been ordered to oversee.[30]

However, even had Yeomans been aware of the account at that time, the question remains as to why his conclusion concerning its ownership or, for that matter, Teleservices' corporate status,

---

[29]Horton testified that Teleservices had accounts at Founders Trust and Fifth Third Bank as well. Tr. Trans., Horton, 108, Jan. 4, 2010 (DN 295).

[30]In addition to Cyberco and Teleservices, Yeomans was appointed as the receiver for Stryon, Inc., Stryon Technologies, Inc., ASP/Cybernet, Inc., Cybernet Group International, Inc., Cybernet Asia Pacific, LLC, Cybernet (Asia Pacific) Limited, The Cybernet Capital Corporation, Cybernet Finance, LLC, CNG Logistics, LLC, T Resources, Inc., and CNG Investment Corp.

matters. Yeomans was certainly entitled to his opinion, albeit his qualifications have yet to be established. This court, though, has already come to its own conclusion about Teleservices' status. That determination was prompted much earlier in this proceeding when Huntington brought to the court's attention a March 2004 certificate that the State of Delaware had issued. That certificate indicated that Teleservices was "no longer in existence and good standing under the laws . . . of Delaware."[31] Nevertheless, this court determined at that time that Teleservices continued its existence as a corporate entity for purposes of this proceeding[32] and that determination is now law of the case.[33] Moreover, this court sees no reason to reexamine the issue at this time based upon only another's opinion and apparently a layman's at that.[34] Indeed, whatever doubts Yeomans may have himself had about Teleservices' existence certainly did not keep him from commencing this Chapter 7 case as if Teleservices were a legally recognized entity entitled to its own relief under the Code.

Absence of Directors, Officers, and Employees

This court also recognizes, as perhaps Yeomans did, that Teleservices had no directors or officers to conduct its affairs. However, the same appears to be true for Cyberco. As Huntington itself pointed out in an earlier brief, "neither Cyberco nor Teleservices observed any formalities.

---

[31]Mo. for Leave to File Surreply, Ex. A, 1, Aug. 28, 2009 (DN 151).

[32]Bench Opinion, Trustee's Mo. for Part. Summary Judgment, 19-20, Sept. 25, 2009 (hereinafter "Bench Opinion, DN 175").

[33]"The doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *Arizona v. California*, 460 U.S. 605, 618, 103 S. Ct. 1382, 1391 (1983) (citation omitted).

[34]Huntington also relies upon Horton's actual testimony that Cyberco, not Teleservices, owned the Silicon Valley account. Tr. Trans., Horton, 34, Jan. 4, 2010 (DN 295). However, as a layman, Horton's opinion is of no more value than Yeomans'.

14

Neither company held shareholder meetings or director meetings . . . Horton and Roepke [two co-conspirators] . . . simply made up records reflecting action by the boards of directors as needed on an ad hoc basis."[35] Yet, despite both having shared these same shortcomings, Huntington still insists that Cyberco was real but Teleservices was not.

Nor does this court give any weight to Cyberco having employees and Teleservices having none, for each had its own role in the overall scheme. Watson had no choice but to staff Cyberco with employees. The same is true for the offices it maintained, for Watson needed the illusion of a fully operational Cyberco to trick Huntington and the equipment finance companies into turning over the millions of dollars that they did. But Watson required not a single employee or an asset beyond a California bank account in order for Teleservices to play its part. Fictitious persons sufficed, as Watson so ably demonstrated.

In sum, this court rejects the spin Huntington now wants to give to what transpired. There is no question that Teleservices was the bare bones of what the law is willing to recognize as a separate and distinct legal entity. However, Teleservices was no more fake than Cyberco or, for that matter, Huntington itself, at least in the eyes of the law. Corporations by their very nature are figments of the imagination.[36] The distinction here is that Watson used the corporate illusion not once, but twice, to defraud many, including Huntington. However, the mere fact that Huntington was tricked into believing that Teleservices was something that it was not does not warrant denying Teleservices' existence altogether, especially when such a denial works to the advantage of

---

[35]Hunt. Memo. Opp. Mo. for PSJ, DN 144 at 6.

[36]A corporation "is a fiction created by law with intent that it should be acted on as if true." *People of Puerto Rico v. Russell & Co.*, 288 U.S. 476, 480, 53 S. Ct. 447, 448 (1933) (quoting *Klein v. Bd. of Supervisors*, 282 U.S. 19, 24, 51 S. Ct. 15, 16 (1930)).

Huntington but not others. Again, if reality is really to replace illusion, then the solution is to ignore both corporations and focus instead upon Watson. This court, though, will not alter the facts in some other fashion simply to accommodate Huntington. It will instead proceed using the "reality" that all, including Huntington, had accepted – i.e., two distinct and separate corporations as opposed to just one.

Alter Ego

Huntington justifies its contention that the Silicon Valley account actually belonged to Cyberco in part with its suggestion that Teleservices was merely Cyberco's alter ego. This is not the first time that Huntington has made this argument either.[37] However, further comment is warranted.

It is important to distinguish between alter ego as a legal doctrine and alter ego as simply a description. Webster's defines an alter ego as a second self.[38] It is used both in the context of corporations and individuals to describe a relationship that is so close that one person can almost substitute for the other. Indeed, "alter ego" and "trusted friend" are synonymous.[39]

---

[37]The issue previously arose in connection with Huntington's Section 548(c) defense of the fraudulent transfers Teleservices had made directly to it by check. Huntington contended as part of that defense that it had given value to Teleservices even though there was no lending relationship between the two. This court concluded that the alter ego doctrine could in concept permit Huntington to establish the desired debtor/creditor relationship with Teleservices. However, it also determined that the alter ego doctrine was premised upon justice being served and that Huntington's intended application of the doctrine would in fact result in an injustice. Therefore, the court concluded that Huntington had not given value even under this theory. Bench Opinion, DN 175 at 78.

Huntington had also raised alter ego as part of its separate effort to substantively consolidate the Cyberco and Teleservices bankruptcy estates. However, it never was addressed because the court determined that Huntington lacked standing. *Cyberco*, 431 B.R. at 432.

[38]WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 75 (1989).

[39]*Id.*

16

Courts, therefore, frequently refer to an alter ego when asked to scrutinize close corporate relationships. However, the term's descriptive value should not be confused with its application as a remedy under the law, for the latter is a much narrower concept. In a sense, all closely held corporations are the alter egos of their shareholders. After all, a closely held corporation is nothing more than a device for an individual to conduct his affairs as if he were another. What makes this game of pretend so attractive is that the law allows him to play without personal risk by providing an absolute defense to the corporation's debt should the game go poorly.[40]

Limiting liability in this fashion certainly serves the public interest. For example, protecting shareholders from the liabilities of their corporations encourages investment. However, like many good ideas, the corporate artifice is subject to abuse and it is in stemming such abuse that "alter ego" has become part of the legal vocabulary as well. In particular, the courts have frowned upon a shareholder using the corporate form as his alter ego to unfairly amass wealth under his own name while at the same time relying upon the corporation's separateness to avoid well deserved liability. Corporations misused in this fashion are also referred to as "mere instrumentalities."

Courts have traditionally responded to such situations by "piercing the corporate veil." In less colorful terms, this means that the protection afforded by the corporate form will be denied, thereby exposing the abusive shareholder to his corporation's debts. Likewise, courts have on

---

[40]18A AM. JUR. 2D *Corporations* § 724 (2012) ("Because a corporation is an entity, separate and distinct from its officers and stockholders, its debts are not the individual indebtedness of its stockholders.").

occasion pierced the veil in reverse by allowing the shareholder's creditors to proceed against the corporation.[41]

As for justification, it is simple – corporations are creatures of state or federal law. Therefore, it follows that the law can fashion the terms of their existence any way it pleases, including a disregard of the corporation's "separateness" altogether whenever there has been abuse. It is not surprising, then, that any discussion concerning the legal application of alter ego theory inevitably includes references to justice and equity as well.[42]    Courts simply will not allow a shareholder to hide behind a corporate veil when to do so would be unjust.

The court has offered this brief explanation to show why Huntington's reliance upon this legal doctrine is misplaced.  Huntington is not, for example, seeking to pierce Teleservices' veil so that it can recover against Cyberco as well.  Huntington has always had a claim against Cyberco that it could enforce.  Indeed, the dispute here is about Huntington improperly collecting that claim by accepting property that had been fraudulently transferred from another.

---

[41]This court acknowledges the Sixth Circuit's statement in *Int'l Union, United Automobile, Aerospace and Agric. Implement Workers of Am. v. Aguirre* that veil piercing and alter ego are very different concepts.  410 F.3d 297, 302 (6th Cir. 2005).  The difference is that "efforts to pierce the corporate veil . . . hold *A* vicariously liable for *B*'s debt" whereas "a contention that *A* is *B*'s 'alter ego' asserts that *A* and *B* are *the same entity*; liability then is . . . direct." *Id.* (quoting from *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1038 (7th Cir. 2000) (emphasis in original).  But it is not clear to this court why a distinction between vicarious liability and direct liability is important if all along the end game is to simply hold A accountable for B's debts under some theory.  Moreover, veil piercing is less a concept that stands separate and apart from alter ego than it is a term of art that has been incorporated into the legal lexicon.  Again, the ultimate issue is whether a shareholder under certain circumstances can be held accountable for his corporation's debts notwithstanding its "separateness."  Veil piercing is simply a colloquialism.

[42]*See, e.g., Paul v. Univ. Motor Sales Co.*, 283 Mich. 587, 602, 278 N.W. 714, 720-21 (1938); *Dep't of Consumer Indus. Servs. v. Shah*, 236 Mich. App. 381, 393, 600 N.W.2d 406, 411-12 (1999); *Bucyrus-Erie Co. v. Gen. Products Corp.*, 643 F.2d 413, 418 (6th Cir. 1981).  *See also generally* 18 AM. JUR. 2D *Corporations* § 44 (2012).

Nor is Huntington at this point arguing that the veil should be pierced in reverse – i.e., that Huntington should be allowed a claim against Teleservices on the theory that Teleservices, or better, Teleservices' bankruptcy trustee, should be precluded from denying Cyberco's separateness from it.[43] Huntington instead insists that the alter ego doctrine be expanded from this relatively simple remedy of eliminating the "separateness" defense in a collection action to actually creating a defense for someone like it whenever rearranging a corporation and its assets suits its purpose.

*Wells*

*Wells v. Firestone Tire and Rubber Co.*[44] is the only published opinion that Huntington cites for this proposition.[45] The plaintiff in *Wells* had already successfully collected a claim from the

---

[43]Huntington did, though, make that argument, albeit unsuccessfully, earlier in the adversary proceeding in connection with its Section 548(c) defense. *Cf. supra*, n.37.

[44]421 Mich. 641, 364 N.W.2d 670 (1984).

[45]One of the unpublished opinions Huntington cites is *Brennan v. Slone (In re Fisher)*, 296 F. App'x 494 (6th Cir. 2008). James Fisher, the debtor, was the sole shareholder of Fisher Data Products ("FDP"). Both were experiencing financial difficulties and FDP had in fact dissolved and sold its patents to Globe Products, a third party. Globe, though, did not want to purchase FDP's inventory outright, preferring instead to purchase the inventory as needed to complete particular orders. National City Bank's lien in the inventory also presented a problem.

However, Fisher did not want to miss a valuable business opportunity. Therefore, he arranged for his girlfriend to purchase, with National City's consent, the FDP inventory for its liquidation value of $3,800. The girlfriend, Rhonda Brennan, then sold to Globe what it needed for almost $100,000.

Apparently, FDP was never placed in a bankruptcy proceeding. However, Fisher himself sought Chapter 7 relief and it was his trustee who attempted to set aside the transfer of inventory from FDP to Brennan as fraudulent to Fisher's own creditors. The bankruptcy court found for the trustee. Among the issues Brennan appealed was the bankruptcy court's determination that the inventory effectively belonged to Fisher on the basis that Fisher was FDP's alter ego.

Although the Sixth Circuit affirmed, its reasoning is not clear. What seemed to impress the panel the most was the fact that Fisher had repeatedly disregarded the corporate form by co-mingling his money with that of FDP's and by then paying his own expenses from the co-mingled funds. The panel also noted that Fisher had not identified FDP as a separate entity when speaking of its financial difficulties, but rather had referred to himself as having those problems. *Id.* at 506-07.

parent corporation for a work-related injury when he attempted to collect again for the same injury from the wholly owned subsidiary that had actually employed him. Indeed, the focus in *Wells* was upon worker's compensation law and the exclusive remedy it is intended to provide to covered employees. *Id.* at 646. Nevertheless, the court included alter ego doctrine in its discussion because "the result, in effect, is a 'reverse piercing' of the defendant's [the subsidiary's] corporate veil." *Wells*, 421 Mich. at 650, 364 N.W.2d at 674.

It is in this context, then, that *Wells* must be read. Nor is anything in *Wells* unique. It recognized, as all courts do, that a corporation's separate identity is to be respected. However, it also recognized that Michigan courts have allowed the corporate veil to be pierced to protect the corporation's creditors just as other courts have. And finally, it acknowledged that the doctrine

---

As for its legal analysis, the panel observed that "veil piercing and *alter ego* concepts are distinct" with the former making "A vicariously liable for B's debts" and the latter making A directly liable because "A and B are the same entity." *Id.* at 506 (citation omitted). Whether this is truly a distinction is debatable. *See supra* n.41. However, even if one accepts the distinction made, the question remains as to how the panel was able to apply a concept that still addressed only the question of liability to conclude that FDP's property was actually owned by Fisher for purposes of Section 548. The panel's conclusion also raises a whole host of related issues. For example, FDP was apparently as insolvent as Fisher. What, then, became of those creditors? Were they too allowed to make claims against Fisher's estate because of the same alter ego theory or were they simply left out of the equation?

This court suggests that both the panel and the bankruptcy court were able to achieve the desired result of making FDP's assets Fisher's by in fact applying the concept of substantive consolidation – i.e., rearranging both the assets and the liabilities of a nonbankrupt entity as if they were the debtor's for purposes of bankruptcy administration. As this court discussed in *Cyberco*, 431 B.R. 404, the alter ego often appears in discussions concerning whether substantive consolidation is appropriate or not. But if that was the theory, *Fisher* is easily distinguishable because the trustee in *Fisher* clearly had standing to consolidate FDP into Fisher's estate whereas Huntington did not have similar standing here. *Cyberco*, 431 B.R. at 404.

Moreover, the Ohio law *Fisher* cites as support contains the same caveat as all other cases that rely upon alter ego theory to fashion a remedy – that the doctrine is to be applied only "where the ends of justice require it." *Fisher*, 291 F. App'x at 506. While applying the alter ego doctrine in that instance may have been just, its application in this instance clearly is not.

might also be invoked by the shareholder "where the equities are compelling" (i.e., reverse piercing). *Wells*, 421 Mich. at 651, 364 N.W.2d at 674.

But again, piercing Teleservices' veil in one direction or another to expand a creditor's reach is not what is at issue here. Nor, for that matter, has Huntington offered anything in the way of competing equities to warrant the extraordinary reconstruction of Cyberco and Teleservices that it seeks. As *Wells* itself confirms, alter ego theory and justice go hand in hand.

> [T]he fiction of a distinct corporate entity separate from the stockholders is a convenience introduced in the law to subserve the ends of justice. When this fiction is invoked to subvert justice, it is ignored by the courts.

*Id.* at 650, 364 N.W.2d at 674.[46]

Is, though, what Huntington requests just? Teleservices may not have had any legitimate purpose and it may not have had any assets to speak of apart from the Silicon Valley account. But Teleservices most certainly had creditors, for every equipment finance company that Watson tricked transferred its money to Teleservices, not Cyberco. As such, each of those companies has the legal right to demand from Teleservices the return of its money.[47] Moreover, it is this same money, once taken, that was fraudulently transferred from an account that all, including Huntington, believed was owned by Teleservices, not Cyberco. And finally, there is no question that a tremendous injustice

---

[46]Citing *Paul v. Univ. Motor Sales Co.*, 283 Mich. 587, 602, 278 N.W. 714, 720 (1938).

[47]Huntington suggests that the equipment finance companies were not creditors of Teleservices because they "entered these transactions based on Cyberco's credit worthiness and expected to be repaid by Cyberco." Hunt. Br., DN 382 at 26. However, for purposes of the Bankruptcy Code, a "creditor" includes any "entity that has a claim against the debtor" and a "claim" includes any "right to payment." 11 U.S.C. §§ 101(5)(A) and (10)(A). Given, then, that the equipment finance companies would have had the absolute right to demand repayment from Teleservices had the fraud ever been revealed, there is no question that equipment finance companies meet the criteria of creditors for purposes of administering the Teleservices' bankruptcy estate.

will be done to those creditors if Teleservices' separate ownership of the Silicon Valley account is ignored as Huntington urges. It does not take genius to realize that the equipment finance companies' chances of recovering what had been stolen from them is much better if Trustee is allowed to recover for their collective benefit what Huntington received from Teleservices than if the two entities are combined as Huntington would like.

On the other hand, this court perceives no corresponding injustice befalling Huntington if Teleservices and Cyberco are left apart. While doing so certainly exposes Huntington to substantial liability under Section 550(a), Section 550(b)(1) in turn provided Huntington with an opportunity to avoid that liability altogether. Huntington has only itself to blame that it was unable to establish the good faith that the Section 550(b)(1) defense requires.

The Eleventh Circuit and the California Courts

Huntington also relies upon *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*[48] and *People v. Semaan*[49] as two other reasons for treating Teleservices' Silicon Valley account as in fact belonging to Cyberco. Neither, though, is persuasive.

*Nordberg*

*Nordberg* involved a Section 548 avoidance action as well. The challenged transfer there was a $350,000 check written by the debtor, Chase & Sanborn, to Carolina Sanchez, a secretary. However, that transfer was only part of a much larger series of transactions that the trial court had described as "bewildering." *Nordberg*, 813 F.2d at 1179. Briefly, Alberto Duque, who controlled Chase & Sanborn, had borrowed money from a friend, Londono, and had then borrowed money

---

[48]813 F.2d 1177 (11th Cir. 1987).

[49]42 Cal.4th 79, 163 P.3d 949 (2007).

again to repay Londono. A portion of this second loan found its way through an account that belonged to Chase & Sanborn and it was that account upon which the $350,000 check had been written. The account had been inactive and Duque had reactivated it only in order to launder the source of the borrowed funds. Indeed, the money remained in the reopened account for only two days before Chase & Sanborn wrote the check and closed it once again. *Id.* at 1182. As for Sanchez, she likewise held the funds only briefly before sending them on to Londono, who then repaid City National, the bank from whom the original loan was made.[50]

*Nordberg* focused on whether Chase & Sanborn had transferred anything to Sanchez in the first place. The reviewing panel disagreed with the trial court's finding that another entity was the source of the transfer, concluding instead that the $350,000 check had come from a Chase & Sanborn account.[51] However, the panel decided as well that the situation warranted looking "beyond the particular transfers in question to the entire circumstance of the transaction." *Id.* at 1181-82. It then determined from those circumstances that Chase & Sanborn had not made the transfer, at least from the perspective of fraudulent transfer law. Rather, the transferor was Duque, Chase & Sanborn's owner.

The panel, in making its decision, believed that it was addressing an issue of first impression.

> No court, so far as we have discovered, previously has established a framework for determining when funds provided to a debtor by a third party become property of the debtor so that an allegedly

---

[50]Given that Duque was the intended beneficiary all along, it would have certainly been much easier had City National simply made the original loan to him instead. However, banking regulations prohibited such a loan because Duque was also City National's majority shareholder. Therefore, both the loan and its repayment took the circuitous route described.

[51]*Nordberg*, 813 F.2d at 1180.

> fraudulent transfer of the funds to a noncreditor is subject to avoidance under 11 U.S.C. § 548.

*Id.* at 1180.

However, one must ask whether *Nordberg* had to approach the problem the way it did. What clearly concerned the panel was the prospect of a windfall at some innocent's expense.

> To conclude otherwise would confer on the creditors a windfall at the expense of the named defendants who, as the creditor trustee admits, were innocent of any intent to diminish the assets of the debtor.

*Nordberg,* 813 F. 2d at 1182 (footnote omitted).

But there are other provisions in the Code that already protect against such outcomes. For example, if Londono and City National were in fact innocent, then one would assume that the Section 550(b)(1) defense would have protected them from any recovery even had the panel found the transfer itself avoidable under Section 548.[52]

Granted, Sanchez, as the initial transferee, would not have had the same protection under Section 548(c) since her exchange with Chase & Sanborn had been gratuitous. However, Sanchez's good faith under that section is at least suspect, for Section 548(c) good faith is measured by the

---

[52]Section 550(b)(1) prevents trustees from recovering avoided transfers from subsequent good faith transferees who take for value and without knowledge of the transfers' avoidability. 11 U.S.C. § 550(b)(1). Londono's and City National's acceptance of the transfer in repayment of antecedent debt would have undoubtedly qualified as value. *Compare* Section 550(b)(1) with Sections 548(c) and (d)(2)(A). As for their good faith and lack of knowledge, Londono's and City National's complicity in the laundering might have raised questions about how truly innocent they in fact were. Nonetheless, it appears that each could have still legitimately asserted good faith vis-a-vis the fraudulent transfer itself, much as Burnazos was able to do under the first scenario examined in *Boston Trading Group, Inc. v. Burnazos,* 835 F.2d 1504, 1516 (1st Cir. 1987) (*see infra*). In other words, while Londono and City National may have been part of Duque's overall scheme to avoid the banking laws, they apparently were not a part of any separate scheme by Chase & Sanborn to defraud its creditors.

24

recipient's honesty.[53] One must ask, then, how Sanchez in good faith could have possibly accepted what she did from Chase & Sanborn given that (1) Chase & Sanborn was insolvent; (2) Sanchez was Duque's personal secretary; (3) Sanchez had done nothing to earn the $350,000 received; (4) Sanchez gratuitously transferred an identical amount to Londono only two days later; and (5) Sanchez had also funneled another $1.65 million to Londono "by other means." *Id.* at 1179. It is also noteworthy that Sanchez never even made the effort to establish her innocence since she was evidently nowhere to be found at the time of trial.[54]

The point is that the panel in *Nordberg* did not have to venture into the uncharted waters that it did to right the perceived wrong. It could have relied instead upon the established Section 548(c) and Section 550(b)(1) defenses, leaving untouched what the panel itself acknowledged had been up to then the accepted rule under both preference and fraudulent transfer law.

> [A]ny funds under the control of the debtor, regardless of the source, are properly deemed to be the debtor's property, and any transfers that diminish that property are subject to avoidance.

*Id.* at 1181.[55]

---

[53]*Cf. Teleservices*, 444 B.R. at 810, 811-12 (holding that Section 548(c) and Section 550(b) good faith is a measure of the recipient's subjective awareness of the fraud being perpetrated.).

[54]Assuming, though, Sanchez was in fact a good faith recipient of the fraudulent transfer from Chase & Sanborn, the trial court could have still shielded her from liability by exercising its discretion under Section 550(a) and not awarding the trustee "value" for the admittedly fraudulent transfer that had passed through her hands but was with her no more. *See infra First Financial* and *Sawran*. However, the Eleventh Circuit never gave the trial court that opportunity since it chose to find its own solution to the problem Sanchez's apparent innocence posed.

[55]The Supreme Court has since confirmed this rule, at least as it applies to deciding what is "property of the debtor" under Section 547.

> The Bankruptcy Code does not define "property of the debtor." Because the purpose of the avoidance provision is to preserve the

In any event, the panel struck out on its own. It did so by concluding that a debtor's control of fraudulently transferred amounts required further definition. The panel believed that the refinement was necessary because of the perceived difference between creditors receiving transfers under Section 547 and non-creditors receiving transfers under Section 548. This distinction, it concluded, warranted for the latter a greater showing of control than what ordinarily was required.

> [W]here a transfer to a noncreditor is challenged as fraudulent, more is necessary to establish the debtor's control over the funds than the simple fact that a third party placed the funds in an account of the debtor with no express restrictions on their use.

*Nordberg*, 813 F.2d at 1181.

Of course, the problem with *Nordberg*'s solution is that nothing in the two sections compared suggests the distinction made. To the contrary, both Section 547 and Section 548 use identical language – "transfer of an interest of the debtor in property" – to describe what is to be avoided as either a preference or a fraudulent transfer. Therefore, while the debtor's control over the interest in question is certainly relevant under either circumstance, there is nothing in these two sections to suggest that a greater degree of control is needed when the avoidance is to be made under Section 548. Moreover, other provisions – to wit, Sections 548(c) and 550(b) – already address the panel's concern of the estate receiving an undeserved windfall at an innocent's expense. Indeed, in creating

_____

> property includable within the bankruptcy estate-the property available for distribution to creditors-"property of the debtor" subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings. For guidance, then, we must turn to § 541, which delineates the scope of "property of the estate" and serves as the postpetition analog to § 547(b)'s "property of the debtor."

*Begier v. IRS*, 496 U.S. 53, 59, 110 S. Ct. 2258, 2263 (1990) (footnote omitted).

26

these defenses, Congress gave the exchange of value a prominent role. In other words, with the exception of Section 550(b)(2) transferees, recipients of gratuitous transfers must account even when they have otherwise taken in good faith. Consequently, one must question a "between the lines" judicial interpretation of Section 548 that relieves these very same gratuitous recipients – i.e., *Nordberg*'s noncreditors – of this explicit obligation to account. Nor is this court's skepticism diminished when it also takes into consideration that *Nordberg*'s interpretation of Section 548 conflicts with identical language in the Code section immediately preceding it. As the Supreme Court itself has said: "A term appearing in a statutory text is generally read the same way each time it appears."[56]

*Nordberg* also leaves unanswered the question of how innocent creditors, as opposed to innocent noncreditors, are to be treated under Section 548. Assume, for example, that Duque had also intended to use the $350,000 Sanchez received to pay her for some past due salary Chase & Sanborn owed. Sanchez would still have been accountable for a constructively fraudulent transfer since less than reasonable value had been exchanged. *Cf.* 11 U.S.C. § 548(a)(1)(B). On the other hand, Sanchez would not have had to account for the wages paid assuming that she was in fact a good faith recipient and the transfer had otherwise occurred outside the preference period. *Cf.* 11 U.S.C. § 548(c). Why, though, would Sanchez be entitled to only a partial defense under this scenario whereas *Nordberg* allowed her, as a gratuitous transferee, a complete defense? Or, would *Nordberg*'s recognition of this inequity have also required yet one more adjustment of Section 548's plain language to accommodate its theory?

---

[56]*Ratzlaf v. U.S.*, 510 U.S. 135, 143, 114 S. Ct. 655, 660 (1994) (citation omitted); *see also Cohen v. de la Cruz*, 523 U.S. 213, 220, 118 S. Ct. 1212, 1217 (1998).

27

In sum, this court does not find *Nordberg* persuasive. Moreover, the case at hand is distinguishable. *Nordberg* is unusual because the principal of the debtor (i.e., Duque) not only was directing where the funds were to go; he was also the source of the funds being laundered.[57] But in this instance, the equipment finance companies, not Watson, were the source of the funds being

---

[57]Huntington actually characterizes *Nordberg* as a money laundering case where "fraudsters, in essence, funneled money through the debtor's bank account and used the money to repay, through an initial transferee, a bank loan." (Hunt. Br., DN 382 at 27). It also cites *Walsh v. Townsquare Assoc.'s (In re Montross)*, 209 B.R. 943 (B.A.P. 9th Cir. 1997) as an example of *Nordberg*'s application to another money laundering situation.

George Montross, the debtor in *Walsh*, had used the accounts of Townsquare, a partnership in which Montross was one of several general partners, to launder money that Montross had obtained from activities totally unrelated to Townsquare's legitimate activities. Montross's bankruptcy trustee had sought the recovery of the deposits into those accounts from Townsquare on the theory that Townsquare, as the owner of the account, was the transferee of avoidable transfers under Section 550(a). However, the trial court determined and the Ninth Circuit BAP in turn affirmed that Townsquare was not a transferee because it lacked the requisite control, citing *Nordberg* in support. *Id.* at 949.

*Walsh*, though, is a very different case from the one at hand. For instance, none of Townsquare's other general partners had signatory rights to the accounts in question nor were they aware that Montross was depositing into these accounts funds other than the rents being legitimately earned by the partnership. As the BAP put it, Montross intended the money deposited to remain his own and in fact carried out that intent "by transferring funds in and out of the account without Townsquare's control or knowledge." *Id.* at 949.

*Montross*, then, is not so much a validation of the "enhanced control" rule espoused by *Nordberg* when gratuitous recipients of fraudulent transfers are targeted as it is a reaffirmation of *Bonded Financial*'s well accepted dominion and control test that the BAP also cited. *Walsh*, 209 B.R. at 948. In other words, the BAP rejected the trustee's contention that Townsquare ever had the ability to invest in *Bonded Financial*'s proverbial "lottery tickets" or "uranium stocks" because no one at Townsquare other than Montross himself knew that the funds passing in and out of the accounts even existed.

This case would be more akin to *Nordberg* and *Montross* had Watson been simply laundering his own money through the Silicon Valley account. However, he was not. Watson was instead using Teleservices as an accomplice, if you will, to pull off the fraudulent scheme he had devised to trick the equipment finance companies to part with millions of dollars for Cyberco's purchase of nonexistent computer equipment. Moreover, Teleservices, in its capacity as a legal entity under the laws of Delaware, was without question both (1) aware of the funds being deposited into the Silicon Valley account; and (2) capable of diverting the monies it was receiving from the victimized equipment leasing companies as it pleased. It was Watson's choice, not duty, to have Teleservices channel its booty to Cyberco.

28

deposited into Teleservices' Silicon Valley account. Nor was that account only a laundry, for it was the device that Watson absolutely needed to trick these companies into parting with their money. And finally, these same companies are also the victimized creditors who now stand to gain through Trustee's successful avoidance and recovery of the fraudulent transfers Teleservices then made from that account.[58]

Therefore, the undeserved windfall that concerned *Nordberg* does not exist here. Nor does its application here make sense. After all, *Nordberg*'s reasoning is based entirely upon the premise that the trustee there was targeting innocent transferees. However, in this instance, Huntington has not only had the opportunity to prove its innocence (i.e., its good faith); Huntington has actually failed to do so. It is difficult, then, to understand how Huntington could possibly rely upon *Nordberg* as the reason why it should be allowed to effectively sidestep the good faith requirements of Sections 548(c) and 550(b)(1) and otherwise avoid an accounting under Section 550(a) regarding the fraudulent transfers it received.

And finally, even if *Nordberg* is on point, *In re Hurtado*,[59] which is a Sixth Circuit decision, must take precedence. This court recognizes that *Hurtado* addresses control over monies in an account from the transferee's perspective as opposed to the debtor's. That is, it was the defendant

---

[58]Huntington intimated at one point that the equipment finance companies' own lack of due diligence was as much to blame for their predicament as anything else. Hunt. Memo. Opp. Mo. for PSJ, DN 144 at 21-23. However, even if true, it has no relevance to the question at hand, that being whether Huntington should be held accountable under Section 550 for all of these funds being then siphoned off from the Silicon Valley account to these creditors' detriment. That the equipment finance companies may have been lax, or even negligent, does not offset the fact that (1) they were Watson's victims; and (2) the funds that Watson had stolen from them would have still been in that account had the transfers to Cyberco and then Huntington not been made.

[59]*Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528 (6th Cir. 2003).

29

transferee in *Hurtado* who was claiming that the money deposited in her account still belonged to

the debtor because she was only to spend it as he directed. Is that, though, any different from a

debtor accepting a gratuitous transfer subject to the same type of restrictions, which was the case in

*Nordberg*? The Sixth Circuit certainly made short work of the defendant's argument in *Hurtado*,

finding instead that her unrestricted dominion and control over the deposited funds was all that

mattered. And this court sees no reason why the Sixth Circuit would not apply this same well

recognized test were these facts before it instead.[60]

---

[60]Although not cited by Huntington, the Fifth Circuit's recent decision in *De La Pena Stettner v. Smith (In re IFS Fin. Corp.)*, 669 F.3d 255 (5th Cir. 2012) is yet another example of a court struggling to apply the fraudulent transfer laws under circumstances where there are multiple entities and an unscrupulous individual in control. In that instance, the mastermind, Pimienta, operated IFS Financial Corporation ("IFS") and seventeen affiliated companies collectively known as Interamericas to provide insurance, mortgage, and banking services. Investors had deposited over $270 million in what they thought was a bank but in fact was an account owned by a Venezuelan corporation that Pimienta and others, through IFS, controlled.

The Interamericas companies began experiencing financial difficulties during which Pimienta and his confidantes removed funds belonging to IFS and the other Interamericas entities and then lent those monies to insiders. Thereafter, the entire enterprise collapsed. IFS, though, was the only one to file for Chapter 7 relief.

The IFS trustee sought to avoid approximately $3 million in transfers under Section 544(b) and its incorporation of Texas's fraudulent transfer laws. The defendants had appealed the trial court's determination that IFS had transferred to these defendants' money because the trustee had conceded at trial that IFS did not legally own the accounts from which the targeted funds had been transferred. However, the Fifth Circuit affirmed, determining that IFS nonetheless had sufficient control over the accounts to establish the requisite ownership interest. *Id.* at 264.

On its face, then, *IFS Financial* seems to support Huntington's position that control takes precedence over legal ownership when fraudulent transfers are at issue. However, there are reasons to distinguish *IFS Financial* from the case at hand. The most obvious is that the panel was interpreting only Texas' fraudulent transfer laws. Moreover, the issue before it was one of first impression as the available case law was "scant." *Id.* at 262.

The panel also seems to have accepted the same implicit substantive consolidation of all of the entities there as the Sixth Circuit did in *Fisher* (*supra* n.45). However, in both *Fisher* and *IFS Financial*, it was the trustee who was advocating the consolidations whereas it is Huntington who advocates consolidation here. Of course, the problem is that this court has already determined that Huntington has no standing to consolidate the Cyberco and Teleservices' estates. *Cyberco*, 431 B.R. at 432.

*Semaan*

Huntington also relies upon *Semaan*[61] for the separate proposition that Cyberco's "acts of ownership" regarding the Silicon Valley account creates under California law the presumption that Cyberco, as opposed to Teleservices, was the actual owner of the Silicon Valley account. Therefore, Huntington argues Trustee must at the very least overcome this presumption through an evidentiary hearing in order to prevail.

However, *Semaan* is itself a case whose outcome was dictated by peculiar facts. Granted, that decision also involved a bank account held in the name of one person with actual ownership then being associated with another. However, the similarity ends there, for the issue in *Semaan* was over the proper application of an evidentiary rule as part of a state criminal proceeding. Specifically, the prosecution had frozen an account held in the name of Marie, the accused's sister-in-law, on the theory that the funds were traceable to him. There was a question, though, as to whether Marie even existed. She supposedly lived in Beirut. However, the only evidence of either her or her interest in the account was an affidavit signed by her supposed attorney.

---

A third reason for distinguishing *IFS Financial* is that it was the IFS trustee himself who was seeking the *de facto* consolidation. Nor was there any apparent objection by an affected creditor other than the insider defendants. But in this instance it is Huntington who is asking that the two separate entities be treated as one. Moreover, the trustees of both estates have vigorously opposed the same because, unlike the situation in *IFS Financial*, the consolidation that Huntington seeks does not work to either of those estates' or their creditors' advantage.

However, what distinguishes this case most from *IFS Financial* is its recognition that each case ultimately must turn on its own peculiar facts. *IFS Financial*, 669 F.3d at 264. Therefore, this court can certainly understand how *IFS Financial* reached the conclusion it did under the circumstances there. Nonetheless, the court remains satisfied that the facts here – i.e., a fraudulent scheme where millions of dollars were being stolen by one corporation and then fraudulently transferred to another – do not warrant the realignment of ownership that Huntington advocates, especially when that realignment would be to the detriment of Teleservices' defrauded creditors.

[61]163 P.3d 949 (2007).

31

The trial court, after an extensive hearing, concluded that the account belonged to the accused and, therefore, that the seizure was proper. 163 P.3d at 952. However, the lower appellate court determined that California's rules of evidence created a presumption of ownership in Marie's favor. As such, it concluded that the trial court had erred because the prosecution had failed to rebut that presumption with clear and convincing evidence. *Id.*

The question, then, before the California Supreme Court was only whether the lower appellate court had properly applied that evidentiary rule. And that court in turn determined that the intermediate court had erred by using the wrong rule. It concluded that another evidentiary rule applied and that Marie, not the accused, had the burden of proving ownership under that different rule. *Semaan*, 163 P.3d at 955. Indeed, it is even another rule of evidence that Huntington refers to in its brief as creating what is supposedly controlling California law.[62] But Huntington also neglects to mention that the court in *Semaan* went on to acknowledge that that presumption only affects the burden of going forward.

> The People's showing that the defendant controls assets gives rise to the presumption that he or she owns them and, thus, places on anyone who would prove the contrary the burden of producing evidence to that effect. Evidence Code section 638 ['A person who exercises acts of ownership over property is presumed to be the owner of it.'] which articulates the presumption just mentioned, is a presumption affecting the burden of producing evidence.

*Id.* at 953-54.

This court, though, is not deciding rights to property seized as part of a criminal forfeiture in California. Rather, the issue here is a federal one – to wit, whether Trustee, as part of this bankruptcy proceeding, may recover from Huntington fraudulent transfers made by Teleservices

---

[62]*Cf.* Cal. Evid. Code § 638 (West 1967).

from its Silicon Valley account. Moreover, this court has already applied evidentiary rules appropriate for this proceeding to evaluate facts that both sides have presented in exhaustive detail. Nor have burdens of going forward been ignored, as evidenced by Huntington's own failure to meet its burden with respect to Section 550(b)(1) good faith.[63] On the other hand, this court has no question whatsoever that Trustee has met her burden with respect to establishing Teleservices' ownership of the Silicon Valley account. Therefore, there is simply no reason to look to *Semaan* for further guidance.[64]

## LIMITING HUNTINGTON'S LIABILITY TO ITS DEBT

Even if, as this court has determined, all of the wires and checks from the Silicon Valley account are to be treated as avoidable transfers from Teleservices, Huntington contests Trustee's further contention that it should be accountable for the over $55 million that was deposited with Huntington but never used to pay down the Cyberco debt.[65] Huntington argues that its mere acceptance of these deposits is not enough to have made it a subsequent transferee under Section 550(a)(2).

---

[63]*Teleservices*, 444 B.R. at 825-30.

[64]The other California decision Huntington cites is *Roberts v. Gratz*, 5 Cal. App. 3d 364 (1970). At issue in that case was the ownership of a bank account titled "Goetz Mabel, Trustee for William Goetz." However, *Roberts* makes only the unremarkable observation that the name placed on the account is not dispositive if parol evidence establishes that the parties creating the account intended otherwise and the "realities of ownership" also support a different conclusion. *Id.* at 368.

[65]Again, Trustee is attempting to avoid (1) $7,395,283.04 in checks that Teleservices wrote directly to Huntington in payment of Cyberco's debt; and (2) another $65,356,244.36 in wire transfers to Cyberco that Cyberco had instructed be deposited in its Huntington accounts. Of these deposits, Huntington needed only about $10 million to cover the remaining debt Cyberco owed it. The difference, then, is what Huntington argues should not be its responsibility.

*Bonded Financial*

Huntington's status as both Cyberco's depository bank and its lender complicates analysis of this aspect of the case, for each relationship in its own right creates the prospect of a Section 550 recovery. Huntington would have it that no transfer occurred for purposes of Section 550(a) with respect to the funds deposited into Cyberco's accounts until Huntington actually exercised its creditor rights against those accounts by either setoff or the enforcement of its lien.[66] This, though, is too narrow of a definition of what gives rise to Section 550 liability once a transfer has been avoided. As the Seventh Circuit observed in the seminal case of *Bonded Financial*, the critical issue

---

[66]Indeed, a significant portion of Huntington's brief treats its security interest in Cyberco's deposit accounts as the focal point for deciding this issue. Here is Huntington's summary of its position:

> The Trustee claims in her motion that the attachment of Huntington's security interest to the deposited funds entitles her to summary judgment in the aggregate amount of the deposits. The Trustee is incorrect for at least four reasons: (a) Cyberco transferred a security interest to Huntington prior to Huntington acting in bad faith or with knowledge of avoidability, (b) the value of a typical security interest is limited by the amount of the debt it secures, (c) Huntington's security interest had no appreciable value, and (d) at a minimum, the value of the security interest presents a question of fact for trial.

Hunt. Br., DN 382 at 33.

However, for the reasons given in this opinion, the court has concluded that Huntington's liability under Section 550(a)(2) can be decided simply based upon its relationship to Cyberco as its depository bank. Therefore, the court has not addressed Huntington's much different arguments regarding any Section 550(a)(2) exposure that might have arisen because of the attachment of its lien.

34

is "dominion over the money or other asset, the right to put the money to one's own purposes."[67] Other circuits, including the Sixth Circuit, have reached the same conclusion.[68]

There is, of course, no question that Huntington's setoff of Cyberco's accounts to repay what it was owed exhibited Huntington's dominion over that account. However, Huntington's rights arising from the account relationship itself also permits for the type of domination that *Bonded Financial* speaks of. As Huntington concedes, its status as Cyberco's depository bank under these accounts resulted in a debt being owed each time Cyberco deposited a transfer from Teleservices.[69] How, though, could Huntington have become Cyberco's debtor unless the deposited wire itself resulted in a transfer being made from Cyberco to Huntington? Or, more to the point, did not Huntington gain the unfettered control that both *Bonded Financial* and *Hurtado* recognize as dispositive whenever it received Cyberco's deposit in exchange for only its promise that Cyberco would be paid back for the same some time in the future?

However, as obvious as the answers to these questions may seem, *Bonded Financial* and other courts have determined that the mere deposit of an avoided transfer into an account does not make the depository bank accountable as a subsequent transferee under Section 550(a)(2). This

---

[67] *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988).

[68] *Hurtado*, 342 F.3d 528, 533 (6th Cir. 2003). *See also Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 58 (2nd Cir. 1997); *Bowers v. Atlanta Motor Speedway, Inc. (In re Southeast Hotel Props. Ltd. P'ship)*, 99 F.3d 151, 156 (4th Cir. 1996); *Sec. First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138, 141 (5th Cir. 1993); *Luker v. Reeves (In re Reeves)*, 65 F.3d 670, 676 (8th Cir. 1995); *Abele v. Modern Fin. Plans Servs., Inc. (In re Cohen)*, 300 F.3d 1097, 1102 (9th Cir. 2002); *Malloy v. Citizens Bank of Sapulpa (In re First Sec. Mortg. Co.)*, 33 F.3d 42, 44 (10th Cir. 1994), *Andreini & Co. v. Pony Express Delivery Servs. (In re Pony Exp. Delivery Services, Inc.)*, 440 F.3d 1296, 1300-01 (11th Cir. 2006).

[69] Hunt. Br., DN 382 at 51.

35

court, though, suggests that these cases have confused the bank's collection of the deposit with the deposit itself and that it is that confusion that has led these courts to conclude as they have. Therefore, it is helpful to consider separately these very different banking functions in order to appreciate why the former does not give rise to Section 550(a) liability whereas the latter does.

It is actually tempting to view the collecting bank as the "initial transferee" of the avoided transfer with its customer in turn being the "entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). Indeed, it was this very argument by the trustee in *Bonded Financial* that prompted the panel's declaration there that dominion, as opposed to receipt, should dictate who is to be liable as the initial transferee under that section.[70] But why this is so is easier explained by first considering a transfer more tangible than the check involved in *Bonded Financial* or in the wires at issue here. For example, assume that the transfers from Teleservices to Cyberco had instead been with suitcases of cash. Cyberco without question would have been the initial transferee of each suitcase received had Cyberco itself driven to California to take delivery. And the same would be true had Cyberco arranged for delivery to be made through a common carrier. The carrier would have simply facilitated the transfer on Cyberco's behalf.

Exchanging wealth in this fashion, though, is both inefficient and risky. Could not Teleservices and Cyberco have also worked out another arrangement whereby their two banks, Silicon Valley and Huntington, arranged for the exchange? And in turn could not Silicon Valley and Huntington have forgone the suitcases altogether and accomplished the same exchange of wealth between their two customers through a few accounting entries?

---

[70]838 F.2d at 893.

The point, of course, is that banks are not initial transferees when their involvement in a transfer is simply to facilitate the same. Therefore, it makes no difference in this instance whether Huntington accepted Teleservices' wires on Cyberco's behalf or whether Cyberco had had Huntington pick up suitcases of cash on its behalf instead. In either instance, Cyberco, not Huntington, would have been the one accountable to Trustee as the intended initial transferee of the now avoided transfer.

*Bonded Financial*'s analysis is no different. It involved $200,000 that the defendant, European American Bank ("EAB"), had received from Bonded Financial Services, a debtor corporation controlled by Mike Ryan. Although EAB was the check's payee, EAB also had instructions to credit that amount to Ryan's account, which it did. The $200,000 then remained on deposit there until Ryan directed EAB ten days later to apply it against a debt that Ryan himself owed EAB.

*Bonded Financial*'s trustee wanted EAB to be treated as the initial transferee. After all, it was the first to have received the check. The panel, though, rejected that argument, determining instead that "dominion over the money or other asset, the right to put money to one's own purpose" was the dispositive test. *Bonded Financial*, 838 F.2d at 893. And by that measure it was clear to the panel that Ryan, as opposed to EAB, was the initial transferee. While EAB may have received the check, EAB had no actual control over its disposition because of the directions it had concerning the check's deposit. As the panel famously put it, Ryan could have invested "the whole $200,000

37

in lottery tickets or uranium stocks." *Id.* at 894. Therefore, Ryan, not EAB, had to be the initial transferee.[71]

This court agrees. EAB certainly facilitated the intended transfer from the bankrupt debtor to Ryan, just as it would have facilitated the same transfer had the debtor corporation delivered cash to EAB with instructions to give it to Ryan when he came to call. Indeed, that was exactly *Bonded Financial*'s point when it referred to armored cars and their transport of valuables:

> The Fed or the receiving bank could be called the "initial transferee"
> of the funds if we disregarded the function of fraudulent conveyance
> law. Similarly, an armored car company might be called the "initial
> transferee" if the bankrupt gave it valuables or specie to carry.

*Bonded Financial*, 838 F.2d at 893.[72]

However, this court disagrees with *Bonded Financial*'s further conclusion that EAB did not become a subsequent transferee of the deposit under Section 550(a)(2) until it finally was directed by Ryan to exercise its setoff rights a week or so later. According to the panel, it was not until that point that EAB gained "dominion" over the funds. *Id.* at 894. But with all due respect, *Bonded Financial* overlooked the fact that actual ownership of the funds had already changed upon deposit.

---

[71]Section 550(a)(1) also treats as an initial transferee "the entity for whose benefit such transfer was made." Therefore, the trustee in *Bonded Financial* had argued in the alternative that EAB should still be held accountable under that subsection because both the debtor corporation's and Ryan's ultimate purpose in making the transfer was to pay down the indebtedness Ryan owed to EAB. However, the panel rejected that argument as well, correctly holding that EAB was a subsequent transferee in the challenged transaction and that "a subsequent transferee cannot be the 'entity for whose benefit' the initial transfer was made." *Id.* at 895.

[72]Nor is distinguishing between the recipient of the transfer and a mere facilitator of that transfer any less an issue in determining subsequent transferee liability under Section 550(a)(2). For example, were the recipient in *Bonded Financial*'s hypothetical to have transferred the valuables yet again, the armored car facilitating that second transfer would have been no more a subsequent transferee under Section 550(a)(2) than would the armored car that had originally transferred the valuables been the initial transferee under Section 550(a)(1).

38

There is no question that Ryan continued to control the account into which the funds were credited in the sense that he could have at any time demanded EAB to pay him or whomever he chose what had previously been deposited. Indeed, Ryan's direction to EAB to setoff its indebtedness against the account exemplified this type of control. However, these rights arose only because Ryan was EAB's creditor, and an unsecured one at that. Again, as Huntington readily acknowledges, the relationship between a depositor and its bank is simply that of a creditor and debtor. Therefore, the agency that had existed between EAB and Ryan concerning the check's collection evaporated the moment EAB credited the amount collected to Ryan's account as instructed. In its place was a new relationship in which EAB now had unrestricted use of the funds. Or, to put it in *Bonded Financial*'s own terms, "the right to put the money to one's own purposes"[73] had shifted from Ryan to EAB as soon as the deposit was made.

To illustrate this point, consider again the hypothetical of Teleservices transacting business with suitcases of cash and assume that Huntington, having taken delivery of a suitcase on Cyberco's behalf, has now contacted Cyberco about picking it up. Had Cyberco done so, Huntington would have preserved its status as simply the facilitator of the intended transfer from Teleservices to Cyberco. However, if Cyberco had chosen instead to deposit that cash with Huntington, Huntington could have used the cash as it pleased, for the deposit agreement it had with Cyberco allowed it to do exactly that. The only caveat would have been Huntington's overall obligation to maintain sufficient liquidity to honor the debt it now owed Cyberco as a depositor whenever Cyberco chose to demand payment.

---

[73]*Id.* at 893.

Banking, then, is at its simplest nothing more than borrowing from depositors at one rate and re-lending to others at a higher rate. Indeed, this court cannot find a better explanation of the kind of control a bank exercises over its customers' deposits than in *New York Cnty. Nat'l Bank v. Massey*, a case that Huntington itself repeatedly cites as dispositive.[74]

> It cannot be doubted that, except under special circumstances, or where there is a statute to the contrary, a deposit of money upon general account with a bank creates the relation of debtor and creditor. **The money deposited becomes a part of the general fund of the bank, to be dealt with by it as other moneys, to be lent to customers, and parted with at the will of the bank, and the right of the depositor is to have this debt repaid in whole or in part by honoring checks drawn against the deposits. It creates an ordinary debt, not a privilege or right of a fiduciary character.** 'The deposit of money by a customer with his banker is one of loan, with the superadded obligation that the money is to be paid, when demanded, by a check.'

192 U.S. 138, 145, 24 S. Ct. 199, 200-01 (1904) (citations omitted) (emphasis added).[75]

---

[74]*See* Hunt. Br., DN 382 at 48-51.

[75]Huntington correctly states that "*Massey* is consistent with the rule that a bankruptcy debtor's deposits in a bank account are part of the bankruptcy estate." Hunt. Br., DN 382 at 50. However, stating the obvious does not warrant the inference actually suggested – that the owner of a deposit account somehow still owns the actual money deposited as opposed to only holding a right to demand repayment for the same. As Huntington itself concedes, a customer's deposit with a bank creates a debtor-creditor relationship with the customer assuming the role of creditor. Consequently, the customer has "control" over the account in only the limited sense of being able to collect on the debt now owed by the bank whenever the customer so demands. *Massey*, 192 U.S. at 145, 24 S. Ct. 200-01. But control of the actual deposit shifts from the customer to the bank as soon as it is made.

Huntington has also suggested that transfers from Teleservices into the payroll account Cyberco maintained at Huntington should be treated differently from the wire transfers into one or another of Cyberco's general accounts there. However, Huntington has not supported that suggestion with any good reason. Nor is this court aware of a special feature – e.g., a depositor's privilege or a trust beneficiary's right – that would distinguish the payroll account from the others. *Cf. id.* Rather, it would appear that the payroll account involved the same debtor-creditor relationship as did Cyberco's other accounts with Huntington and, as such, Huntington would have had the same control over deposits made into it as deposits made into any of the rest of Cyberco's accounts.

In short, a bank can invest its customers deposits as it likes, restrained only by a hopefully watchful regulator's eye and its own self-restraint. Indeed, if recent events reflect the norm, it is not all that farfetched to imagine even "lottery tickets" and "uranium stocks" being included in a bank's investment portfolio.[76]

This court suspects that *Bonded Financial*, like *Nordberg*, was afraid that innocent transferees would suffer at the expense of undeserving estates if it found that EAB had controlled its customer's account any earlier than it did. Indeed, Huntington itself begins its brief by expressing the same concern.

> To Huntington's knowledge, never in the history of American jurisprudence has a lender been required to pay more in an avoidance and recovery action than the amount owed by the borrower. To Huntington's knowledge, never in the history of American jurisprudence has a depository bank been required to pay in an avoidance and recovery action for funds deposited by the depositor into the depositor's account and then withdrawn by the depositor.

Hunt. Br., DN 382 at 1.

These concerns, though, are already addressed through Section 550(a)(2)'s protection of good faith transferees who take for value. For instance, had *Bonded Financial* instead treated the earlier deposit into EAB's account as the Section 550(a)(2) transfer, EAB would have still been exonerated under Section 550(b)(1) because of the panel's further conclusion that EAB had taken in good faith and

---

And finally, Huntington suggested at one point that the wire transfers, once deposited in Cyberco's Huntington accounts, had a diminished value from Huntington's perspective because of the restrictions imposed by the account relationship. However, as *Massey* shows, that relationship imposed no restriction upon Huntington's control of what had been deposited.

[76]*Cf. Bonded Financial*, 838 F.2d at 894.

without knowledge[77] and the fact that the debtor/creditor nature of the account relationship made the deposit an exchange for value. That is, every deposit by a bank's customer is for value because by definition it is accompanied by a corresponding promise from the bank that it will repay the same upon the customer's demand. *Cf. Massey*, 192 U.S. at 145, 24 S. Ct. at 200-01.[78]

Therefore, *Bonded Financial*'s suggestion that something more is required of a depository bank to control the money in its customer's account is no more valid than *Nordberg*'s conclusion that something more was required for Chase & Sanborn to have controlled the gratuitous transfer it had received. What is important in *Bonded Financial* was EAB's own good faith and lack of knowledge regarding the avoidability of the deposit. Unfortunately for Huntington, it was not able to establish the same good faith and lack of knowledge regarding the deposits Cyberco was making with it.

Huntington, in short, is that rare depository bank who cannot seek refuge behind Section 550(b)(1)'s protective shield.[79] As this court previously observed:

> Other lenders may be alarmed that Huntington's Section 550(a)
> exposure could be as much as four times what it lent simply because
> Cyberco also maintained its deposit accounts at Huntington. Indeed,
> the system Huntington used to manage Cyberco's cash is commonly

---

[77] *Bonded Financial*, 838 F.2d at 897-98.

[78] The panel in *Bonded Financial* in fact found that EAB had exchanged value because the transfer received reduced Ryan's indebtedness to it. However, regardless of whether the value exchanged was the satisfaction of antecedent debt or the incursion of a new obligation, *Bonded Financial* confirms that Section 550 value can be given to anyone, as opposed to just the debtor, in order to be recognized for the Section 550(b)(1) defense. *Cf. supra*, n.52.

[79] Specifically, this court found after a twelve-day trial that: (1) Huntington was actually in bad faith with respect to the checks and wire transfers it received during the latter half of 2004; (2) Huntington also could not establish its good faith with respect to either these transfers or any earlier transfer received on or after April 30, 2004; and (3) while Huntington had established its good faith with respect to all transfers received prior to April 30, 2004, Huntington nonetheless was charged with knowledge of the avoidability of those transfers. *Cf. Teleservices*, 444 B.R. 818-30.

42

used by many banks when revolving lines of credit have been extended. Therefore, "Am I next?" is a legitimate question to ask.

As odd as it may seem, Huntington's plight is comparable to a leper's. Leprosy is a horrible disease that is also very contagious. It is fortunate, then, that 95% of the world's population is naturally immune to its effects. Only a small fraction of those exposed actually suffer from its symptoms.

Section 550 liability is also highly contagious in the sense that virtually every commercial lender is exposed to the recovery of numerous avoidable transfers simply because the transfers were deposited in customer accounts. The good news, though, is that Section 550(b)(1) immunizes the vast majority of such banks from this disease. That is, most banks who accept deposits that are later avoided not only had given value in exchange because of the account's debtor/creditor relationship, but had also taken in good faith and without knowledge of the deposits' avoidability. Huntington's problem is that Rodriguez's decision to withhold from Kalb information about Watson's past compromised its Section 550(b)(1) immunity from April 30, 2004 on. As such, Huntington finds itself among the small percentage of depository banks that can be afflicted by a Section 550(a) recovery of this type.

*Teleservices*, 444 B.R. at 842 n.260.

The same point can also be made with the suitcases of cash example previously used. Had, for instance, Teleservices chosen to transfer its wealth to Cyberco in that fashion and Huntington in turn placed the deposited suitcases in its vault, Huntington would have without question had to account for all that was there. A bank, though, does not make money by keeping cash in a safe. Huntington would have undoubtedly lent out whatever was received as was its right under the deposit relationship. But the decision to lend or not has no bearing upon the exposure Huntington confronts. Whether hoarded in a vault or out on loan, Huntington would have had to account under Section 550(a) for everything delivered. Likewise, Huntington's good faith could have exonerated it regardless of how it had chosen to exercise its control over the same. Indeed, it is ironic that

43

Huntington would have been able to avoid Section 550(a) accountability altogether had only it met Section 550(b)(1)'s standards as well. However, with this realization must also come the recognition that Huntington's inability to avail itself of the Section 550(b)(1) defense makes Huntington accountable for all of the "suitcases" as opposed to just the ones it kept for itself.[80]

Time Is Not A Factor

This court recognizes that what Huntington did not pay itself by way of final setoff in all likelihood passed quickly from Huntington to Cyberco's own creditors and the co-conspirators. After all, Cyberco was always in need of cash. Indeed, large amounts of what was being transferred by Teleservices into Cyberco's accounts was then being used to make lease payments to previously bilked equipment finance companies. Otherwise, the scam would have collapsed.

Therefore, the court has considered whether some time element should be added to the concept of control so as to distinguish between money that only passes through an account from those instances where the bank actually had the opportunity to lend it out to some borrower. Such a distinction might make sense if banking was actually transacted with suitcases of cash, for it would be much easier there to determine where the cash received then went. However, modern banking is accomplished through accounting entries, not suitcases of cash. Therefore, who is to say whether a bank, in honoring a check drawn on a depositor's account, was using that depositor's money, another

---

[80]Huntington's additional agreement with Cyberco to regularly setoff Cyberco's debt against those accounts and then re-lend on the line of credit as needed (*See supra* n.7) added a further component to the everyday deposit relationship Cyberco otherwise had with Huntington. However, as Huntington concedes, that addition did not materially alter that relationship. It merely made it a "glorified" account. Hunt. Br., DN 382 at 63. If anything, the regular sweeps reinforced the fact that Huntington had complete dominance over whatever was being deposited and that it was Huntington's money, not Cyberco's, that was then flowing back to Cyberco through new advances on the line of credit.

44

depositor's money, or money borrowed from the Federal Reserve even when that check was presented on the same day as the deposit?

The court is also mindful that time is not included as a consideration in the widely accepted definition of what constitutes property when considering a trustee's avoidance powers. Again, the Supreme Court said in *Begier*:

> Because the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate-the property available for distribution to creditors-"property of the debtor" subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.

496 U.S. at 58, 110 S. Ct. at 2263.

Property of the debtor for purposes of avoidance actions, then, is a function of only: (1) whether the party had control over the funds; and (2) whether the transfer then made diminished the estate. Time of control is simply not part of the equation.

Indeed, diminution of the estate is not even an issue when the liability of a transferee under Section 550 is being assessed. But then, this court sees no reason why it should be a factor given that diminution of the estate is relevant only with respect to the initial transfer and then only as to its avoidability. Moreover, as previously noted, Section 550 already protects subsequent transferees like Huntington through the Section 550(b)(1) defenses afforded to good faith recipients taking for value and without knowledge.[81] That, this court believes, is protection enough. There is no need for this court to create other defenses for those transferees who fall short of these well-recognized

---

[81]Although an initial transferee is not eligible for the Section 550(b)(1) defense, it would be eligible for other defenses depending upon the type of transfer avoided. In the case of a Section 548 avoidance action, the initial transferee's defense would be Section 548(c) (taking in good faith and for value).

45

requirements, especially when the particular defense suggested – the actual time in control – would be so difficult to assess.[82]

<u>*Nordic Village, Baker & Getty,* and *Hurtado*</u>

Huntington argues that the Sixth Circuit has adopted *Bonded Financial* and, as a consequence, this court has no choice other than to follow its rejection of depository banks as subsequent transferees. However, while there are certainly Sixth Circuit decisions that have cited *Bonded Financial*, none of them have reached that particular conclusion.

*Bonded Financial* first appeared in *IRS v. Nordic Village, Inc. (In re Nordic Village, Inc.).*[83] However, it is cited only by Judge Kennedy in her dissent. Moreover, Judge Kennedy relied upon *Bonded Financial* solely for its holding that a bank's services as a financial intermediary do not make it the initial transferee for purposes of Section 550 liability.[84] She did not address the issue raised here, that being whether a customer's decision to also deposit that transfer with the same bank might still make it a subsequent transferee under Section 550(a)(2).

---

[82]As discussed *infra*, the court's discretion to award value or not under Section 550(a) also gives it leeway to adjust Section 550(a) liability. For example, a recipient of an avoided gratuitous transfer under Section 548 would not be eligible for the Section 550(b)(1) defense but might still be entitled to leniency under Section 550(a) if the funds remained in the transferee's control for only a brief time and the circumstances are otherwise appropriate. Indeed, that was what occurred in *First Financial. See infra.* However, for the reasons also stated later in this opinion, this court does not believe that the circumstances here – i.e., Huntington's lack of good faith – warrant the exercise of its Section 550(a) discretion in this instance.

[83]915 F.2d 1049.

[84]"I agree with the . . . decision of the Seventh Circuit in *Bonded Financial* that the bank, Ameri-Trust, is not a transferee, but merely a 'financial intermediary.'" *Id.* at 1063, n.7 (citation omitted).

46

The Sixth Circuit next cited *Bonded Financial* in *Baker & Getty Fin. Servs.*[85] But the issue there was also whether the bank was an initial transferee or not of the avoided transfer. The defendant bank in that instance had insisted that it should be treated as a subsequent transferee as opposed to an initial transferee because another person, Rice, had deposited the subject funds in his own account before they were finally used to pay the defendant bank. *Baker & Getty*, though, rejected that argument, determining instead that Rice had held the monies solely as an agent for another. *Id.* at 722.

And it was only in this context that *Baker & Getty* cited *Bonded Financial*. The panel certainly recognized that "as a matter of raw power" Rice could have used the funds any way he pleased while he held them – he could have "taken the cash to a race track or a jewelry store."[86] Nonetheless, the panel concluded that Rice did not have the dominion over the funds that *Bonded Financial* required because he held them only as an agent for one of the debtors.

> It would make no difference whether Rice then took the cash home, or placed it in a safe deposit box in the Bank: the money would still be Cordek's [Rice's principal], and the Bank would still be an initial transferee of the money.

*Id.* at 722.[87]

---

[85] *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 974 F.2d 712, 722 (6th Cir. 1992).

[86] *Id.*

[87] At first blush, it would seem that the defendant bank in *Baker & Getty* could have still asserted its good faith defense even as an initial transferee under Section 548(c). However, the panel also affirmed the lower court's conclusion that the targeted transfer could be avoided as a preference as well. Therefore, the defendant bank was limited as an initial transferee to the much narrower defenses provided to preferential transferees under Section 547(c). *Id.* at 723.

47

Finally, there is *In re Hurtado*,[88] which is the most recent published Sixth Circuit opinion that cites *Bonded Financial*. But once again, the issue addressed there was whether the defendant was the initial transferee or not. In that instance, the panel rejected the recipient's argument that she was holding the fraudulent transfers received from her son as his agent. Citing *Bonded Financial* as authority, the panel observed that "Hurtado was not under any legal obligation to follow the debtor's directions," and that "Hurtado was vested with legal authority to do what she liked with the funds." *Id.* at 535, 536. However, substitute "Huntington" for "Hurtado" and the panel described the situation here as well. Granted, Huntington is once removed from the transfers being avoided whereas Mrs. Hurtado was the debtor's initial transferee. Nothing, though, suggests that that would have affected the panel's decision. After all, it should make no difference for purposes of control whether the transferee was first or second. Huntington's legal authority was no less than Mrs. Hurtado's. It had in effect borrowed money from Cyberco with each deposit made. As such, Huntington had the same rights as any other borrower – to do what it pleased with the monies loaned subject only to the agreed upon terms for repayment[89]

In sum, the Sixth Circuit has clearly embraced *Bonded Financial*'s concept of establishing transferee liability under Section 550(a) based upon whether the defendant had control or not of the avoided transfer. However, none of the Sixth Circuit cases that have discussed *Bonded Financial* has adopted the further proposition that something more is required when the targeted defendant is

---

[88]342 F.3d 528.

[89]The only other Sixth Circuit case in which *Bonded Financial* is cited is *First Independence Capital Corp. v. Merrill Lynch Bus. Fin. Servs., Inc. (In re First Independence Capital Corp.)*, 181 F. App'x 524 (6th Cir. 2006), which is an unpublished opinion. Moreover, the two citations in *First Independence* to *Bonded Financial* relate to entirely different Section 550(b)(1) issues – what constitutes good faith and knowledge of the transfer's avoidability. *Id.* at 528, 530.

48

someone other than the initial transferee of the transfer avoided. Therefore, this court is not constrained from rejecting that peculiar aspect of what is otherwise a well reasoned opinion by the *Bonded Financial* panel.

*Massey*

As already discussed, *New York Cnty. Nat'l Bank v. Massey*[90] offers an excellent description of the absolute control a bank exercises over its customers' deposits. Nonetheless, Huntington cites *Massey* as the seminal case for what it claims is a well established principle – that "a deposit of money into a bank account is not a transfer from the depositor to the bank for purposes of making the bank a 550 transferee." Hunt. Br., DN 382 at 48.

Huntington, though, is too expansive in its interpretation. *Massey* is a claims allowance case. The appellant bank had setoff a deposit made by the debtors only days before the petition and then filed a claim for what remained due. The trustee in turn objected, contending that the claim should be disallowed in its entirety until the bank returned the obvious preference to the estate.[91]

---

[90]192 U.S. 138, 24 S. Ct. 199.

[91]If the case had been filed today, trustee would have cited Section 502(d):

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

The comparable section under the former Act was Section 57g. The Bankruptcy Act of 1898 § 57g, Ch. 541, 30 Stat. 544, 560 (1898) (repealed) (hereinafter "the Bankruptcy Act of 1898").

49

Courts that have struggled with reconciling the 2005 amendments to the Code can sympathize with *Massey*'s predicament. At that point, the Bankruptcy Act of 1898 had only recently been enacted and, like the Bankruptcy Code that replaced it, the former Act was intended to update the bankruptcy laws. One of its new provisions was Section 60, which addressed preferences. Among other things, it made avoidable any transfer that enabled a creditor "to obtain a greater percentage of his debt than any other of such creditors of the same class."[92] Unfortunately, a carryover provision, Section 68, seemed to still allow for bank setoffs against depositors' accounts, even though preferential. It provided in pertinent part that:

> ( a.) In all cases of mutual debts or mutual credits between the estate
> of a bankrupt and a creditor, the account shall be stated and one debt
> shall be set-off against the other and the balance only shall be allowed
> or paid.

*Massey*, 192 U.S. at 144, 24 S. Ct. at 200 (quoting The Bankruptcy Act of 1898 § 68, Ch. 541, 30 Stat. at 565).

The bankruptcy referee and the district court had allowed the bank's claim over the trustee's objection. The circuit court, though, sided with the trustee, concluding instead that the bank had to return the setoff because it had clearly improved the bank's position to the detriment of the estate's other claimants. *Id.* at 144-45, 24 S. Ct. at 200.

The Court, in reversing, was no less perplexed by the contradiction of the two provisions than were the lower courts. Nonetheless, the Court resolved it just the same. Its solution was to limit the types of transfers avoidable under former Section 60 to only those made "as a payment, pledge, mortgage, gift, or security." *Id.* at 146, 24 S. Ct. at 201. In other words, while the Court conceded

---

[92]The Bankruptcy Act of 1898 § 60, Ch. 541, 30 Stat. at 562.

that a setoff could be preferential,[93] it concluded that it was among the "preferences" that a trustee could avoid under former Section 60.

The Court also explained why Congress might have made this exception. What it suggested was that a bank, in exercising a setoff, would not have improved its position in at least one sense.

> [A] deposit of money to one's credit in a bank does not operate to diminish the estate of the depositor, for when he parts with the money he creates at the same time, on the part of the bank, an obligation to pay the amount of the deposit as soon as the depositor may see fit to draw a check against it. It is not a transfer of property as a payment, pledge, mortgage, gift, or security.

*Massey*, 192 U.S. at 147, 24 S. Ct. at 201.

It is this quotation and, in particular, the second sentence, that Huntington relies upon in supporting its contention that no transfer takes place between a bank and its customer when funds are deposited into an account. However, as just shown, the Court never said that customer deposits were not transfers. Nor, for that matter, did it rule out the possibility of a setoff still being subject to avoidance as a fraudulent transfer. Rather, it focused only upon the avoidance of a bank setoff as a preference. And even there, the Court had to have concluded that another transfer had already taken place before the challenged setoff was taken. Otherwise, there was no need for the Court to have included its observations about the debtor-creditor relationship between a bank and its depositor and the unrestricted control a bank exercises once a deposit is made. Put simply, had the preceding deposit not been a transfer, the bank in *Massey* would have had nothing to setoff.[94]

---

[93]"It is true that it [the deposit] creates a debt, which, if the creditor may set it off under § 68, amounts to permitting a creditor of that class to obtain more from the bankrupt's estate than creditors who are not in the same situation . . . ." *Id.* at 147, 24 S. Ct. at 201.

[94]*Id.* at 149, 24 S. Ct. at 202. In fairness, the Court seemed to favor a broader interpretation of former Section 60. However, in a statement reminiscent of recent opinions, it said that "[w]e are

51

Pre-Code courts later cited *Massey* as controlling on this issue. For example, in *Germania Sav. Bank & Trust Co. v. Loeb*, a case which Huntington also cites, the Sixth Circuit said:

> It has been authoritatively decided by the Supreme Court, **in considering these two sections**, that the balance of a regular bank account at the time of filing the petition is a debt due to the bankrupt from the bank, and in the absence of fraud or collusion between the bank and the bankrupt, with the view of creating a preferential transfer, the bank need not surrender such balance, but may set it off against notes of the bankrupt held by it, and may prove its claim for the amount remaining due on the notes. *N.Y. County National Bank v. Massey*, 192 U.S. 138, 24 Sup.Ct. 199, 48 L.Ed. 380.

188 F. 285, 288 (6th Cir. 1911) (emphasis added).[95]

The Code, though, has since addressed preferential setoffs by adding Section 553(b).[96] Therefore, *Massey* has become an anachronism.[97]

---

to interpret statutes, not to make them." *Id.* at 146, 24 S. Ct. at 201.

[95]Interestingly, these same courts, including *Germania Savings Bank*, softened *Massey*'s holding somewhat by still holding the bank accountable for a preferential setoff if fraud or collusion was present or the bank's intention was otherwise "to effect a preference." *See also First Nat'l Bank of Negaunee v. Fox*, 111 F.2d 810, 814 (6th Cir. 1940).

[96]    Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, 561, 365(h), 546(h), or 365(i)(2) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

11 U.S.C. § 553(b)(1).

[97]*See also In re Satterla*, 15 B.R. 166, 168 (Bankr. W.D. Mich. 1981).

*Broadview Lumber*

Most of the other cases Huntington cites as authority besides *Bonded Financial* and *Massey* for its "deposits aren't transfers" theory are easily distinguishable. For instance, *Andreini & Co. v. Pony Express Delivery Servs.*,[98] *Nordberg v. Societe Generale*,[99] *Malloy v. Citizens Bank of Sapulda*,[100] and *Rupp v. Markgraf*,[101] all relate to the very different question of distinguishing between the depository bank and the customer for purposes of identifying the "initial transferee" under Section 550(a)(1).[102] As for *Citizens' Nat'l Bank*[103] and *Pioneer Liquidating Corp.*,[104] those cases simply repeat *Massey*'s now irrelevant holding regarding preferential setoffs.

---

[98] *Pony Express Delivery Servs.*, 440 F.3d 1296.

[99] *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196 (11th Cir. 1988).

[100] *First Sec. Mortg.*, 33 F.3d 42.

[101] 95 F.3d 936 (10th Cir. 1996).

[102] *See supra Bonded Financial*. Huntington also cites other "initial transferee" cases where, like the insurance broker in *Pony Express Delivery Servs.*, the targeted entity had in fact received the transfer (as opposed to having merely facilitated it) but where dominion and control did not exist because the funds received were held on behalf of another. *See Coutee*, 984 F.2d 138; *Finley, Kumble, et al.*, 130 F.3d 52; *Tese-Milner v. Moon (In re Moon)*, 385 B.R. 541 (Bankr. S.D.N.Y. 2008); and *Official Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants, Inc.)*, 287 B.R. 41 (Bankr. D. N.J. 2002).

[103] *Citizens' Nat'l Bank of Gastonia, N.C., v. Lineberger (In re Kirby-Warren Co.)*, 45 F.2d 522 (4th Cir. 1930).

[104] *Pioneer Liquidating Corp. v. San Diego Trust & Sav. Bank (In re Consolidated Pioneer Mortg. Entities)*, 211 B.R. 704 (S.D. Cal. 1997).

However, the remaining case Huntington cites, *Broadview Lumber*,[105] warrants additional discussion because it alone is actually on all fours with Huntington's proposition – i.e., that Cyberco's deposits of the wire transfers into its Huntington accounts did not in and of themselves expose Huntington to liability as a subsequent transferee under Section 550(a)(2).[106] But with all due respect, *Broadview Lumber* is incorrectly decided.

*Broadview Lumber* involved the question of whether two banks with whom avoidable transfers had been deposited were liable as subsequent transferees. The court concluded that they were not because neither had the requisite control over the funds deposited.

> SMB never took in any of debtor's funds such that it could use or control the property. The funds were deposited into checking accounts controlled by Mansfield. Likewise, Mercantile served as a conduit of debtor's funds into the construction account which was controlled by Mansfield.

*Id.* at 964.

However, as already shown, banks that accept deposits from their customers do have use or control of the deposited funds. The deposit creates only "an ordinary debt, not a privilege or right of a fiduciary character." *Massey*, 192 U.S. at 145, 24 S. Ct. at 200-01 (citation omitted). As for the money deposited, it without question becomes "part of the general fund of the bank . . . to be lent to customers, and parted with at the will of the bank." *Id.* In turn, the depositor retains only the right

---

[105]*O'Neal v. Sw. Mo. Bank of Carthage (In re Broadview Lumber Co., Inc.)*, 168 B.R. 941 (Bankr. W.D. Mo. 1994).

[106]Although not cited along with *Broadview Lumber*, cases cited elsewhere in Huntington's brief have made the same distinction. *See, e.g., Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 313 n.9; *Danning v. Miller (In re Bullion Reserve of N.A.)*, 922 F.2d 544, 549 (9th Cir. 1991) (court holding that defendant could not be a subsequent transferee of fraudulent transfer because he "had no 'dominion over the money' nor could he 'put the money to [his] own purposes.'").

to have the debt created "repaid in whole or in part by honoring checks drawn against the deposits." *Id.* Although *Massey* made these observations over a century ago, it had no doubt about the nature of the bank/depositor relationship then and there is no reason to believe that the Court would speak with any less certitude now.[107]

Therefore, for the reasons given, this court determines that there is no genuine issue of fact regarding Huntington's Section 550(a)(2) liability to the Teleservices estate as the immediate transferee of the numerous fraudulent transfers Teleservices made to Cyberco, the initial transferee. Granted, the funds Cyberco deposited with Huntington became part of a sophisticated cash management system whereby Cyberco, with Huntington's assistance, could minimize its borrowing costs under the line of credit. However, as Huntington itself agrees, "these cash management services simply created a glorified bank account under which Cyberco's deposited funds were always available to it automatically under the contracts." Hunt. Br., DN 382 at 63. It follows, then, that whatever Cyberco deposited in this "glorified" account came under Huntington's immediate control because of the debtor-creditor relationship created. Consequently, summary judgment is appropriate with respect to this aspect of Trustee's motion since Huntington has already failed in its attempted Section 550(b)(1) defense to these transfers.[108]

### JUDICIAL DISCRETION AND SECTION 550(a) RELIEF

Huntington next argues that this court has the ability to reduce its Section 550 exposure even if it had been the technical recipient of all the deposited wires. According to Huntington, its liability

---

[107]*See also Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 672 (S.D.N.Y. 1996); *Hall v. Rochester Trust Co.*, 9 F. Supp. 797, 799 (D. N.H. 1935); *Werkman v. Harms*, 232 Ill. App. 20, 23 (1924).

[108]*Cf. Teleservices*, 444 B.R. at 840.

should be limited to only the setoffs taken to reduce Cyberco's debt because "Huntington returned all but its loan repayments to Cyberco and Cyberco's creditors."[109]  Huntington, though, does not direct the court to anything within Section 550 itself that would permit the requested reduction. Rather, Huntington points to three cases, *First Financial*,[110] *Sawran*,[111] and *Kingsley*[112] as examples of courts choosing to ignore the technical application of Section 550 when the outcome it produces seemed unfair.

### *First Financial* and *Sawran*

Both of these cases involved compelling facts.  In *First Financial*, the trustee was attempting to recover from Shults, a subsequent transferee, monies that he had held for only a few months in a segregated account.  Indeed, when Shults returned what he had received to the initial transferee, he included interest.  The court there recognized that the trustee's pursuit of Shults as a Section 550(a)(2) transferee was "an entirely valid and reasonable legal position."[113]  Nonetheless, the court dismissed what appeared to it to be an unfair claim on the trustee's part.

> The purpose of the subsequent/mediate transferee rule of § 550(a)(2) is to provide an alternative source of recovery to a bankruptcy estate with respect to an entity (individual or other) which actually realized the benefit of the fraudulent conveyance made by the debtor, and not

---

[109]Hunt. Br., DN 382 at 74.

[110]*Manning v. Wallace (In re First Fin. Assoc's, Inc.)*, 371 B.R. 877 (Bankr. N.D. Ind. 2007).

[111]*Bakst v. Sawran (In re Sawran)*, 359 B.R. 348 (Bankr. S.D. Fla. 2007).

[112]*Bakst v. Wetzel (In re Kingsley)*, 2007 WL 1491188 (Bankr. S.D. Fla. 2007), *aff'd*, 518 F.3d 874 (11th Cir. 2008).

[113]*First Financial*, 371 B.R. at 919.

> to merely provide another alternative source of collection apart from policy considerations for the enactment of the section.

371 B.R. at 919.[114]

Sawran also involved a court stepping in to prevent the estate from realizing what it believed would be a windfall at the subsequent transferees' expense. In that instance, the trustee had avoided a preferential transfer from the debtor to her father. The father, though, had in turn transferred what he had received to the debtor's other siblings with instructions that they use it to cover the debtor's expenses. The siblings then used the money as instructed, although some still remained when the debtor filed her petition.

The trustee contended that the siblings, as Section 550(a)(2) transferees of the avoided preference, should be liable for the entire amount received. However, the court reduced their liability to account for the expenditures they had made on their sister's behalf. Sawran, 359 B.R. at 353. As in First Financial, the Sawran court found that the circumstances warranted a deviation from the technical outcome otherwise dictated by Section 550(a)(2). This time, though, the court relied upon its equitable authority under Section 105(a) and its further conclusion that Section 550(d) "empowers

---

[114]First Financial did offer as a rationale that (1) Shults had never received a transfer under the circumstances; and (2) Shults was otherwise a good faith transferee within the meaning of Section 550(b)(2). However, the court did not explain why it, as a court sitting in the Seventh Circuit, was not obligated to follow Bonded Financial in determining Shults' status. The court was also mistaken in allowing Shults the Section 550(b)(2) defense since he was only the second transferee in the chain and Section 550(b)(2) requires that the transferee be at least three persons removed. Shults instead had to rely on Section 550(b)(1) and he did not qualify for that defense because he had not given any value in exchange.

courts to prohibit a trustee from recovering under [s]ection 550(a) from a transferee that has already returned to the estate that which was taken in violation of the Code."[115]

But as well meaning as the courts in *First Financial* and *Sawran* may have been, the soundness of their decisions is nonetheless suspect. For example, it has been well settled for some time that a bankruptcy court's equitable powers under Section 105 cannot be used to deviate from outcomes otherwise mandated by the Code. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S. Ct. 963, 969 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of Bankruptcy Code."). *See also Mitan v. Duval (In re Mitan)*, 573 F.3d 237, 243 (6th Cir. 2009); *Solow v. Kalikow (In re Kalikow)*, 602 F.3d 82, 96–97 (2nd Cir. 2010); *HSBC Bank USA v. Branch (In re Bank of New England Corp.)*, 364 F.3d 355, 362 (1st Cir. 2004). The Court has been equally clear that courts are to enforce Congress' enactments as written even if their literal interpretation seems harsh. *Lamie v. U.S. Trustee*, 540 U.S. 526, 538, 124 S. Ct. 1023, 1032 (2004). *See also Massey*, 192 U.S. at 146 ("We are to interpret statutes, not to make them.").

Having, though, offered this criticism, the court submits that Section 550(a) itself permits the discretion that both *First Financial* and *Sawran* were looking for to remedy the injustices they perceived. Under that section, the trustee has a choice. If the defendant is still in possession of the avoided transfer – say, a Ferrari – then the trustee has the absolute right to demand its return. Moreover, it makes no difference whether the defendant was the initial transferee or a subsequent one.

---

[115] *Sawran*, 359 B.R. at 353 (quoting *Dobin v. Presidential Fin. Corp. of Del. Valley (In re Cybridge Corp.)*, 312 B.R. 262, 271 (Bankr. D. N.J. 2004).

The Ferrari's return is obligatory unless the defendant qualifies for one of the Section 550(b) defenses.

On the other hand, recovering the Ferrari's value is not so absolute. Rather, that option is available only "if the court so orders." 11 U.S.C. § 550(a). In other words, while a trustee may certainly ask to be awarded a money judgment in lieu of the property's actual return, it is ultimately up to the court to decide whether the requested relief is warranted – e.g., where the transferee had destroyed the property or where the property was no longer within the court's jurisdiction.

However, the court sees no reason why this same discretion cannot be used to the transferee's advantage. Suppose, for example, that *A*, the Ferrari's initial transferee, had in turn given it to the trustee's best friend. Under that circumstance, the trustee might still prefer a money judgment from *A*. Could not, though, *A* respond by asking the court to refuse the trustee's demand and have him get the Ferrari back from his friend instead? And if that is so, could not the *First Financial* and *Sawran* courts have also used their Section 550(a) discretion to compensate for the perceived injustices there?

In sum, Section 550(a) itself provides sufficient discretion to address situations where compelling facts make the application of avoidance law so difficult. However, neither that section nor these two cases suggests that the discretion given is to deviate too far from the expected norm. Remember, the emphasis in *First Financial*, *Sawran*, and for that matter, *Nordberg*, was upon the same good faith that both Sections 548(c) and 550(b)(1) already require for a successful defense. In fact, the transferees' good faith in *First Financial* and *Sawran* was exemplary given that Shults returned the transfer untouched and with interest and the siblings used what they had received to

59

protect their profligate sister from herself. These defendants' shortcoming was only that they had not given the requisite value as well.[116]

However, Huntington presents exactly the opposite situation. Unlike Shults and the siblings, it had in fact exchanged value for the transfers received.[117]   What is instead missing here is Huntington's good faith. Moreover, this court sees no undeserved windfall being realized by Trustee if Huntington is left to only its Section 550(b)(1) defense. As this court observed in an earlier opinion, the issue here is not about either harm done by Huntington or damages that should be awarded for the same. Rather, "Huntington and Trustee are at odds only because Trustee seeks to recover fraudulent transfers from a transferee who happens to object."[118]

Consider, then, the suitcases of cash example one more time. Had Huntington actually kept each suitcase received, it would have had to return every single one for each represented a fraudulent depletion of the Teleservices estate. And the same would have been true had Huntington instead kept only a few suitcases to pay down Cyberco's debt and returned the rest to Cyberco and its creditors. The Teleservices estate would have been no less depleted. Nor would Huntington have been in any better position to explain its lack of good faith.

Put simply, Huntington's fate has rested all along on the availability of the defense Section 550(b)(1) itself offers. While Section 550(a) may give some opportunity for courts to expand that

---

[116]In *Sawran*, the court found the defendant "innocent of wrongdoing." 359 B.R. at 354. And in *First Financial* the court had to have concluded that Shults was in good faith because it determined, albeit incorrectly, that he was eligible for the Section 550(b)(2) defense and that defense looks only to the transferee's good faith. 371 B.R. at 920.

[117]The value exchanged was either the pay down of Cyberco's debt or the corresponding promise of repayment arising from the deposit relationship itself.

[118]*Teleservices*, 444 B.R. at 817.

60

defense when only the exchange of value is lacking, this court sees no justification for exercising that discretion here when the problem instead is Huntington's failure to establish its own good faith. Section 550(b)(1) itself has given Huntington a fair chance to avoid having to account for the many fraudulent wires that it received as a subsequent transferee and it deserves no more chance than that under these circumstances.[119]

*Kingsley*

*Kingsley*[120] was decided by the same judge as *Sawran*. Both cases involved debtors with financial problems transferring money to a friend or relative with the understanding that it was to be spent for the debtor's benefit. If there is a difference factually, it is only that the debtors in *Kingsley* without question intended to hinder the collection efforts of a creditor, whereas the concern in *Sawran* was only with the debtor's spendthrift ways.

Wetzel, the transferee in *Kingsley*, claimed that he, like the siblings in *Sawran*, should get credit for the amounts that he had then repaid to debtors or their creditors under the arrangement

---

[119]Although this court is satisfied that its Section 550(a) discretion should not be used to relieve Huntington of its inability to establish Section 550(b)(1) good faith from April 30, 2004, it is equally convinced that Huntington acted both in good faith and without knowledge of the transfers' avoidability for whatever Cyberco deposited into its Huntington accounts prior to April 30, 2004. This is a considerable amount, since it represents $30,442,476.90 of the total amount Trustee seeks to recover. Nonetheless, this court determined in a prior opinion that it had no choice but to follow Sixth Circuit precedent and that precedent requires a finding that Huntington in fact did have knowledge of the avoidability of these additional deposits. As such, the Section 550(b)(1) defense was not available with respect these transfers either. *Cf. Teleservices*, 444 B.R. at 835-40.

The court mentions this here because it has considered whether it should use its Section 550(a) discretion to correct what in its opinion is an injustice upon Huntington. However, as tempting as the thought may be, this court recognizes that its differences with *Nordic Village* is with respect to the interpretation of the law and that it must defer to the superior court in such matters. Therefore, if Huntington is to be relieved of this portion of its Section 550(a) liability to the Teleservices' estate, it is the Sixth Circuit that it must convince.

[120]2007 WL 1491188.

61

made. The trustee, though, argued that the circumstances were different because the defendants in *Sawran* were innocent whereas Wetzel clearly was aware of the debtors' fraudulent scheme.[121]

The court agreed with trustee that Wetzel "admittedly participated in a scheme to hinder creditors of the Debtors" and that, as a consequence, "the equitable considerations . . . are absent here." *Kingsley*, 2007 WL 1491188 at *4. However, it continued to have the same concern as in *Sawran* about Section 550 being misused to create a windfall for the estate instead of being used to simply accomplish a more equitable distribution among creditors.

> However, the issue of windfall to the estate remains. The Trustee possesses the power to avoid fraudulent transfers in order to prevent the depletion of the estate, to promote an equitable distribution of the debtor's assets, and to protect creditors who advanced credit in ignorance of the fraud.

*Id.*

And the court ultimately concluded that Section 550's purposes had already been met with "Defendant's prepetition repayments to the Debtors and Debtors' creditors." *Id.* Consequently, it did not hold Wetzel accountable for most of the $4,516 he had received notwithstanding his complicity in the fraud.[122]

---

[121]It was unclear whether Wetzel actually knew that the Kingsleys were making the transfer in order to avoid a feared setoff by Bank of America. However, Wetzel was aware at the time of the transfer that the Kingsleys had met with bankruptcy counsel and that they had decided to file for bankruptcy relief.

[122]The court, though, did require Wetzel to repay the remaining $215.16 he had paid to the debtors or their creditors postpetition. Its rationale, albeit without much explanation, was that the proper recipient for Wetzel's postpetition repayments was the bankruptcy estate, not the debtors, "[b]ecause assets acquired postpetition by a Chapter 7 debtor generally do not become property of the estate." *Kingsley*, 2007 WL 149118 at *6.

The Sixth Circuit addressed the same type of scheme in *Hurtado*.[123]  Like *Kingsley*, Jon and Denise Hurtado had fraudulently transferred money to Barbara, Jon's mother, under an arrangement whereby it would only be spent at their direction.  And, in turn, Barbara Hurtado dutifully paid back everything to Jon and Denise with either checks to them or to the creditors they preferred.  Granted, *Hurtado* is distinguishable from *Kingsley* because *Hurtado* never addressed *Kingsley*'s concerns about windfalls being realized by the estate.  It instead focused on rejecting the mother's argument that she had been merely a "conduit" for the monies she was holding for her son.  *Hurtado*, 342 F.3d at 534.  Nonetheless, *Hurtado* does reveal the Sixth Circuit's resistance to bankruptcy policy as an excuse for bad behavior given its unequivocal refusal to accept "equitable principles alone" as reason for treating Barbara Hurtado as anything other than a knowing participant in a scheme to defraud Jon and Denise's creditors.  *Id.*

It is equally fair to say that the Eleventh Circuit in *Kingsley* was just as dubious about letting Wetzel off scot-free.  What troubled that panel was the bankruptcy court's reliance upon equity while also recognizing Wetzel's unclean hands.

> We have noted that "[t]he equitable doctrine of unclean hands provides that one who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice or unfairness will appeal in vain to a court of conscience."

*Bakst v. Wetzel (In re Kingsley)*, 518 F.3d 874, 878 (11th Cir. 2008) (citations omitted).  Nonetheless, the panel affirmed.  But it did so only because of its concession that the bankruptcy court had acted within its authority and had done so without clearly abusing its discretion.  *Id.*

---

[123]342 F.3d at 528.

63

There is also reason to question what appears to be *Kingsley*'s premise – that Section 550 and the avoidance laws it supports are morally indifferent, with their purpose instead being only "to prevent the depletion of the estate" and "to promote an equitable distribution of the debtor's assets." *Kingsley*, 2007 WL 1491188 at *4. Indeed, *Kingsley*'s premise goes beyond the understandable concern of estates' realizing windfalls through double recoveries to also rewarding the debtor's accomplice whenever the fraud succeeds. The question, of course, is whether the drafters, in enacting Section 550, really intended the courts to turn their backs on such behavior altogether.

Other courts besides *Kingsley* have included a similar moral indifference in evaluating other aspects of the Code's treatment of fraudulent transfers. For example, the court in *Bayou Group* observed that Section 548(c) bad faith was "somewhat different" from an ordinary person's association of the term with "dishonesty" and "deceit."[124] It explained that Section 548 "is not a punitive provision designed to punish the transferee, but is instead an equitable provision that places the transferee in the same position as other similarly situated creditors who did not receive fraudulent conveyances." *Id.* at 827.

However, this court in another opinion explained at length why neither the Code nor the case law supports *Bayou Group*'s conclusion.[125] Suffice it to say here (1) that the Supreme Court long ago recognized that intentionally fraudulent transfers like the ones made in *Kingsley* and *Hurtado* are inherently wrong;[126] and (2) that neither Sections 548 or 550 protects a bad faith recipient from having

---

[124]*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC)*, 396 B.R. 810, 847 (Bankr. S.D.N.Y. 2008)).

[125]*Teleservices*, 444 B.R. at 794-813.

[126]*See supra Van Iderstine* and the distinction made there between *malum per se* and *malum prohibitum*.

to account for intentionally fraudulent transfers, windfalls notwithstanding. Indeed, the court's earlier assessment of Huntington's conduct under only a standard of subjective good faith is a consequence of its rejection of *Bayou Group*'s amorality. Therefore, this court is reluctant to allow Huntington to now turn the tables and suggest that *Kingsley* permits morality to be once again read out of the avoidance laws through the discretion Section 550(a) permits in awarding value.

By no means, though, is this court rejecting *Kingsley* out of hand. It disagrees with only *Kingsley*'s rationale and *Kingsley*'s seemingly inflexible rule that a bad faith recipient of a voidable transfer is relieved from liability so long as whatever he received ended up in some way or another back with the debtor or his creditors. For example, had Wetzel returned the money after having had his own second thoughts as opposed to having successfully pulled off the fraud as he did, *Kingsley*'s exoneration of Wetzel would have been much more understandable.

But even if one agrees with *Kingsley*, one must still ask whether even that court's much lower standard for assessing a Section 550 recipient's accountability had been met. As the court in *Kingsley* observed, one of the purposes of a trustee's avoidance powers is "to promote an equitable distribution of the debtor's assets." *Kingsley*, 2007 WL 1491188 at \*4. But was Wetzel's payment of the creditors the debtors preferred over the creditor they wanted to defraud really an equitable distribution?[127] And the same question must be asked here, for the credit Huntington seeks is not for

---

[127]One can also ask whether a recovery from Wetzel would have violated the single satisfaction rule (i.e., Section 550(d)) that *Kingsley* relied upon given that denying relief against Wetzel meant no satisfaction at all. In other words, there would have been a double recovery, and therefore a windfall, had the *Kingsley* trustee first recovered the transfers Wetzel had made to creditors as preferences and then asked Wetzel to account for those same transfers. However, nothing in *Kingsley* suggests that the trustee had made any attempt to recover beyond pursing Wetzel himself. Therefore, *Kingsley* appears to be more about limiting the trustee's options for recovery than about preventing windfalls.

money actually returned to Teleservices. Rather, it is for the millions of dollars that Cyberco itself was paying to numerous equipment finance companies on account of previously executed leases and other obligations. Granted, Watson's only reason for preferring these creditors was his need to sustain the fraud. However, the fact remains that the payments resulted in an inequitable distribution with the earlier victims being favored over the rest. Indeed, Watson's final victims would have likely received none of the payments for which Huntington now wants credit since Watson bilked them only weeks before the FBI's raid and the ensuing involuntary petition.

Of course, Meoli, as Teleservices' trustee, could have in theory restored some equilibrium to this imbalance by pursuing preferences in her own right. In other words, she could have conceivably claimed that the payments being made by Cyberco on account of the leases and other obligations were also payments on account of antecedent debt owed to Teleservices and, as such, preferential. However, that relief would have applied to only the relatively few payments made by Cyberco after October 22, 2004 (i.e., Teleservices' preference period for non-insider transferees). Moreover, there would have been the issue of whether even these payments were preferential since Section 547 requires the transfers to have been made from the debtor's property and these payments had come from Cyberco, not Teleservices.

The point is that the credit Huntington seeks does not even meet the equitable standards that *Kingsley* itself set as determinative of when a bad faith recipient of avoided transfers may still be excused.[128] Moreover, if, as the Eleventh Circuit in *Kingsley* concluded, a trial court has broad discretion to consider the equities when deciding Section 550(a) liability, then this court most

---

[128]Interestingly, *Kingsley* did not address this problem even though about half of what Wetzel paid back went directly to the debtors' creditors instead of to the debtors themselves.

certainly can use that very same discretion here to take into consideration the source of the money Cyberco was using to pay the earlier finance companies. In *Kingsley*, the debtors had given Wetzel something that actually belonged to them – their tax refund. However, here the monies that Cyberco was recirculating out of its Huntington accounts was yet more money stolen from even newer victims.

Nor will this court overlook Huntington's own role in Watson's continued bilking of equipment finance companies for the roughly eight months that followed Rodriguez's April 2004 discovery of Watson's criminal past. Up until then, Huntington's receipt of the suspicious wires from Teleservices was in good faith.[129] However, Huntington has (1) not been able to establish its good faith from that point on because of Rodriguez's failure to share this knowledge;[130] and (2) Huntington was actually turning a blind eye to its mounting suspicions by that summer, letting its overwhelming desire to be repaid dictate its behavior instead.[131]

As critical as these findings were to denying Huntington's claimed defenses under Section 548(c) and 550(b)(1), they are just as important to the overall question of equity now that Huntington reinserts that issue into the equation by citing *Kingsley*. And what the court now concludes is that if Rodriguez had not failed in informing Kalb of Watson's criminal past (1) not only would Huntington likely have put a stop to Teleservices' transfers of stolen money into its accounts, but (2) that its decision to no longer accept those transfers would have just as likely put an end to Watson's

---

[129]*Teleservices*, 444 B.R. at 825-26.

[130]*Id.*

[131]*Id.* at 830.

entire scheme. Therefore, Huntington must bear at least some responsibility for the millions of dollars that continued to be stolen from equipment finance companies from that point on.[132]

In sum, this court has its doubts about *Kingsley*'s unwillingness to include honesty and integrity in assessing whether an active participant to creditor fraud should have to account or not under Section 550. However, even if *Kingsley*'s less demanding expectations were to be accepted, this court is still satisfied that the circumstances here, when considered as a whole, do not warrant Huntington being given any better defense than what Section 550(b)(1) already provides.[133]

## SECTION 544(b) / MUFTA TRANSFERS

Trustee's complaint, as now amended,[134] includes targeted transfers made to Cyberco's Huntington accounts more than a year preceding the commencement of Teleservices' case. There are seventeen of these transfers. All occurred between September 3, 2003 and December 29, 2003.

Trustee cannot avoid these transfers under Section 548 because of the one year limitation then imposed under that section. 11 U.S.C. § 548(a)(1).[135] Therefore, her amended complaint challenges

---

[132]The court recognizes that its last statement would appear to contradict the district court's earlier dismissal of tort claims that some of the equipment finance companies had themselves brought against Huntington under a similar theory. *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 875, 883 (W.D. Mich. 2010). This court, though, is not finding that Huntington in fact committed a tort. It is simply taking into consideration the likely impact of Huntington's own conduct in weighing the equities that Huntington itself has brought into play in its effort to skew an outcome that the law otherwise clearly requires.

[133]*But see infra* **Cyberco's Recovered Preferences**.

[134]*See supra* n.12.

[135]The window is actually two years under the Code as currently enacted. However, that change was made effective on October 15, 2005 and applies only to cases commenced after that date. BAPCPA, Pub. L. No. 109-8, § 1501(b)(1) (2005). *See Barner v. Saxon Mtg. Servs., Inc.*, 597 F.3d 651, 654 (5th Cir. 2010).

68

them instead based upon Section 544(b) and its incorporation of Michigan's own fraudulent transfer laws ("MUFTA").[136]  MUFTA for the most part parallels Section 548.  For example, this court's findings that Teleservices actually intended to defraud its creditors is equally applicable to avoid the 2003 transfers under MUFTA.[137]  However, there are a number of issues that are unique to Trustee's Section 544(b) / MUFTA count.

*Boston Trading, Sharp International,* and *B.E.L.T.*

Huntington has questioned in its most recent brief[138] whether fraudulent intent, actual or otherwise, is even relevant under applicable state law if the intended transferee is a creditor. Although the case law Huntington cites interprets the laws of other states, they, like MUFTA, are close adaptations of model acts concerning fraudulent transfers.  Therefore, consideration of these cases is appropriate.

*Boston Trading*[139] is the oldest of the cases cited.  It involved a court appointed receiver's effort to recover allegedly fraudulent transfers made to Robert Burnazos.  Burnazos had sold Boston Trading Group ("BTG"), one of the companies under receivership, to two individuals.  Those individuals, as BTG's new owners, then made to Burnazos on account of that sale a number of payments that were traceable to monies the two had unlawfully obtained from BTG investor accounts. The receiver contended that the transfers were both actually and constructively fraudulent under

---

[136]Michigan Uniform Fraudulent Transfer Act, MICH. COMP. LAWS §§ 566.31, *et seq.*

[137]The 2003 transfers would also be constructively fraudulent under MUFTA because Cyberco did not give reasonably equivalent value in exchange. MICH. COMP. LAWS § 566.35(1).

[138]*See, e.g.,* Supp. Br. in Opp'n to Trustee's Am. Mo. for Summary Judgment, 3-4, Sept. 23, 2011 (DN 423) (hereinafter "Hunt. Supp. Br., DN 423").

[139]*Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504 (1st Cir. 1987).

69

Massachusetts law. He posited two different theories – either (1) BTG itself was a creditor of BTG's new owners and that the transfers by them to Burnazos had defrauded BTG; or (2) the BTG investor account holders were the creditors and that the payments to Burnazos had defrauded them. The receiver appealed the trial court's dismissal of the actual fraud count under each theory and Burnazos appealed the jury verdict that some, but not all, of the payments he received had to be returned as constructively fraudulent. In reaching that verdict, the jury specifically rejected Burnazos' good faith defense because he had known about the new owners' churning of the investor accounts. *Boston Trading*, 835 F.2d at 1507.

*Boston Trading* is a difficult case to understand because the panel had to explain why the trial court had erred in dismissing the receiver's actual fraud counts and why the jury verdict finding constructive fraud had to be vacated as well. Moreover, each explanation had to address both of the theories posed. Fortunately, Huntington's reliance on *Boston Trading* relates only to the panel's analysis of the actual fraud count under the first of those theories because it is only with respect to that theory that the panel discussed a creditor's immunity from Massachuset's fraudulent transfer laws.

Again, the receiver's first theory had BTG as the creditor being defrauded by the new owners' payments to Burnazos. But in casting BTG as the owners' creditor, the receiver focused only upon the owners' churning of the accounts and the debt to BTG that their dishonesty had created. "In effect, the Receiver argues that Shaw and Kepreos [the owners] took the $473,000 from BTG by fraud (or other dishonest means) and paid it to Burnazos who had full knowledge of their dishonesty." *Id.* at 1510. Churning the accounts, though, had nothing to do with any intent on the part of the owners

70

to defraud BTG through their payments to Burnazos. Therefore, the panel found the receiver's theory flawed. *Id.* at 1510-11.

It was also this flaw that prompted the panel to make the statement Huntington cites in its brief.

> [W]e have found no modern case (nor any reference in any modern case, treatise, or article to any case in the past 400 years) that has found a fraudulent conveyance in such circumstances. That is not surprising, for the fraud or dishonesty in this example concerns not S & K's transfer to B, but *the manner in which the original debt to C arose.* **Fraudulent conveyance law is basically concerned with *transfers* that "hinder, delay or defraud" creditors; it is not ordinarily concerned with how such debts were created.**

*Boston Trading*, 835 F.2d at 1510 (emphasis added).

The panel said that the receiver should have instead sued Burnazos for restitution on the theory that he had received the challenged payments fully aware that BTG's owner had made them in violation of the fiduciary obligations they owed to it. *Id.* at 1511.

This, then, was the first reason why the panel had rejected the receiver's theory that the owners themselves had made the fraudulent transfers. Another was that the targeted transfers under that theory were payments on account of a debt to Burnazos that the two owners had legitimately incurred as part of BTG's sale. These transfers, then, seemed more in the nature of preferences and, as the panel observed, Massachusetts and most other courts have held that preferences are not fraudulent conveyances. *Id.* The panel also offered its own explanation for why the two should not be equated.

> [T]o find an actual intent to defraud creditors when, as in our example, an insolvent debtor prefers a less worthy creditor, would tend to deflect fraudulent conveyance law from one of its basic functions (to

see that an insolvent debtor's limited funds are used to pay *some* worthy creditor), while providing it with a new function (determining *which* creditor is the more worthy).

*Id.* (emphasis in original).[140]

Huntington would like to distill from all this its own dictum that "transfers intended to pay creditors are not fraudulent under state law, even if the funds transferred were derived from criminal or fraudulent activity, and even if the recipient knew of the wrongful activity." Hunt. Supp. Br., DN 423 at 3. However, preferences and fraudulent transfers have never been so neatly divided. Granted, a preference cannot also be a constructively fraudulent transfer because a preference by definition is made on account of an antecedent debt (11 U.S.C. § 547(b)(2)) and payment on account of an antecedent debt will almost always establish the equivalent value needed to negate otherwise constructively fraudulent transfers by an insolvent debtor. *Cf.* 11 U.S.C. § 548(a)(1)(B)(i). On the other hand, a preference is still akin to a constructively fraudulent transfer in the sense that both are avoidable without having to establish actual fraud. The difference between the two lies only in what short of actual fraud is necessary.[141]

Consider, then, a constructively fraudulent transfer instead of a preference. Would anyone ever say that an insolvent debtor's transfer on account of antecedent debt, while certainly not constructively fraudulent, might not still be actually fraudulent if enough other badges of fraud were

---

[140]The panel also said earlier in its opinion: "The basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them." *Boston Trading*, 835 F.2d at 1509 (emphasis in original) (citations omitted).

[141]For additional discussion about the relationship between preferences and actually and constructively fraudulent transfers, *see Teleservices*, 444 B.R. at 800-08.

72

otherwise present?[142] But what if the insolvent debtor had made that same transfer only days before the commencement of his case? Would not that transfer be susceptible to avoidance not only as actually fraudulent but also as a preference? Or, to ask the question differently, would a successful 547(c) defense to the trustee's preference action under such circumstances mean that the court would have to then dismiss as well the trustee's alternative theory of actual fraud no matter how numerous the badges might be?

In fact, these questions are merely rhetorical because the Supreme Court has already said that a "transaction may be invalid as a preference **and** as a fraudulent transfer." *Dean v. Davis*, 242 U.S. 438, 444, 37 S. Ct. 130, 132 (1917) (emphasis added). The difference lies in a preference being only *malum prohibitum* – i.e., prohibited only as a matter of statute – whereas an actually fraudulent transfer is inherently wrong – i.e., *malum per se*. As the Court itself explained in a decision preceding *Dean*:

> The statute recognizes the difference between the intent to defraud and the intent to prefer, and also the difference between a fraudulent and a preferential conveyance. One is inherently and always vicious; the other innocent and valid, except when made in violation of the express provisions of a statute. One is *malum per se* and the other *malum prohibitum*,-and then only to the extent that it is forbidden.

*Van Iderstine v. Nat'l Disc. Co.*, 227 U.S. 575, 582, 33 S. Ct. 343, 345 (1913).

However, having made this observation, *Van Iderstine*, like *Dean*, also recognized that preferences and actually fraudulent transfers are not mutually exclusive – that a debtor can put his property beyond the reach of his creditors just as easily by favoring some creditors and not others.

> There is no necessary connection between the intent to defraud and that to prefer, but in asmuch [sic] as one of the common incidents of

---

[142]*Cf.* MICH. COMP. LAWS § 566.34(2)(i).

> a fraudulent conveyance is the purpose on the part of the grantor to apply the proceeds in such manner as to prefer his family or business connections, the existence of such intent to prefer is an important matter to be considered in determining whether there was also one to defraud.

*Id.* *See also Coder v. Arts*, 213 U.S. 223, 242, 29 S. Ct. 436, 444 (1909) (holding that a debtor's good faith is all that keeps a preference from also being a fraudulent transfer).[143]

Indeed, while Huntington cites two other cases, *Sharp International*[144] and *B.E.L.T., Inc. v. Wachovia Corp.*[145] as also recognizing the supposed mutual exclusivity of preferences and fraudulent transfers, these cases are in fact consistent with *Dean, Van Iderstine*, and *Coder*.  For example, in *Sharp*, the Second Circuit did not reject out of hand the bankruptcy estate's claim that the preferential transfers were also actually fraudulent; rather, it did so only because the estate had not alleged sufficient facts to support the more difficult contention that there had also been actual fraud.  403 F.3d at 56 ("[T]he intentional fraudulent conveyance claims fails [sic] for the independent reason that Sharp [the estate] inadequately alleges fraud with respect to the transaction that Sharp seeks to void . . . [T]he $12.25 million payment was at most a preference between creditors . . . .").  Similarly, in *B.E.L.T.*, the Seventh Circuit said only that the transaction challenged there was best described as "a preference among creditors."  403 F.3d at 477.  It did not, though, say that the transfer could not have been a fraudulent transfer as well.  Rather, the panel found that there simply were not enough facts.

> So did Lacrad repay First Union "with actual intent to hinder, delay, or defraud any creditor of the debtor"? The district judge found the

---

[143]For a more detailed discussion of *Coder, Van Iderstine*, and *Dean, see Teleservices*, 444 B.R. at 800-03.

[144]*Sharp Int'l Corp. v. State St. Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43 (2nd Cir. 2005).

[145]*B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474 (7th Cir. 2005).

> complaint inadequate to allege fraud, which must be pleaded with particularity under Fed.R.Civ.P. 9(b). Although intent may be pleaded generally, the other elements of fraud require details-details that were missing from the complaint and remain missing on appeal.

*Id.* at 478.

Therefore, for all of these reasons, the court rejects Huntington's contention that recipients of transfers on account of antecedent debt are subject to recovery only to the extent that the transfers are avoidable under Section 547 or comparable state preference laws.[146] But Huntington's argument also fails for yet another reason – none of the transfers challenged here were preferential in nature (i.e., on account of an antecedent debt). Remember, the portion of *Boston Trading* that Huntington relies upon relates to the first of the receiver's two theories for recovery against Burnazos – i.e., that the owners had defrauded BTG by transferring their own money to Burnazos. The comparable theory here would be for Trustee to claim that Cyberco, not Teleservices, was the fraudulent debtor and that it is the transfers from Cyberco to Huntington that are to be avoided.[147]

---

[146]Although *Boston Trading*'s citation to Massachusetts case law suggests that preferences are avoidable only under the bankruptcy laws, Michigan's fraudulent transfer laws include the avoidance of what would be considered under Section 547 an insider preference if the creditor had reasonable cause to believe that the debtor was insolvent at the time of the transfer. MICH. COMP. LAWS § 566.35(2).

[147]As already discussed in connection with *Kingsley*, Huntington would like this court to treat the equipment finance companies as effectively having received preferences from Teleservices. It justifies its position by pointing out that a significant portion of what Cyberco was depositing into its Huntington accounts ultimately ended up in the hands of earlier equipment finance companies in the form of debt reductions or lease payments. Huntington resists characterizing Watson's scam as a Ponzi scheme, preferring instead to characterize Teleservices as a "garden variety crook." Hunt. Supp. Br., DN 423 at 4. Nonetheless, it suggests that the necessity of Teleservices' funneling what it had stolen from recent victims back through Cyberco to placate former victims gives the scam enough of a Ponzi flavor to warrant making this leap.

Huntington's argument might have some appeal were it the more recently bilked equipment finance companies making this argument instead. Indeed, the Supreme Court, in adjudging the relative rights of the victims to the original Ponzi scheme, spoke of how equity could override

That, though, is not Trustee's theory. Indeed, the facts here resemble the receiver's second theory – that BTG's investor account holders (i.e., the equipment finance companies here) were the defrauded creditors and that it was BTG (Teleservices here) who was fraudulently transferring its wealth to Burnazos (Cyberco here). However, *Boston Trading* made quick work of this alternative theory for a reason that had nothing to do with Burnazos being a creditor or the transfers being avoidable as preferences instead. Rather, *Boston Trading* found the receiver's avoidance action

---

otherwise plausible legal constructs. *See Cunningham v. Brown*, 265 U.S. 1, 44 S. Ct. 424 (1924). At issue there was the bankruptcy trustee's attempt to recover as preferential payments Mr. Ponzi had made to some nervous investors who had fortuitously demanded the return of their investments before the scheme collapsed. These investors had claimed as their defense that they were simply recovering what they themselves had previously invested. The Court, though, rejected the argument because of the investors' inability to trace. And in doing so, the Court also found inapplicable a venerable tracing rule, finding instead that all of the defrauded investors, no matter what their circumstance, had been transformed by that point into nothing more than creditors of the bankruptcy estate. It said:

> After August 2d the victims of Ponzi were not to be divided into two classes, those who rescinded for fraud and those who were relying on his contract to pay them. They were all of one class, actuated by the same purpose to save themselves from the effect of Ponzi's insolvency. Whether they sought to rescind, or sought to get their money as by the terms of the contract, they were, in their inability to identify their payments, creditors, and nothing more. It is a case the circumstances of which call strongly for the principle that equality is equity, and this is the spirit of the bankrupt law.

265 U.S. at 13, 44 S. Ct. at 427.

It may be at some later point in the administration of the Teleservices bankruptcy case that this court will apply these same equitable principles as it sorts out the claims made by the equipment finance companies against the Trustee's recoveries on the estate's behalf. However, for the reasons already stated in this opinion and numerous other previous opinions, this court sees no merit to the egalitarianism that Huntington demands to be imposed here, especially when the outcome sought takes money away from what could be repaid to the equipment finance companies and puts it into the pocket of someone who has not established its good faith.

76

wanting under this other theory because he lacked standing to act on the investor account holders' behalf.

> In our view, a verdict for the Receiver under either statutory provision is legally improper because in count 4 [i.e., the second theory], the Receiver is suing not on behalf of BTG itself, but solely on behalf of the investors in BTG's commodity pools, and the Receiver lacks the legal authority to bring this kind of suit.

835 F.2d at 1514.

In reaching that conclusion, the panel found in *Caplin v. Marine Midland Grace Trust Co. of NY*,[148] an earlier Supreme Court case, three reasons why the Chapter X trustee in that instance and the receiver before it could not proceed. Those reasons were: (1) neither the Chapter X trustee's nor the receiver's authority extended beyond the claims that the debtor itself could make; (2) the bondholders in *Caplin* and the account holders in *Boston Trading* could bring their own avoidance actions against the defendant; and (3) in each instance, complex litigation issues would arise if the trustee/receiver and the bondholders/account holders were allowed to proceed against the same defendant on parallel paths. *Boston Trading*, 835 F.2d at 1514-15.

However, Trustee's pursuit of Huntington is not based upon either receivership law or the former Bankruptcy Act. Rather, Trustee's power to both avoid and recover the transfers received by Huntington derives from the authority the Code itself gives through Sections 544(b), 548, and 550. Therefore, while standing was an issue in *Caplin* and *Boston Trading*, it is not an issue here.

And the Bankruptcy Code likewise addresses *Boston Trading*'s and *Caplin*'s other two concerns. In particular, the automatic stay imposed by Section 362 prevents Teleservices' creditors (i.e., the victimized equipment finance companies) from proceeding with their own fraudulent transfer

---

[148]406 U.S. 416, 92 S. Ct. 1678 (1972).

actions against Huntington.  *See Meoli v. Huntington Nat'l Bank (In re Teleservices Group, Inc.)*, 463

B.R. 28 (Bankr. W.D. Mich. 2012).  That same stay also eliminates the problem *Boston Trading* and

*Caplin* foresaw of the trustee/receiver going head to head with individual creditors' own avoidance

claims.  *Id.*[149]

---

[149]The Sixth Circuit itself has explained how the automatic stay, combined with other aspects of the Code, brings order to the chaos of competing lawsuits that concerned *Boston Trading* and *Caplin*.

> The corporate Chapter 7 bankruptcy case is designed to provide an orderly proceeding in which the debtor corporation's assets may be marshalled and their pro rata distribution to creditors obtained. To this end the Bankruptcy Court is vested with exclusive jurisdiction over all the debtor's property. *See* 28 U.S.C. § 1471(e) (1982). The filing of a bankruptcy petition operates as a stay of any action to obtain possession of "property of the estate" which is comprised of "all legal or equitable interests of the debtor in property." 11 U.S.C. § 541(a)(1) (1982). *See* 11 U.S.C. § 362(a) (1982). Once the trustee, under the auspices of the Bankruptcy Court, has collected all the debtor's property the Code dictates an elaborate step-by-step distribution order which serves to ensure an equitable distribution of the debtor's assets. *See* 11 U.S.C. § 726 (1982). These characteristics of bankruptcy-the exclusive jurisdiction of the Bankruptcy Court, the stay of any creditors' piecemeal actions to collect the property of the debtor's estate, and the detailed order for distribution of the debtor's assets-protect equal treatment for all creditors and avoid the incoherent dismemberment of the debtor which would occur under a "first-come-first-served" scheme. *See* H.R.Rep. No. 595, 95th Cong., 2d Sess. 178, *reprinted in*, 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6138.

> In a further effort to consolidate all the debtor's assets and distribute them equally between creditors, the Bankruptcy Code contains provisions empowering the court or the trustee in bankruptcy to recover property belatedly, unlawfully, or fraudulently transferred by the debtor in an effort to place it outside the reach of creditors.

*N.L.R.B. v. Martin Arsham Sewing Co.*, 873 F.2d 884, 887 (6th Cir. 1989).

Therefore, this court does not find *Boston Trading* or, for that matter, *Sharp International* or *B.E.L.T.*, dispositive. Trustee without question has the authority as the representative of the Teleservices bankruptcy estate to seek the avoidance of the fraudulent transfers that Huntington received both directly from Teleservices and indirectly as a subsequent transferee under Section 550(a)(2). Moreover, even if the law were to immunize recipients of preferences from also being challenged as recipients of actually fraudulent transfers, Huntington would not be entitled to that defense in this instance because none of the transfers Teleservices made to either Huntington or Cyberco were preferential within the meaning of Section 547(b). That is, none of the transfers were on account of an antecedent debt because neither Huntington nor Cyberco received any of those transfers as Teleservices' creditor.

Other Section 544(b) / MUFTA Arguments

Huntington also raises other arguments that are unique to Section 544(b) avoidance actions. Huntington first focuses on Section 544(b) itself. That section provides, in relevant part:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor **that is voidable under applicable law by a creditor holding an unsecured claim** that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1) (emphasis added).

There must, then, be at least one current creditor of the estate who was also a creditor at the time of the challenged transfer in order for a trustee to exercise his avoidance powers under this section. However, Trustee has identified only a single Teleservices creditor, Orlan Capital Bank, as meeting this requirement. Huntington points out as well that Orlan's claim is at most the $3,580,715.10 it was tricked into paying to Teleservices as part of Watson's scam. What Huntington contends is that this

is also the maximum amount that Trustee can avoid under Section 544(b) because it is all that Orlan would have been able to recover had Orlan itself attempted to avoid the transfer under MUFTA.[150]

Huntington's argument has merit if only the Michigan statute is considered. Unlike Section 548, which has the trustee effectively representing all creditors, MUFTA allows each creditor to proceed individually. Accordingly, transfers found to be fraudulent under its provisions are to be avoided only "to the extent necessary to satisfy the creditor's claim." MICH. COMP. LAWS § 566.37(1)(a).

However, as compelling as Huntington's argument may first seem, it is Section 544(b), not MUFTA, that controls. As for that section, it requires only that the targeted transfer be "avoidable," which would certainly be the case if Orlan had substituted for Trustee with respect to any of the transfers made in 2003. Of course, Trustee would still have a problem if Section 544(b) also required her to look to state law for a remedy. But the Bankruptcy Code designates Section 550, not state law, as providing the remedies for avoided Section 544(b) transfers and that section clearly permits recovery of the entire transfer avoided as opposed to what might otherwise be available as the remedy were state law to apply. *Cf. Suhar v. Burns (In re Burns)*, 322 F.3d 421, 427 (6th Cir. 2003) ("[A]voidance and recovery are distinct concepts and processes.").[151] Therefore, the court concludes

---

[150]Hunt. Supp. Br., DN 423 at 1.

[151]Huntington argues that Section 550(a)'s own limitation on the magnitude of avoidance ("... to the extent that a transfer is avoided ....") lends support to its contention that Trustee should only to able to recover under Section 544(b) what would be permitted under MICH. COMP. LAWS § 566.37(1). That argument might warrant further consideration were Section 550(a) to address transfers avoided under Section 544(b) alone. However, Section 550(a) covers many other types of avoidable transfers and it is because of these other transfers that Section 550(a) permits a recovery only "to the extent that a transfer is avoided ...." For example, while a payment on account of an antecedent debt may generally be avoidable as a preference under Section 547(b), it is in fact not avoidable "to the extent" contemporaneous value is exchanged under Section 547(c)(1), "to the

that Trustee's identification of only Orlan as a qualifying creditor under Section 544(b)(1) imposes no limitation upon Trustee's ability (1) to avoid all of the 2003 transfers from Teleservices to Cyberco's Huntington accounts; or (2) to then seek recovery from Huntington under Section 550 for the same. *See also* 5 *Collier on Bankruptcy* ¶ 544.06[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011).[152]

*Alliance Bancorp*

Huntington also cites an unpublished Michigan Court of Appeals opinion for the proposition that MUFTA does not apply to funds obtained by fraud or theft. *See Alliance Bancorp. v. Select Mortg., L.L.C.*, No. 274853, 2008 WL 724092 (Mich. Ct. App. Mar. 18, 2008). *Alliance Bancorp* involved a debtor who had amassed his fortune through fraud. At issue was whether the debtor had also violated MUFTA when he later transferred a large amount of that wealth to others. The panel

---

extent" the transfer is in the ordinary course under Section 547(c)(2), or "to the extent" new value is given under Section 547(c)(4). *See also* 11 U.S.C. §§ 548(c) and 553(b).

[152]Huntington cites *Dahar v. Jackson (In re Jackson)*, 318 B.R. 5 (Bankr. D. N.H. 2004) for the proposition that state avoidance laws provide for equitable adjustments and therefore Huntington is entitled to such adjustments with respect to the transfers that are only avoidable under Section 544(b) and applicable state law. Indeed, Michigan's and New Hampshire's fraudulent transfer laws are identical, with each providing for adjustment of any money judgment awarded "as the equities may require." MICH. COMP. LAWS § 566.38(3) and N.H. REV. STAT. ANN. § 545-A:8 (III).

*Jackson* permitted an adjustment in that instance because of its conclusion that Section 544(b) required it to apply New Hampshire fraudulent transfer law, including the equitable adjustment provision. *Id.* at 26-28. However, for the reasons just given, this court disagrees with *Jackson* on this point. Section 550(a), not state law, dictates what the trustee may recover with respect to an avoided Section 544(b) transfer. But, with this said, the discretion given to the court under Section 550(a) to award value offers the same opportunity for adjustment when only a money judgment is sought. *See supra First Financial* and *Sawran*. Indeed, it is likely as not that Congress was attempting to mimic the equitable adjustment provisions of comparable state fraudulent transfer laws when it left awards of value under Section 550(a) to the court's discretion.

81

concluded that he had not because the debtor had no legal interest in what had been transferred. *Id.* at *2.

In reaching its conclusion, the panel relied upon the Sixth Circuit's decision in *In re Newpower*[153] and that case's own reference to Michigan law concerning the ownership of stolen property. However, *Alliance Bancorp* failed to appreciate an important distinction in *Newpower*. There is no question that a thief who commits the crime of larceny (i.e., taking another's property without the owner's consent) gains no title to what has been stolen. Title remains instead with its rightful owner. However, if the theft is accomplished by false pretenses, title is transferred because the "owner intend[ed] to part with both title and possession, albeit for the wrong reasons." *Newpower*, 233 F.3d at 929. Or, to put it differently, when the thief "fraudulently convinces another to part with *both* possession and title to the property [i.e., commits the crime of false pretenses] . . . the offender obtains voidable title to the property." *Id.* (emphasis in original).[154]

Therefore, *Alliance Bancorp*'s conclusion that the debtor in that instance had not acquired a transferable interest in his victims' money is simply wrong. Nor is the distinction that it makes between legal and illegal ownership correct, for MUFTA requires only that the debtor had intended

---

[153]*Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922 (6th Cir. 2000).

[154]*See also Teleservices*, 444 B.R. at 787 (citation omitted).

> Ownership might have been a question had Teleservices taken the money at gunpoint instead. However, in this instance all of the victims' money had been willingly transferred to Teleservices, albeit under false pretenses. Consequently, Teleservices would have obtained under the law a sufficient interest in what it had stolen in order to have made a cognizable Section 548(a) transfer of its property when it then used the purloined funds to pay off the remainder of Cyberco's debt to Huntington.

to transfer something in which he had an interest.  As the panel itself noted, "'[a]sset' means property of a debtor, and 'property' is **anything** that may be the subject of ownership." *Alliance Bancorp* at *2 (citing MICH. COMP. LAWS §§ 566.31(b) and (j)) (emphasis added).  And finally, apart from its misinterpretation of the law, *Alliance Bancorp* offers no other explanation for why the victim of a party's fraud should not have recourse to Michigan fraudulent transfer laws in addition to any other remedy that might be available to it.

This court certainly recognizes the deference it is to give to a state court's interpretation of its own laws.  However, in this instance, that interpretation is set forth in an unpublished opinion which has no binding effect.  *Cf.* MCR 7.215(C)(1).  Moreover, *Alliance Bancorp* is not a decision by Michigan's highest court and this court is persuaded for the reasons given that Michigan's Supreme Court would not adopt *Alliance Bancorp* were it to be presented with the same issue.  *Cf. Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1140 (6th Cir. 1986) (court holding that an intermediate state court's decision on point is controlling regarding an interpretation of that state's law "unless it [the federal court] is convinced by other persuasive data that the highest court of the estate would decide otherwise." (citation omitted)).[155]

Huntington's Lien

Huntington's final argument concerning Trustee's Section 544(b) claim relates to the security interest that attached to the same Huntington accounts into which the 2003 (and, for that matter, the 2004) transfers from Teleservices to Cyberco were being deposited.  It makes this argument because MUFTA excludes from its scope "the transfer of any asset that 'is encumbered by a valid lien.'"[156]

---

[155]*See Puckett v. Tenn. Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir. 1989).

[156]Hunt. Br., DN 382 at 66 (citing MICH. COMP. LAWS § 566.31(b)(i)).

Unfortunately, Huntington's argument applies only with respect to the initial transfer itself and, in this instance, the initial transferee of all of the 2003 transfers was Cyberco, not Huntington. In other words, had Teleservices been indebted to Cyberco and had Cyberco also held a lien in Teleservices' Silicon Valley account, then Teleservices' transfers from Cyberco would not have been fraudulent to the extent the transfers paid down that debt. The reason why is that the previously granted lien would have had the effect of Cyberco being paid with something already given to it. *See also Richardson v. Huntington Nat'l Bank (In re Cyberco Holdings, Inc.)*, 382 B.R. 118, 139-42 (Bankr. W.D. Mich. 2008).[157]

However, Cyberco was not a creditor of Teleservices nor, for that matter, did it hold a lien in the Silicon Valley account. As for Huntington, it was the subsequent, not the initial transferee, of all of these transfers. Therefore, while its lien certainly would have attached to the voidable wire transfers when deposited into Cyberco's accounts with it, that lien would not have offered Huntington any additional protection from what otherwise was its liability under Section 550(a)(2) for receiving an already avoided transfer from Teleservices to Cyberco. Rather, Section 550(b)(1) dictated its defense and, as already discussed, it was not available with respect to the 2003 transfers because of Huntington's deemed knowledge of their voidability. *Cf. Teleservices*, 444 B.R. at 830-40.

---

[157]Fraudulent transfers avoidable under Section 548 are similarly influenced by liens against the original property transferred. However, in that instance it is the exclusion of liens from what constitutes the property transferred that accomplishes the limitation. In other words, only the "interest of the debtor in property," 11 U.S.C. § 548(a)(1), is subject to avoidance, not the property as a whole. Consequently, this reason that a trustee's attempted recovery of fully encumbered property, no matter how fraudulent, would be pointless under either Sections 548 or 544(b). *Id.*

## PREJUDGMENT INTEREST

Trustee also includes in her motion the request that the estate be awarded prejudgment interest should summary judgment be granted in the estate's favor. Although not altogether clear, it appears that Trustee would prefer that interest be added from the date each transfer occurred as opposed to from the date Trustee filed her complaint. As authority, Trustee points to the court's ability under Section 550(a) to award "value" in lieu of ordering the return of the avoided transfer itself. *See, e.g., CNB Int'l, Inc. v. Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 335-36 (Bankr. W.D.N.Y. 2008). However, Trustee also acknowledges that (1) any award under Section 550(a) is left to the sound discretion of the trial court; and (2) whatever is awarded should be compensatory, not punitive. Br. in Supp. of Trustee's Am. Mo. for Summary Judgment, 36-37, Jan. 21, 2005 (DN 269).

With this in mind, the court concludes that Huntington is also liable for prejudgment interest, but only with respect to those transfers received by Huntington on or after April 30, 2004, the date when Huntington could no longer establish its good faith. Trustees frequently request this court to award the value of the avoided transfer instead of ordering the property's return. And perhaps this court would add interest to every such request were it required to award value whenever asked. However, as Section 550(a) makes clear, value is to be awarded only when the court so orders.

The problem, of course, is that there is no apparent justification for awarding interest if the court orders the return of the property instead. One can certainly understand why a trustee would prefer receiving the value of an avoided transfer of inventory over having to recover and liquidate the inventory himself. However, if that inventory is still sitting on the transferee's loading dock, is not its return the proper remedy? Moreover, even were the court inclined to award value, common sense

85

says that there should be an adjustment downward to reflect the estate's savings in freight and selling costs, not an adjustment upward for interest earned on something yet to be converted into money.

Granted, the trustee might still argue that the transferee's resistance had delayed the property's liquidation. But even here it is seldom the transferee's fault that an avoidance is being sought. After all, it was the debtor who made that transfer. Indeed, in most instances, it is only the debtor's insolvency that has raised questions about an otherwise valid transaction. Why, then, should the transferee have to compensate the estate for the time spent trying to keep something that under any other circumstance would have continued to be his?

Nor does this court see any reason to come to a different conclusion because money, not physical property, is involved. Again, Watson could have made each of the transfers Trustee now seeks to avoid and recover with suitcases of cash rather than by wire. It is equally conceivable that Huntington could have put all of those suitcases in a corner of its vault for safekeeping. But if that had occurred, the appropriate remedy under Section 550 would have been simply to return the suitcases to the estate. Whether interest should also be awarded would depend upon the entirely different question of whether Huntington had also reached an agreement to pay interest or not while Huntington kept the suitcases on Cyberco's behalf.

In sum, awarding value under Section 550(a) is only one component of an overall statutory scheme where another component is the return of the avoided transfer itself and another is no recovery at all.[158] Moreover, what value to award is left entirely to the court's discretion. And while that discretion is typically exercised to compensate the estate whenever the return of the actual

---

[158]For example, the preferential or fraudulent granting of a lien in property otherwise in the estate's possession would require only the court's declaration that the lien was void under Section 547 or 548.

86

property is either impractical or unfair, there is no guaranty.[159]  Rather, that same discretion allows

for the possibility that no value will be awarded or that interest may not be added.[160]

Using, then, the discretion that Section 550(a) provides, the court concludes that Trustee is

entitled to prejudgment interest, but only with respect to the transfers for which Huntington has not

established its good faith.  As already discussed, an unsuspecting recipient of an avoidable transfer

should be immune from any claim that the debtor's decision to make that transfer delayed

administration of that asset.  But in this instance, the court has found that Huntington had turned a

blind eye to the deposits being made by the summer of 2004 and that it had not otherwise met its

burden of establishing its good faith from April 30, 2004 on.[161]  Therefore, the court finds that

Huntington does share responsibility for the voided transfers for this interval, including responsibility

for the interest that would have accrued had these particular transfers never been made.  Accordingly,

---

[159]See supra First Financial and Sawran.

[160]Indeed, were there to be such a guaranty, it would inevitably beg the question as to why interest is to be added only when value is awarded in lieu of the property's return.  In other words, if the estate is to be compensated whenever dispossession has resulted in a time differential loss, then should not interest be awarded for instances where the avoided transfer is itself returned as opposed to just avoided transfers involving the award of value?

[161]This court has considered the option of awarding interest for all of the avoided transfers on the basis that Huntington has also been found to have had knowledge of the avoidability of those transfers.  Cf. 11 U.S.C. § 550(b)(1).  However, this court has chosen not to use its discretion to include additional interest for the transfers preceding May 1, 2004 because Huntington's "knowledge" was not actual, but only assumed based upon Nordic Village's objective standard.  Cf. Teleservices, 444 B.R. at 835-40.  While the court has applied that standard, albeit reluctantly, to hold Huntington responsible for the additional $23,020,193.86 these transfers represent, this court nonetheless concludes that Huntington can legitimately be charged interest under Section 550(a) only with respect to those deposits made after Huntington could no longer establish a good faith excuse for accepting them (i.e., April 30, 2004).

87

the court's Section 550(a) award of value against Huntington will reflect the lost interest for the transfers made during this interval.[162]

## CYBERCO'S RECOVERED PREFERENCES

Huntington's final argument relates to the recovery of preferences by Thomas Richardson, Cyberco's bankruptcy trustee, on behalf of that estate. The court understands that Richardson's effort has yielded in excess of $4 million to date.

Ordinarily, what a trustee avoids and recovers in one estate is irrelevant to a trustee's administration in another. However, in this instance, most, if not all, of what Richardson has recovered as avoidable preferences[163] in the Cyberco case is attributable to monies that Cyberco itself had received as the initial transferee of fraudulent transfers from Teleservices. Therefore, Huntington wants credit for what it contends the Cyberco estate itself should now have to give back.

Huntington's argument has merit. Assume for a moment that Cyberco had used one of the hypothetical suitcases of cash to prefer a creditor. If, upon avoidance, that creditor still had the suitcase, it is likely that its return to the Cyberco estate would be ordered. But would not the Cyberco trustee in turn have the same responsibility to account to the Teleservices estate for that same suitcase? After all, it was Teleservices' suitcase in the first place and Cyberco gained control of it only because Cyberco itself was the beneficiary of a fraudulent transfer. And if that is to be the outcome, then Huntington should certainly no longer have to account for that same suitcase.

---

[162]Exhibits 1 and 2 to Trustee's May 20, 2011 motion to amend (DN 373) indicates that the transfers made on or after April 30, 2004, whether directly by check or indirectly by wire into Cyberco's Huntington accounts total $49,731,333.54.

[163]Although this discussion would apply to all avoided transfers in Cyberco, the court will for convenience refer only to preferences that have been avoided.

Indeed, this argument is just a variation of the one Huntington has made in the Cyberco bankruptcy case in responding to Richardson's attempts there to recover from it as preferences the same suitcases, if you will, that Meoli is attempting to recover here. Huntington's legitimate complaint, which is now set forth as a motion for summary judgment, is that it should not have to account twice to two different estates for the same transfer. Nor does this court believe that Huntington should be so exposed for reasons that it will soon give in a bench opinion granting Huntington's motion.

Suffice it to say here that Section 550 does not offer any explicit mechanism to prevent two estates from doubling up against the same transferee. But once again the court finds an answer in the overall discretion that Section 550(a) provides. In this instance, Huntington has clearly received as a Section 550(a)(2) transferee some fraudulent transfers from Teleservices to Cyberco that Cyberco in turn has just as clearly used to prefer Huntington as a Section 550(a)(1) transferee. If these transfers were both accomplished with the same suitcase of cash and Huntington still had that suitcase, the fair resolution of Huntington's dilemma would be for one court to order the suitcase's return to the Teleservices estate and the other court to deny Cyberco estate's competing request for value in lieu thereof. After all, the Cyberco estate, as an initial transferee, would have had to account to the Teleservices trustee in any event had that estate recovered it from Huntington as a preference first.

Turning now to the instant problem, Meoli is in effect asking this court to award the Teleservices estate the value of fraudulently transferred "suitcases" that Huntington no longer holds but that the Cyberco estate has now recovered from others. It does not seem unreasonable, then, for Huntington to demand that Meoli first attempt to get these suitcases back from Cyberco. And

89

likewise, it would not be unreasonable for this court to refuse to award the Teleservices estate the value of those suitcases were Meoli to leave that avenue of recovery untouched.

However, the record at this point is not complete enough for this court to determine conclusively one way or the other as to whether Huntington should receive a credit under this theory or what the amount of that credit might be. Moreover, Trustee's motion to disallow this defense altogether as untimely has yet to be decided. Therefore, the court will not issue its final report and recommendation until that motion is heard and, if denied, until the issues regarding this final defense are determined at the trial now scheduled for the end of April. However, trial will be limited to only these issues and Trustee's proofs regarding the appropriate interest rate.[164]

## CONCLUSION

The court finds that, with the exception of Huntington's request for credit on account of the recovered Cyberco preferences, there remains no genuine issue of fact and that Trustee prevails as a matter of law with respect to its motion for summary judgment. In particular, the court makes all of the following determinations in Trustee's favor:

> 1.     Teleservices and Cyberco are distinct legal entities that will be kept separate for purposes of assessing Huntington's liability.

> 2.     The Silicon Valley account, together with all amounts Silicon Valley credited to that account, belonged to Teleservices, not Cyberco. Consequently, all transfers from that account to either Huntington directly through checks written on that account or to Huntington indirectly through wire transfers made into Cyberco's Huntington accounts were transfers of Teleservices' property for purposes of Section 548(a) and MICH. COMP. LAWS § 566.31.

---

[164]Trustee's motion challenging this defense is scheduled for April 18, 2012. The court will, in the interim, amend its final pretrial order to both eliminate issues that have now been disposed of by the partial granting of Trustee's summary judgment motion and to further elaborate upon what it believes are the issues that must be addressed in connection with this final defense. The parties will be given an opportunity to discuss and refine those issues at the April 18, 2012 hearing in the event Trustee's motion is denied.

3.     All of the transfers made by Teleservices from the Silicon Valley Bank account either directly to Huntington through checks written on that account or indirectly through the wire transfers to Cyberco's Huntington accounts were made with the actual intent to hinder, delay, or defraud Teleservices' creditors. *Cf.* 11 U.S.C. § 548(a)(1)(A) an MICH. COMP. LAWS § 566.34(1)(a).

4.     All of the transfers made by Teleservices from the Silicon Valley account either directly to Huntington through checks written on that account or indirectly through the wire transfers to Cyberco's Huntington accounts were made while Teleservices was insolvent and without Teleservices receiving reasonably equivalent value in exchange. *Cf.* 11 U.S.C. § 548(a)(1)(B) and MICH. COMP. LAWS § 566.35(1).

5.     Huntington was the initial transferee of the checks written by Teleservices on the Silicon Valley account. 11 U.S.C. § 550(a)(1).

6.     Huntington, as the initial transferee, did not receive any of those checks for value or in good faith. 11 U.S.C. § 548(c) and MICH. COMP. LAWS § 566.38(1).

7.     Cyberco was the initial transferee of the wire transfers to Cyberco's Huntington accounts. 11 U.S.C. § 550(a)(1).

8.     Cyberco, as the initial transferee, did not receive any of the wire transfers into its Huntington accounts for value or in good faith. *Cf.* 11 U.S.C. § 548(c) and MICH. COMP. LAWS § 566.38(1).

9.     Huntington was the immediate transferee of the wire transfers into Cyberco's Huntington accounts. 11 U.S.C. § 550(a)(2).

10.     Huntington, as the immediate transferee, did not establish its good faith with respect to any of the wire transfers made on or after April 30, 2004. 11 U.S.C. § 550(b)(1).

11.     Huntington, as the immediate transferee, had knowledge of the avoidability of all of the wire transfers. 11 U.S.C. § 550(b)(1) and *Nordic Village*, 915 F.2d 1049.

12.     With the exception of any credit that may be given for the Cyberco trustee's recovery of preferences, entering judgment against Huntington for all transfers avoided under Section 548 or 544(b) is appropriate notwithstanding the court's discretion under Section 550(a) to award a lesser amount.

13.     With the exception of any credit that may be given for the Cyberco trustee's recovery of preferences, the amount recoverable from Huntington is $72,751,527.40. 11 U.S.C. § 550.

14.     Huntington is also liable for prejudgment interest with respect to all avoided transfers it received on or after April 30, 2004.

The court will issue a separate order consistent with this opinion.

_____   3/30/12
Hon. Jeffrey R. Hughes
United States Bankruptcy Judge


Signed this 30th day of March,
2012 at Grand Rapids, Michigan.